**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LAND GRANTORS IN HENDERSON, UNION and WEBSTER COUNTIES, KENTUCKY and THEIR HEIRS, | ) | |
| Claimants, | ) | |
| v. | ) | No. 93-648-1L |
| | ) | Judge Susan G. Braden |
| THE UNITED STATES | ) | |
| Defendant. | ) | |

**UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, MOTION FOR JUDGMENT ON THE RECORD**

## TABLE OF CONTENTS


**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**MEMORANDUM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**I. PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**A. Pre-Trial Proceedings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**B. The Court's *Sua Sponte* Document Requests and the First Interim Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**C. Events Subsequent to the Issuance of the First Interim Report** . . . . . . . . . . . 4

**II. STANDARDS OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**III. ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**A. This is a Congressional Reference Proceeding, and the Court Lacks Jurisdiction to Enter Final Judgment Under the Tucker Act** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**B. Claimants Lack Standing to Bring a Tucker Act Claim** . . . . . . . . . . . . . . . . 13

**C. Claimants' Tucker Act Claim Is Barred by the Six-Year Statute of Limitations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**1. Claimants' Mutual Mistake Claim Accrued No Later Than September 1967, and Is Therefore Barred by the Statute of Limitations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**2. The Doctrine of Equitable Tolling Is Not Available** . . . . . . . . . . . . . . 18

**i. Even if Equitable Tolling Is "Available in a Sufficiently Analogous Private Suit," this Claim Would Still Be Time Barred** . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**ii. Congress Has Expressed a Clear Intent that Equitable Tolling Should Not Apply in Section 2501** . . . . . . . 21

**3. Even if Equitable Tolling Is Permitted Under Section 2501, the Facts of this Case Do Not Warrant Application of the Doctrine** . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**i. Claimants Did Not Diligently Pursue Their Legal Rights** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**ii. No Extraordinary Circumstance Stood in the Way of Any Claimant Asserting His or Her Legal Right** . . . 31

**a. "The record evidences that numerous requests/petitions were made by the former landowners to repurchase their land after World War II ended." Land Grantors I, 64 Fed. Cl. at 713.** . . . . . . . . . . . . . . . 33

**b. "The record also evidences that there was considerable confusion about what federal office was responsible for decisions about disposal of Camp Breckinridge that was caused by the Government." Land Grantors I, 64 Fed. Cl. at 713.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**c. "The record evidences no public notice or local news article[s] about the 1957 lease to Felmont Oil or [the] 1959 lease to Kingwood Oil at the time they were entered." Land Grantors I, 64 Fed. Cl. at 714.** . . . . . . . . . . . . . . . 37

**d. "Landowners living in the Henderson, Union, and Webster County areas may have assumed, albeit erroneously, that sufficient efforts were made to preserve their legal rights to benefit from the doctrine of equitable tolling by the filing of the Higginson complaint." Land Grantors I, 64 Fed. Cl. at 715.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

e. **"Plaintiffs did not have the ability to compel the Government to obtain and release information about the 1957 and 1959 leases and 1965 sales" because the "Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, ("FOIA") was not enacted until 1966." Land Grantors I, 64 Fed. Cl. at 715.** . . . . . . . . . . . . . . . 40

iii. **The United States is Significantly Prejudiced by Application of the Doctrine of Equitable Tolling** . . . . . . . . . . 41

4. **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

D. **Count I is Barred by the Doctrine of Laches** . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

E. **Count I Must be Dismissed for Failure to State a Claim Upon Which Relief Can Be Granted** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

1. **Claimants' Right to Avoid the Contracts Are Barred for Failure to Act Within a Reasonable Time** . . . . . . . . . . . . . . . . . . . . . . . 44

2. **Subsequent Discovery of Commercially Valuable Mineral Deposits Cannot Retroactively Create a Mistake of Fact** . . . . . . . . . 45

3. **The Alleged Mistake of Fact Did Not Have a Material Effect on the Parties' Bargain** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

4. **The Former Landowners Bore the Risk of Mistake** . . . . . . . . . . . . . . 48

F. **In the Alternative, Count I Cannot Be Supported Under the Trial Record Generated in Land Grantors v. United States, No. 94-643X (Fed. Cl.)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

1. **The Parties Were Not Mistaken About Any Fact** . . . . . . . . . . . . . . . . 52

2. **There Was No Subsequent Discovery of Any Mistake of Fact** . . . . . 58

3. **Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

G. **Claimants Failed to Prove Damages Caused by the Alleged Mutual Mistake** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

IV. **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

## TABLE OF AUTHORITIES

### FEDERAL CASES

Aetna Casualty & Surety v. United States,
228 Ct. Cl. 146 (1981) . . . . . 65

Alder Terrace, Inc. v. United States,
161 F.3d 1372 (Fed. Cir. 1998) . . . . . 7

Allen v. Wright,
468 U.S. 737 (1984) . . . . . 13

Anderson v. United States,
344 F.3d 1343 (Fed. Cir. 2003) . . . . . 13

Anderson v. United States,
73 Fed. Cl. 199 (2006) . . . . . 65

Bailey v. West,
160 F.3d 1360 (Fed. Cir. 1998) (en banc) . . . . . 24

Baldwin County Welcome Center v. Brown,
466 U.S. 147 (1984) . . . . . 25, 41

Bowen v. City of New York,
476 U.S. 467 (1986) . . . . . 24

Brice v. Sec'y of Health & Human Servs.,
240 F.3d 1367 (Fed. Cir. 2001), cert. denied, 534 U.S. 1040 (2001) . . . . . 19

Burger King Corp. v. Mason,
710 F.2d 1480 (11th Cir. 1983) . . . . . 66

Campbell v. Potter,
2004 WL 2861871 (E.D. Pa. Dec. 9, 2004) . . . . . 28

Colorado Coal & Iron Co. v. United States,
123 U.S. 307 (1887) . . . . . 44-46

Dairyland Power Coop. v. United States,
16 F.3d 1197 (Fed. Cir. 1994) . . . . . 43, 46

Drew v. Dep't of Corrections,
297 F.3d 1278 (11th Cir. 2002), cert. denied, 537 U.S. 1237 (2003) . . . . . . . . . . . . . . . . 28

DuMarce v. Scarlett,
446 F.3d 1294 (Fed. Cir. 2006), cert. denied, _ U.S. _, 127 S.Ct. 1335 (2007) . . . . 19, 26

Emerald Maint., Inc. v. United States,
925 F.2d 1425 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Entines v. United States,
39 Fed. Cl. 673 (1997), aff'd, 185 F.3d 881 (Fed. Cir. 1999),
cert. denied, 526 U.S. 1117 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Erickson Air Crane Co. v. United States,
731 F.2d 810 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Eurell v. United States,
566 F.2d 1146 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fallini v. United States,
56 F.3d 1378 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996) . . . . . . . . . . . . . . . . 17

Figueroa v. United States,
57 Fed. Cl. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Firestone & Parson, Inc. v. Union League of Philadelphia,
672 F.Supp. 819 (E.D. Pa. 1987), aff'd, 833 F.2d 304 (3rd. Cir. 1987) . . . . . . . . . . . . . 20

Flippin Materials Co. v. United States,
160 Ct. Cl. 357 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

Frazer v. United States,
288 F.3d 1347 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Godley v. United States,
5 F.3d 1473 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Grymes v. Sanders,
93 U.S. 55 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 44, 45

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . 63

Higginson v. United States,
Case No. 2074 (W.D. Ky. Sept. 7, 1965) (unpublished),
aff'd, 384 F.2d 504 (6th Cir. 1967), cert. denied, 390 U.S. 947 (1968),
reh'g denied, 391 U.S. 961 (1968) . . . . . . . . . . 18, 48

Hopland Band of Pomo Indians v. United States,
855 F.2d 1573 (Fed. Cir. 1988) . . . . . . . . . . 24

Irwin v. Dep't of Veterans Affairs,
498 U.S. 89 (1990) . . . . . . . . . . 18, 25-31

John R. Sand & Gravel Co. v. United States,
457 F.3d 1345 (Fed. Cir. 2006), reh'g en banc denied (Nov. 30, 2006),
cert. granted in part, _ U.S. _, 127 S.Ct. 2877 (2007) . . . . . . . . . . 17

Kanehl v. United States,
38 Fed. Cl. 89 (1997), adopted by
Kanehl v. United States, 40 Fed. Cl. 762 (1998) . . . . . . . . . . 28

Kirkendall v. Dep't of Army,
479 F.3d 830 (Fed. Cir. 2007) (en banc),
petition for cert. filed, 76 USLW 3009 (July 5, 2007) . . . . . . . . . . 19, 22-24

Lampf v. Gilbertson,
501 U.S. 350 (1991) . . . . . . . . . . 24

Land Grantors v. United States,
64 Fed. Cl. 661 (2005) . . . . . . . . . . passim

Land Grantors v. United States,
69 Fed. Cl. 435 (2005) . . . . . . . . . . 4, 11, 42

Land Grantors v. United States,
71 Fed. Cl. 614 (2006) . . . . . . . . . . 27, 29, 37, 42

Land Grantors v. United States,
74 Fed. Cl. 518 (2006) . . . . . . . . . . 3, 5, 27, 37, 39, 59, 60

Land Grantors v. United States,
77 Fed. Cl. 686 (2007) . . . . . . . . . . 6, 9, 11

Landmark Land Co. v. FDIC,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

MacLean v. United States,
454 F.3d 1334 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Martinez v. United States,
333 F.3d 1295 (Fed. Cir. 2003) (en banc),
cert. denied, 540 U.S. 1177 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19, 25-27

Miller v. Albright,
523 U.S. 420 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mobil Oil Exploration & Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

N.Y. Life Ins. Co. v. United States,
190 F.3d 1372 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Nat'l Austl. Bank v. United States,
452 F.3d 1321 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 43, 44

Northrop Grumman Corp. v. United States,
47 Fed. Cl. 20 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Pace v. DiGuglielmo,
544 U.S. 408 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 31

Paine Webber Real Estate Sec., Inc. v. D.G. Meyer & Co.,
835 F.Supp. 116 (S.D.N.Y. 1993), aff'd, 9 F.3d 242 (2nd Cir. 1993) . . . . . . . . . . . . . . . 20

Palumbo v. Ewing,
540 F. Supp. 388 (D. Del. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Philippine Sugar Estates Dev. Co. v. Government of Philippine Islands,
247 U.S. 358 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Powers v. Ohio,
499 U.S. 400 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Price v. Symsek,
988 F.2d 1187 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Principal Life Ins. Co. v. United States,
70 Fed. Cl. 144 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Ransom v. United States,
900 F.2d 242 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Santana-Venegas v. Principi,
314 F.3d 1293 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

School Dist. of City of Allentown v. Marshall,
657 F.2d 16 (3rd Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Sicom Sys., Ltd. v. Agilent Techs., Inc.,
427 F.3d 971 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Singleton v. Wulff,
428 U.S. 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-16

Southwest Welding & Mfg. Co. v. United States,
179 Ct. Cl. 39, 373 F.2d 982 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Truckee-Carson Irrigation Dist. v. United States,
14 Cl. Ct. 361 (1988), aff'd, 864 F.2d 149 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Beggerly,
524 U.S. 38 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Brockamp,
519 U.S. 347 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Virginia v. Am. Booksellers Ass'n,
484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Wallace v. Kato,
_ U.S. _, 127 S.Ct. 1091 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Warren v. United States,
74 Fed. Cl. 723 (2006) . . . . . . . . . . 26

**STATE CASES**

Allied Chem. Corp. v. Union County Bd. of Supervisors,
511 S.W.2d 196 (Ct. App. Ky. 1974) . . . . . . . . . . 47

City of New Bedford v. Lloyd Inv. Ass'n,
363 Mass. 112, 292 N.E.2d 688 (1973) . . . . . . . . . . 20

Developers Three v. Nationwide Ins. Co.,
582 N.E.2d 1130 (Ohio App. 1990) . . . . . . . . . . 66

Haag v. State Bd. of Univ. & School Lands,
219 N.W.2d 121 (N.D. 1974) . . . . . . . . . . 45

Hollifield v. Blackburn,
294 Ky. 74, 170 S.W.2d 910 (1943) . . . . . . . . . . 21

Krahmer v. Christie's Inc.,
903 A.2d 773 (Del. Ch. 2006) . . . . . . . . . . 20

McNeely v. Philadelphia Nat'l Bank,
314 Pa. 334 (1934) . . . . . . . . . . 20

**FEDERAL STATUTES**

Freedom of Information Act, 5 U.S.C. § 552 . . . . . . . . . . 33, 40

28 U.S.C. § 1346 . . . . . . . . . . 39

28 U.S.C. § 1491 . . . . . . . . . . 3, 4, 5

28 U.S.C. § 1492 . . . . . . . . . . 1, 6, 8, 13

28 U.S.C. § 2501 . . . . . . . . . . passim

28 U.S.C. § 2509 . . . . . . . . . . 8-10

40 U.S.C. § 471 . . . . . . . . . . 39

40 U.S.C. § 751 . . . . . . . . . . 37

**FEDERAL RULES**

RCFC 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

RCFC 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 45, 61

RCFC 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

RCFC 58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

**TREATISES**

Corbin on Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 49

2 E. Allan Farnsworth, FARNSWORTH ON CONTRACTS (3d ed. 2004) . . . . . . . . . . . . . . . . . . . . . 50

**RESTATEMENTS**

RESTATEMENT (SECOND) OF CONTRACTS § 152 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

RESTATEMENT (SECOND) OF CONTRACTS § 154 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

RESTATEMENT (SECOND) OF CONTRACTS § 155 (1981) . . . . . . . . . . . . . . . . . . . . . . . . 45, 49, 50

**OTHER LEGISLATIVE MATERIALS**

Senate Bill 794, 103d Cong. (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Senate Resolution 98, 103d Cong. (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13

**OTHER AUTHORITIES**

Frona M. Powell, Mistake of Fact in the Sale of Real Property,
40 Drake L. Rev. 91 (1990/1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Daniel Yergin, The Prize: The Epic Quest for Oil, Money & Power
(Simon & Schuster 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# I. PROCEDURAL BACKGROUND

## A. Pre-Trial Proceedings

Claimants filed this Congressional Reference matter pursuant to 28 U.S.C. section 1492, after the Senate transmitted Senate Bill 794, 103d Cong. (1993) ("S. 794"), and Senate Resolution 98, 103d Cong. (1993) ("S. Res. 98"), to this Court. See Comp. ¶ 1 (Docket No. 2); First Am. Compl. ¶ 1 (Docket No. 25). S. 794 limits relief to those former landowners, or heirs of former landowners, who can prove that they were:

(1) promised they would be given priority to repurchase land sold by them if sold by the United States Government; and
(2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights.

S. 794, Sec. 2. The Senate directed the Chief Judge to "proceed . . . in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report back to the Senate, at the earliest practicable date, giving such findings of fact and conclusions that are sufficient to inform Congress of the amount, if any, legally or equitably due from the United States to the claimants individually." S. Res. 98.

The Court notified potential claimants of the filing and gave them an opportunity to join. See Order, dated Jan. 24, 1995 (Docket No. 22). Claimants filed a First Amended Complaint on September 22, 1995, listing approximately 1,000 individuals who wished to participate in these proceedings. (Docket No. 25). On the same date, Claimants filed a Motion to Certify a Class (Docket No. 26), which the Court denied in December 1997. See Order, dated Dec. 23, 1997 (Docket No. 42).

Claimants' First Amended Complaint, like Claimants' original complaint, alleged eight

counts.[1] In November 1998, the Court issued an order, which accomplished two things: (1) the Court dismissed Claims 2 and 5 in their entirety as well as the pertinent allegations of Claim 7; and (2) the Court dismissed any individual whose claims related to properties that the United States had acquired by direct condemnation. See Order, dated Nov. 24, 1998, at 9 (Docket No. 65).

Claimants requested a stay on February 26, 1999, in order to determine which individuals remained in this litigation after the Court's November 1998 Order, and to develop a settlement position. (Docket No. 69). After Claimants developed their settlement position and the parties were unable to resolve their differences of opinion, the Court conducted a trial on September 8-10 and November 22-23, 2004.

**B. The Court's *Sua Sponte* Document Requests and the First Interim Report**

After trial, the Court *sua sponte* asked the parties to submit information about the disposal of the Breckinridge properties in the mid-1960s. The government provided responsive documents to the Court on March 7, 2005. (Docket No. 162). These documents, which Claimants had access to prior to trial but had chosen not to introduce, included news releases about public auctions and advertisements for public auctions. The government argued at that time that the requested information was not relevant to any issues involved in this case:

> Claimants have never alleged any wrongdoing with respect to the public auction in the late 1960s and did not present any evidence with respect to that issue

---

[1] The eight counts were: (1) Condemnation of Real Property Interests – Just Compensation Claim; (2) Condemnation of Real Property Interests – Alternative Claims; (3) Condemnation of Sub-surface Mineral Interests – Just Compensation Claim; (4) Condemnation of Sub-surface Mineral Interests – Due Process Claim; (5) Vested Right of Re-purchase – Due Process Claim; (6) Loss of Agricultural Products – Just Compensation Claim; (7) Loss of Agricultural Products – Due Process Claim; and (8) General Equity Claim.

> during trial. As a consequence, there is limited evidence in the record pertaining to the auction and sale in the late 1960s. The government believes that the lack of evidence on this point is appropriate given that the congressional reference bill focuses on the government's acquisition of these properties, not the later sale.

Def.'s Resp. to the Court's March 3, 2005 Email Correspondence at Ex. A (Docket No. 162).

On March 23, 2005, the Court *sua sponte* requested additional information from the United States related to the amount the "Government was paid in 1967 for coal rights on Tracts 1, 7A, and 7B." Land Grantors v. United States, 64 Fed. Cl. 661, 695 (2005) ("Land Grantors I"). The United States filed a motion to limit review to the trial record (Docket No. 164), which the Court denied (Docket No. 165). The United States provided the requested information on March 31, 2005. (Docket No. 169).

The Court issued an Interim Report Regarding S. 794 "A Bill For the Relief of Land Grantors in Henderson, Union, and Webster Counties, Kentucky, and Their Heirs" and Memorandum Opinion on April 1, 2005. See Land Grantors I, 64 Fed. Cl. 661. Among other conclusions, Land Grantors I dismissed Counts 6 and 7 of the First Amended Complaint for failure to prosecute, and held that "Plaintiffs' constitutional claims are not ripe for adjudication." See id. at 717.

Although the title of Land Grantors I indicates that it is "Regarding S. 794," the Court expressed reluctance to issue a final report. Rather, the Court directed the parties to "show cause why the court should not enter a final judgment, pursuant to 28 U.S.C. § 1491(a)(1), and stay issuance of a Final Report, pursuant to S. 794." Id. at 718. The Court has since stated that Land Grantors I "dismissed all claims arising under S. 794, Section 2(1), 103d Cong. (1993)." Land Grantors v. United States, 74 Fed. Cl. 518, 521 (2006) ("Land Grantors IV"). The parties responded to the Court's show cause order in October 2005. See Def.'s Resp. to the Court's

Show Cause Order (Docket No. 181); Pls.' Memo. on Order to Show Cause Regarding Entry of Final Judgment (Docket No. 182).

In Land Grantors I, the Court articulated a new basis for liability – mutual mistake – which was not mentioned in Claimants' First Amended Complaint. See Land Grantors v. United States, 69 Fed. Cl. 435, 437 n.1 (2005) ("Land Grantors II") ("As the Government correctly observed, 'the doctrine of mutual mistake was identified *sua sponte* by the Court for the first time after post-trial briefing has been completed.'") (citation omitted). According to the Court, the 1942-1944 sales Contracts[2/] were void because they were based on a mutual mistake that "no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operations at the time of sale." Land Grantors I, 64 Fed. Cl. at 703.

**C. Events Subsequent to the Issuance of the First Interim Report**

On October 3, 2005, approximately thirteen months after trial, Claimants – for the first time ever in this litigation – asserted jurisdiction under 28 U.S.C. section 1491 and alleged a new claim of mutual mistake (Count I). See Second Am. Compl. at ¶¶ 32-40 (Docket No. 183). In Count I, Claimants repeat, as allegations, the Court's preliminary findings regarding mutual mistake in Land Grantors I. The United States opposed the filing. See Def.'s Opp'n to Filing of Claimants' Proposed Second Am. Compl., filed Oct. 18, 2005 (Docket No. 185).

In December 2005, the Court requested additional briefing on whether it should *sua*

---

[2/] The Court defined "Contracts" to be "an option for purchase of land; a certificate of inspection and possession; an affidavit of the vendor; a warranty deed; and a receipt for the United States Treasurer's check." Land Grantors I, 64 Fed. Cl. at 702 n.38.

*sponte* reconsider the 1997 decision on class certification. (Docket No. 192).[3] In June 2006, the Court reconsidered the 1997 decision, certified an opt-in class, and requested additional briefing on the form of class notice. (Docket No. 211). The parties submitted proposed notices in August 2006.[4]

On December 14, 2006, the Court issued a Second Interim Report, Memorandum Opinion, and Order. Land Grantors v. United States, 74 Fed. Cl. 518 (2006) ("Land Grantors IV"). In Land Grantors IV, the Court stated its intention to *sua sponte* defer "final disposition in this case until the *en banc* decision in Kirkendall[ v. Dep't of the Army] is issued and final." Land Grantors IV, 74 Fed. Cl. at 525. The Court also directed the parties to consider whether this case could be resolved by mediation. See id.; see also Order, dated Jan. 26, 2007 (Docket No. 217). The parties agreed to participate in mediation. See Pls.' Resp. to Order, dated Jan. 29, 2007 (Docket No. 218); Def.'s Resp. to Order, dated Feb. 15, 2007 (Docket No. 220).

On February 28, 2007, the Court *sua sponte* severed any "claims asserted under 28 U.S.C. § 1491" and assigned the severed claims a new docket number – Case No. 93-648-1L. See Order, dated Feb. 28, 2007 (Docket No. 225). The United States objected to the Court's *sua sponte* severance order. See Def.'s Objection to Court's Feb. 28, 2007 Order (Docket No. 228). The Court's severance order resulted in the creation of this case – Land Grantors v. United

---

[3] The United States opposed reconsideration. See Def.'s Resp. to Court's Dec. 29, 2005 Order (Docket No. 194); see also Def.'s Mot. to Strike Mot. for Reconsideration (Docket No. 197); Def.'s Reply in Support of Def.'s Mot. to Strike (Docket No. 199); Def.'s Opp'n to Claimants' Mot. to Reconsider Class Cert. (Docket No. 207).

[4] See Def.'s Mot. to Approve Proposed Class Notice and Proposed Request to Join, dated Aug. 25, 2006 (Docket No. 214); Pls.' Status Report, dated Aug. 25, 2006 (Docket No. 213). The government's motion remains pending.

States, No. 93-648-1L (Fed. Cl.). As the government understands the Court's severance order, this case only includes Count I of the Second Amended Complaint. All other counts, which the government understands are asserted under 28 U.S.C. sections 1492 and 2509, are pending in Land Grantors v. United States, No. 93-648X.[5]

Claimants withdrew from mediation on May 18, 2007, and asked the Court to stay their Tucker Act claim until final resolution of the Congressional Reference claims. See Pls.' Notice of Withdrawal (Docket No. 231). The United States responded on May 29, 2007. See United States' Resp. to Claimants' Notice of Withdrawal (Docket No. 232). On July 6, 2007, Claimants withdrew their earlier request and instead asked the Court to stay the Congressional Reference case and first resolve the Tucker Act claim. See Pls.' Resp. to Status Conference of June 27, 2007 (Docket No. 233). The Court's Third Interim Report, denying the government's Opposition to the Filing of Claimants' Proposed Second Amended Complaint and directing the filing of this motion, followed. See Land Grantors V, 77 Fed. Cl. 686.

## II. STANDARDS OF REVIEW

In this motion, the United States raises both jurisdictional and non-jurisdictional defenses. The Court should dismiss Count I for lack of jurisdiction for three reasons: (1) this is a Congressional Reference matter only; (2) the majority of Claimants lack standing under the Tucker Act to pursue a claim of mutual mistake; and (3) a claim of mutual mistake is barred by the six-year statute of limitations, 28 U.S.C. section 2501. In addressing these defenses, it would be appropriate for the Court to apply the standards set forth in Rule 12(b)(1) of the Rules of the

[5] Consequently, this motion and memorandum does not focus on the verbal repurchase promises, which some Claimants have alleged were made in the 1940s.

Court of Federal Claims. Under this standard, "the court must accept as true the complaint's undisputed factual allegations and construe the facts in the light most favorable to plaintiff." Figueroa v. United States, 57 Fed. Cl. 488, 492 (2003) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

The plaintiff bears the burden of establishing subject matter jurisdiction, which must be done by a preponderance of the evidence. Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936)); Entines v. United States, 39 Fed. Cl. 673, 678 (1997) ("Plaintiff bears the burden of establishing all jurisdictional requirements, including compliance with the six-year statute of limitations, and must do so by a preponderance of the evidence."), aff'd, 185 F.3d 881 (Fed. Cir. 1999), cert. denied, 526 U.S. 1117 (1999). Where, as here, the Court lacks jurisdiction over subject matter of the complaint, the correct remedy is dismissal of the action. See Truckee-Carson Irrigation Dist. v. United States, 14 Cl. Ct. 361, 368 (1988) ("[U]nder [Court of Federal Claims] Rule 12(h)(3), this court is mandated to . . . dismiss the action '[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter. . . .'") (alteration in original), aff'd, 864 F.2d 149 (Fed. Cir. 1988). Accordingly, the Court should dismiss the complaint in its entirety pursuant to Rule 12(b)(1).

If the Court determines it has jurisdiction to hear Count I, the Court should dismiss that claim for failure to state a claim upon which relief can be granted. Under this argument, Count I should be dismissed pursuant to Rule 12(b)(6). "The Court of Federal Claims may grant a motion to dismiss for failure to state a claim upon which relief may be granted where the plaintiff can prove no set of facts that would support its claim." N.Y. Life Ins. Co. v. United

States, 190 F.3d 1372, 1377-78 (Fed. Cir. 1999). Dismissal is proper under Rule 12(b)(6) when "the facts as alleged in the complaint do not entitle the plaintiff to a legal remedy." Holland v. United States, 59 Fed. Co. 735, 738 (2004) (citing N.Y. Life Ins. Co., 190 F.3d at 1377).

If the Court determines it has jurisdiction to hear Count I and declines to dismiss the claim pursuant to Rule 12(b)(6), the United States is entitled to judgment because this claim is barred by the doctrine of laches. In addition, the United States is entitled to judgment based on the trial record generated in Land Grantors v. United States, No. 94-638X. In order to succeed on this claim, Claimants must satisfy each element of mutual mistake by "clear and convincing evidence." Nat'l Austl. Bank v. United States, 452 F.3d 1321, 1329-30 (Fed. Cir. 2006); see also Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993) ("A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt."). As discussed below, Claimants fail to meet this burden of proof, and Count I must be rejected.

## III. ARGUMENT

### A. This is a Congressional Reference Proceeding, and the Court Lacks Jurisdiction to Enter Final Judgment Under the Tucker Act

Claimants originally filed this matter pursuant to 28 U.S.C. sections 1492 and 2509 only, not the Tucker Act. See Compl. ¶ 1; First Am. Compl. ¶ 1. Claimants sought only the issuance of a report that could be transmitted to Congress in accordance with 28 U.S.C. section 2509, not entry of final judgment. See First Am. Compl. at 59-60 (request for relief, which seeks only a recommendation to the Senate); Compl. (unnumbered) (same). The parties litigated this matter as a Congressional Reference matter, and the Court treated it as such, from its initial filing in

January 1994, to October 2005. E.g., Trial Transcript ("Tr. Tr.") at 177:12-14 (Court permitting Claimants' expert witness to submit an amended expert report after testifying on direct and stating "[i]f this was not a Congressional Reference case, we wouldn't be doing this at all, quite candidly").

In October 2005, thirteen months after trial and six months after the Court issued Land Grantors I, Claimants submitted a proposed Second Amended Complaint, which added a claim of mutual mistake and alleged jurisdiction under the Tucker Act. See Second Amended Complaint, Count I. The United States opposed the filing. However, the Court allowed the amended complaint to be filed on July 31, 2007. See Land Grantors V, 77 Fed. Cl. at 687.

As discussed in more detail in the Defendant's Response to the Court's Show Cause Order (filed Oct. 3, 2005) (Docket No. 181), which the United States incorporates herein by reference, this Court lacks jurisdiction to enter final judgment in this Congressional Reference matter. The Court's powers under 28 U.S.C. section 2509 are wholly advisory; the statute does not permit the Court to issue a final judgment against the United States. If the Court believes Claimants have a viable legal claim (or a viable equitable claim), the statutorily-prescribed course of action is for the Court to inform the Senate in a report. See 28 U.S.C. § 2509(c) (stating that a hearing officer must inform Congress "whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant"); Appendix D ¶ 6 to the Rules of the Court of Federal Claims (same); see also Def.'s Resp. to the Court's Show Cause Order at 1-4 (Docket No. 181) (discussing the legislative history of 28 U.S.C. section 2509).

Even if 28 U.S.C. section 2509 allowed for entry of final judgment in Congressional

Reference cases, that option would be foreclosed here because Claimants explicitly waived all legal claims before, during and after trial. See, e.g., Pls.' Pre-Trial Memo. (Docket No. 124) at 23 ("This Congressional Reference action presents an equitable claim for resolution by the Court."); Pls.' Objections to the Def.'s Pre-Trial Filings (Docket No. 135) at 3 ("The Claimants will not seek to establish a 'legal claim' at trial."); Tr. Tr. at 164:17 (Claimants' Counsel: "We do not have a legal claim in this case."); Tr. Tr. at 165:21-22 (Claimants' Counsel: "We are not claiming, Your Honor, that there is a breach of contract. . . ."); Pls.' Post-Trial Br. (Docket No. 156) at 65 ("This is not a contract case."). The parties' pre-trial pleadings and post-trial memoranda are devoid of any mention of the doctrine of mutual mistake. See Def.'s Response to Court's Show Cause Order at 4-9. Claimants did not assert any claim under the Tucker Act in their complaint, pre-trial filings or their post-trial brief. Claimants, therefore, waived any and all legal claims, and cannot assert them now in a new complaint, filed well after trial ended. See Principal Life Ins. Co. v. United States, 70 Fed. Cl. 144, 157 (2006) ("Under Rule 16 of the Federal Rules of Civil Procedure, which is virtually identical to RCFC 16, legal[] and . . . factual theories not raised in pretrial filings generally are considered to be waived or abandoned.").

The Court acknowledged that the "First Amended Complaint did not set forth a separate claim for alleged mutual mistake," but asserted in Land Grantors I that "the requisite elements are set forth in [several enumerated paragraphs in the First Amended Complaint]." Land Grantors I, 64 Fed. Cl. at 707.[6] The Court subsequently acknowledged, however, that it *sua*

[6] The United States considered each of the paragraphs identified in Land Grantors I in its Response to the Court's Show Cause Order at 4-9, dated Oct. 3, 2005 (Doc. No. 181). As discussed there, it is the government's position that none of the elements of a mutual mistake claim are alleged in the paragraphs enumerated in Land Grantors I.

*sponte* identified the doctrine of mutual mistake after trial, but asserted that "[t]his basis for liability, in large part, only became apparent *after* post-trial briefing was completed when the court required the Government to supplement the record with documents relevant to S. 794 that previously were not produced." Land Grantors II, 69 Fed. Cl. at 437 n.1 (emphasis in original). According to the Court, then, although Claimants asserted a claim of mutual mistake in 1994, that claim only became apparent after the Court required the United States to submit certain documents after trial. And although Claimants' First Amended Complaint (and both parties' pre- and post-trial memoranda) did not mention "mutual mistake" or the Tucker Act (and despite the fact that Claimants' counsel explicitly waived all legal claims on multiple occasions before, during, and after trial), Claimants were allowed to amend their complaint more than a year after trial to add such a claim because, the Court concluded, these issues were tried by express or implied consent of the United States. See Land Grantors V, 77 Fed. Cl. at 687 (citing RCFC 15(b)). The United States submits that these procedures cannot be sustained.

It is the United States' position that the documents the Court requested *sua sponte* after trial ("the disposal-related documents") did not elucidate a theory of mutual mistake. The Court referenced the disposal-related documents (identified as Court Exhibits 3A-3L) three times in its discussion of mutual mistake. These citations do not support a claim of mutual mistake:

1. The Court relied on Court Ex. 3A and Court Ex. 3I to reach a conclusion that "the former landowners' claim arising from the 1967 coal sale accrued on or about September 29, 1967." Land Grantors I, 64 Fed. Cl. at 711. Court Exhibit 3A does not include any documents with a September 1967 date. Court Exhibit 3I, an invitation to bid on certain coal rights, shows that bids for certain coal interests

would be opened on September 29, 1967. While Court Exhibit 3I certainly shows when the coal rights were sold, the document does not elucidate a claim of mutual mistake (or support a conclusion that the parties shared a mistake as to any fact when the Contracts were signed in the early 1940s).

2. The Court relied on Court Ex. 3A (denoted as "Court Ex. 4A") to conclude that the General Service Administrator's Commissioner accurately informed three individuals in 1978 that the "disposal of Camp Breckinridge was in accordance with existing laws and regulations and has withstood judicial review." Land Grantors I, 64 Fed. Cl. at 711 n.49 (relying on the document to support a conclusion that the government's conduct did not rise to fraudulent concealment). This document does not relate in any fashion to facts supporting a claim of mutual mistake.

3. The Court cites Court Ex. 3A to show that Congressman Carroll Hubbard was afforded an opportunity to examine "any and all correspondence and documents of the General Services Administration relating to the disposition of acquisitions of Camp Breckinridge" in 1978. Land Grantors I, 64 Fed. Cl. at 716 n.54. That letter, too, does not elucidate (or relate to) a claim of mutual mistake.

The disposal-related documents, therefore, do not support a claim of mutual mistake under the Tucker Act.

This is a Congressional Reference matter only, and the Court lacks jurisdiction to enter final judgment pursuant to the Tucker Act. See also Def.'s Resp. to the Court's Show Cause Order (Docket No. 181). Delaying final resolution of the Congressional Reference matter is

inconsistent with the rules of this Court and the Senate's explicit direction to proceed with 28 U.S.C. section 1492 and 2509 and report back "at the earliest practicable date." S. Res. 98. Trial was concluded in the Congressional Reference matter nearly three years ago. The Court should, therefore, dismiss Claimants' Tucker Act claim and issue a final report in the Congressional Reference matter.

**B. Claimants Lack Standing to Bring a Tucker Act Claim**

If the Court intends to treat this Congressional Reference matter as a Tucker Act claim, the vast majority of Claimants must be dismissed for lack of standing. In every federal case, a plaintiff must establish standing in order to invoke the court's jurisdiction. See Sicom Sys., Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 975 (Fed. Cir. 2005). The party invoking federal jurisdiction bears the burden of establishing standing by a preponderance of the evidence. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). Standing stems from Article III's limitation "on 'the federal judicial power to the resolution of actual 'cases' or 'controversies.'" Anderson v. United States, 344 F.3d 1343, 1349 (Fed. Cir. 2003) (quoting U.S. Const. art. III, § 2); id. at 1350 n.1 (standing applies to Article I courts that exercise the judicial power of the United States). Standing also includes prudential limitations, including "the general prohibition on a litigant's raising another person's legal rights. . . ." Allen v. Wright, 468 U.S. 737, 751 (1984).

Claimants are unable to overcome two separate standing problems. First, most Claimants are alleged heirs of former landowners, not former landowners themselves. These individuals did not sign any Contracts, and are not in privity of contract with the government. See Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990) (privity of contract exists when the contract

is "between the plaintiff and the government and entitle[s] the plaintiff to money damages in the event of the government's breach of that contract"); Erickson Air Crane Co. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984) ("The government consents to be sued only by those with whom it has privity of contract. . . .").

Where a litigant asserts the injury of another, as here, he or she must overcome a presumption against third-party standing. See Miller v. Albright, 523 U.S. 420, 445 (1998); Singleton v. Wulff, 428 U.S. 106, 113 (1976) ("Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation."). The Supreme Court has permitted third-party standing only when the litigant satisfies "three important criteria":

> The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

Powers v. Ohio, 499 U.S. 400, 411 (1991) (internal citations omitted). Claimants do not satisfy these criteria.

First, standing requires "at an irreducible minimum an injury in fact; that is, there must be some 'threatened or actual injury resulting from the putatively illegal action.'" Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 392 (1988). That injury must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000). The alleged heirs of the former landowners cannot make such a showing. Any alleged monetary harm to the heirs is purely speculative – i.e., if the parties had not made a mutual mistake, perhaps the former landowners would have gone through a condemnation trial rather than voluntarily selling their property;

perhaps the jury would have awarded more money than the government's offer; perhaps the former landowners would have retained those funds until their death; perhaps the former landowner would have bequeathed those funds to Claimants rather than someone else. This alleged harm is far too speculative to rise to an "injury in fact" for standing purposes.[7]

Second, a "close relation" requires that the litigant be "fully, or very nearly, as effective a proponent of the right" as the third party. Singleton, 428 U.S. at 115. The alleged heirs lack such a relationship. Many Claimants are generations removed from a former landowner, and some have apparently never spoken to any former landowners. E.g., CX-64 at 61 (alleging certain Claimants are Great Granddaughters to former landowners). Consequently, almost all of Claimants' discovery responses included no useful information about even the most basic allegations. E.g., DX-669 (showing that none of the discovery respondents named a government agent who allegedly made a verbal repurchase promise, and 117 out of 194 discovery responses did not even allege that a government agent had made such a promise). None of the Claimants have ever presented any evidence to support a theory of mutual mistake, and would have no ability to do so given their lack of first hand knowledge about the signing of the Contracts. Claimants are not "fully, or very nearly" as effective as the former landowners in pursuing these claims, and cannot satisfy third-party standing. Singleton, 428 U.S. at 115.

Finally, Claimants have never alleged (much less proven) that any former landowner faced some hindrance that limited his ability to protect his own interests. See id. at 116

---

[7] In Land Grantors I, the Court stated that "Plaintiffs have 'legally protected interests' in their former land, including coal, gas, oil and other mineral rights and the 1942-1944 contracts with the Government, which allegedly were 'invaded' or adversely affected." Land Grantors I, 64 Fed. Cl. at 696. The Court's statement appears limited to former landowners, not the majority of Claimants who are heirs of former landowners.

(requiring there to be "some genuine obstacle" to third party's ability to sue). Even if, as Claimants now allege, most former landowners are now deceased, Claimants have not shown any reason why this suit could not have been brought by the former landowners themselves decades ago. The heirs of the former landowners, therefore, lack standing to pursue a Tucker Act claim, and their claims must be dismissed.

In addition to the above, a second standing problem exists. A majority of former landowners had leased their mineral rights to third party oil and gas companies well before the United States acquired the Breckinridge properties. The government paid the third party oil and gas companies for their rights under these leases and paid the former landowners for their leases. Claimants lack standing to raise any complaint about the amounts the United States paid the third parties for their mineral interests. The Court should, therefore, dismiss any Claimant whose claim relates to a tract where the former landowner had entered into a mineral lease prior to the government's acquisition.

### C. Count I Is Barred by the Six-Year Statute of Limitations

As discussed below, the parties did not enter into the Contracts with a mutual mistake, and the doctrine of mutual mistake has no application in this case. See discussion, supra §§ III(E), (F). Even if the doctrine of mutual mistake could potentially apply in this case, that claim is barred by the six-year statute of limitations and, therefore, must be dismissed for lack of jurisdiction. See 28 U.S.C. § 2501.

### 1. Claimants' Mutual Mistake Claim Accrued No Later Than September 1967, and Is Therefore Barred by the Statute of Limitations

"The six-year statute of limitations set forth in Section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir. 2006), reh'g en banc denied (Nov. 30, 2006), cert. granted in part, _ U.S. _, 127 S.Ct. 2877 (2007); Martinez v. United States, 333 F.3d 1295, 1316 (Fed. Cir. 2003) (en banc), cert. denied, 540 U.S. 1177 (2004). The six-year time limit for filing claims set forth in Section 2501, therefore, "must be strictly construed." John R. Sand, 457 F.3d at 1355.

For purposes of 28 U.S.C. section 2501, a claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Id. at 1355-56; see also Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995) ("Whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."), cert. denied, 517 U.S. 1243 (1996).

The Court concluded that a claim of mutual mistake accrued on various dates between May 1957 and September 1967. See Land Grantors I, 64 Fed. Cl. at 711 (claims arising from the Department of the Interior's ("DOI's") leases to Felmont Oil Corporation accrued on May 1, 1957, when those leases were signed); id. (claims arising from DOI's leases to Kingwood Oil Co. accrued on December 1, 1959, when those leases were signed); id. (claims arising from the sales of certain coal, gas, oil, and other mineral interests accrued on April 15, 1966); id. (claims arising from coal sales accrued on September 29, 1967); but see id. at 714 ("some of the facts of

mutual mistake could have been ascertained" on April 30, 1964). The filing of a lawsuit in April 1965 against the United States supports the Court's conclusion that any claim would have accrued prior to September 1967. See Higginson v. United States, Case No. 2074 (W.D. Ky. Sept. 7, 1965) (unpublished), aff'd, 384 F.2d 504 (6th Cir. 1967), cert. denied, 390 U.S. 947 (1968), reh'g denied, 391 U.S. 961 (1968).

Given these accrual dates, Claimants had to file any Tucker Act claim as early as May 1, 1963 (Felmont Oil Corporation leases), and no later than September 29, 1973 (coal sale leases), six years after the leases were signed. See 28 U.S.C. § 2501. Claimants did not file a Tucker Act claim until October 2005, 42 years and 32 years too late, respectively. Even assuming the filing of Claimants' Tucker Act claim relates back to the filing of Claimants' First Amended Complaint, a conclusion the United States disputes, the claim would be 31 years and 21 years too late, respectively.

Claimants' Tucker Act claims, therefore, are barred by Section 2501.

**2. The Doctrine of Equitable Tolling Is Not Available**

In limited circumstances, the doctrine of equitable tolling may operate to prevent the running a statute of limitations. In regard to suits against the United States, the Supreme Court has stated that the "rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95-96 (1990). The Federal Circuit has not yet determined whether equitable tolling is available under Section 2501. Martinez, 333 F.3d at 1318; Frazer v. United States, 288 F.3d 1347, 1353 (Fed. Cir. 2002).

As discussed below, even if equitable tolling is potentially available under Section 2501,

the facts of this case do not justify its application here. See discussion, supra § III(C)(3). Accordingly, the Court should refrain from addressing this unsettled question, and dismiss Claimants' untimely Tucker Act claim for lack of jurisdiction. See Martinez, 333 F.3d at 1318 (declining to decide "whether equitable tolling is generally available under section 2501" because plaintiff could not show any facts in support of its application); DuMarce v. Scarlett, 446 F.3d 1294, 1305 (Fed. Cir. 2006) (same), cert. denied, _ U.S. _, 127 S.Ct. 1335 (2007).

If the Court intends to address the applicability of equitable tolling under Section 2501, the Court must consider two questions: (1) Is equitable tolling "available in a sufficiently analogous private suit," and (2) If an analog exists, has Congress expressed a clear intent that equitable tolling should not apply? Kirkendall v. Dep't of Army, 479 F.3d 830, 837 (Fed. Cir. 2007) (en banc), petition for cert. filed, 76 USLW 3009 (July 5, 2007). Both questions should be resolved in the government's favor.

**i. Even if Equitable Tolling Is "Available in a Sufficiently Analogous Private Suit," this Claim Would Still Be Time Barred**

Equitable tolling is available in suits against the United States only when equitable tolling "is available in a sufficiently analogous private suit." Id. at 837 (where plaintiff's claim brought under the Veterans Employment Opportunities Act was deemed "sufficiently analogous to private actions brought under Title VII of the Civil Rights Act of 1964," which does permit equitable tolling in lawsuits brought by private employees against private employers); see also Brice v. Sec'y of Health & Human Servs., 240 F.3d 1367, 1372 (Fed. Cir. 2001) (where plaintiff's Vaccine Act claim was deemed sufficiently analogous to tort claims among private parties, which does permit equitable tolling in lawsuits brought among private parties), cert.

denied, 534 U.S. 1040 (2001).

Claims of mutual mistake between private parties are not entitled to the kind of open-ended tolling necessary to allow this claim to proceed. If available at all, equitable tolling in the context of mutual mistake claims merely postpones the accrual date from the date of contracting to the date of discovery of the mistake. See, e.g., Paine Webber Real Estate Sec., Inc. v. D.G. Meyer & Co., 835 F.Supp. 116, 119 (S.D.N.Y. 1993) (stating that if the claim is one for mutual mistake, the federal limitations period "recognizes equitable tolling until discovery, [while] the New York statute of limitations . . . bars claims more than six years after the mistake occurred") (emphasis added), aff'd, 9 F.3d 242 (2nd Cir. 1993); Krahmer v. Christie's Inc., 903 A.2d 773, 778-79 (Del. Ch. 2006) (stating that if equitable tolling applied to a claim of mutual mistake, "the statute will begin to run only upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery [of the injury]") (emphasis added); accord Corman's Limitation of Actions §8.3 at 9 (when available, tolling will delay accrual of a mutual mistake claim until the mistake "is, or should reasonable by, discovered").[8] If applicable

[8] In these cases, the courts follow a line of cases holding that mutual mistake claims begin to run at the time of the transaction, rather than when the mistake is discovered. See, e.g., City of New Bedford v. Lloyd Inv. Ass'n, 363 Mass. 112, 119, 292 N.E.2d 688, 692 (1973); McNeely v. Philadelphia Nat'l Bank, 314 Pa. 334, 342 (1934) (holding that a suit to recover money allegedly paid under a mistake of fact was barred because it was not made within the limitations period measured from the date of payment, and not from the later date when the mistake was discovered, stating "[t]he time of discovery of the mistake has nothing to do with the cause of action"); Firestone & Parson, Inc. v. Union League of Philadelphia, 672 F.Supp. 819, 822 (E.D. Pa. 1987) (same), aff'd, 833 F.2d 304 (3rd. Cir. 1987). Equitable tolling in these cases, then, would merely extend the accrual date from the time the mistake was made (i.e., the date of contracting) until the mistake was discovered.

Other courts reach the same result by holding that claims of mutual mistake accrue in the (continued...)

at all, then, equitable tolling would merely permit Claimants to sue within six years after the date of the discovery of the mistake (or, at the latest, within six years after 1967 for certain claims, according to the Court's findings in Land Grantors I), rather than six years after the date of contracting (approximately 1941). See discussion, infra, § III(C)(1). Since Claimants did not file suit within six years of either date, their claims are barred.

In order for this claim to be timely, Claimants would have to argue that open-ended equitable tolling is available. That position, however, is untenable. See, e.g., School Dist. of City of Allentown v. Marshall, 657 F.2d 16, 20 (3rd Cir. 1981) ("The tolling exception is not an open-ended invitation to the courts to disregard limitations periods simply because they bar what may be an otherwise meritorious case."). Accordingly, this claim is time barred.

**ii. Congress Has Expressed a Clear Intent that Equitable Tolling Should Not Apply in Section 2501**

The second part of the Kirkendall test is whether Congress expressed a clear intent that equitable tolling should not apply. See Kirkendall, 479 F.3d at 837. Equitable tolling is not available if the relevant limitations statute provides "good reason to believe that Congress did

---

[8/](...continued)
first instance "when the fraud or mistake becomes discoverable by the exercise of ordinary diligence. . . ." Hollifield v. Blackburn, 294 Ky. 74, 170 S.W.2d 910, 911 (1943); accord Grymes v. Sanders, 93 U.S. 55, 62 (1876) (noting that "[w]here a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. . . . Delay and vacillation are fatal to the right which had before subsisted") (emphasis added). Section 2501 already provides that the statute of limitations will not begin to run until the plaintiff knew or should have known of the claim (arguably the date of discovery). This is an additional reason why equitable tolling is not available here. See United States v. Beggerly, 524 U.S. 38, 48-49 (1998) (concluding that equitable tolling was not available under the Quiet Title Act because Congress had already accounted for equitable principles in that statute by "providing that the statute of limitations will not begin to run until the plaintiff 'knew or should have known of the claim of the United States'").

not want the . . . doctrine to apply." United States v. Brockamp, 519 U.S. 347, 350 (1997). To make this determination, the Court must look to several factors: "the statute's detail, its technical language, its multiple iterations of the limitations period in procedural and substantive form, its explicit inclusion of exceptions, and its underlying subject matter." Kirkendall, 479 F.3d at 836-37 (citing Brice, 240 F.3d at 1372).

Since Irwin, the Supreme Court has rebuffed one attempt to apply equitable tolling outside the context of Equal Employment Opportunity suits. See Brockamp, 519 U.S. 347 (suits for tax refunds may not be equitably tolled because the language of the statute does not permit the conclusion that Congress intended such a waiver). Here, as with Brockamp, there are strong reasons for resolving this issue in the Government's favor.

First, the text of Section 2501 is inconsistent with the application of equitable tolling. Section 2501 provides that "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. This language is emphatic and certain, and therefore favors against allowing equitable tolling. The limitations provisions for tax refunds and quiet title actions are similarly direct, and it is well-settled that tolling is not recognized under those provisions. See Brockamp, 519 U.S. at 351 (equitable tolling not available for statute reading "[c]laim for . . . refund . . . of any tax . . . shall be filed by the taxpayer" within a specified time period); Beggerly, 524 U.S. at 48-49 (equitable tolling not available for statute concluding that quiet title action "shall be barred unless it is commenced within twelve years of the date upon which it accrued"). There is no significant difference in emphasis or certainty among these statutes.

One need look no further than Section 2509 – the statute covering Congressional Reference matters – to underscore this point. In Section 2509(c), Congress explicitly directed the Court to consider "facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy." Section 2501 includes no equivalent provision, and therefore does not permit equitable tolling.

Second, Section 2501 refers to "[e]very" claim asserted in this Court, except where the statute expressly so provides. As with the statute Brockamp, Section 2501 sets forth explicit exceptions to its basic time limits, and those very specific exceptions are not relevant here. See 28 U.S.C. § 2501 ("A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases."). The Federal Circuit in Kirkendall noted the absence of explicit exceptions in a different limitations period to justify the application of equitable tolling there. See Kirkendall, 479 F.3d at 840. Adding additional exceptions that are not included in the explicit exception beyond those actually included in Section 2501 is inconsistent with Congress' clear intention.

Third, when the statute's plain language already includes equitable components, see Beggerly, 524 U.S. at 48 (Quiet Title Act, which provided that the limitations period did not begin to run until the plaintiff "knew or should have known of the claim of the United States"), or when the plain language manifests congressional intent to preclude equitable tolling, see Brockamp, 519 U.S. at 352 (pointing to existence of explicit exceptions, which does not include "open-ended 'equitable' exceptions"), the limitation period should not be extended further. Since Section 2501 does not begin to run until the plaintiff knew or should have known of the

claim, additional tolling is unnecessary and inconsistent with Section 2501. See Beggerly, 524 U.S. at 48 (suits to quiet title against the United States have a stated period of limitations, which begins to run on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States); Lampf v. Gilbertson, 501 U.S. 350, 363 (1991) (equitable tolling doctrine is fundamentally inconsistent with structure of the securities statute, which includes a one year discovery rule followed by a three-year period which clearly serves as a cutoff); see Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988) (Tucker Act claim accrues when all events have occurred and the claimant knows or should know of the claims).

Fourth, the six-year statute of limitation period is not unduly short, and affords ample opportunity to litigants to raise a Tucker Act claim. Compare Kirkendall, 479 F.3d at 841 (justifying application of equitable tolling because the 15-day period was "extraordinarily short"). This factor, then, favors a conclusion that equitable tolling does not apply.

Finally, because Section 2501 is designed to limit the waiver of sovereign immunity, and not to serve remedial purposes, tolling should not be inferred. See Bowen v. City of New York, 476 U.S. 467, 480 (1986); Compare Bailey v. West, 160 F.3d 1360, 1365 (Fed. Cir. 1998) (*en banc*) (equitable tolling permitted based upon the nature of veterans statutes); Kirkendall, 479 F.3d at 841 (justifying application of equitable tolling because the purpose of the statute at issue is to assist veterans in obtaining employment, and such claims are often pursued without the benefit of legal representation) with Beggerly, 524 U.S. at 49 (equitable tolling not available in the context of the Quiet Title Act because the Quiet Title Act "deals with ownership of land," and it "is of special importance that landowners know with certainty what their rights are, and

the period during which those rights may be subject to challenge").

For all these reasons, equitable tolling would be inconsistent with Section 2501 and therefore is not permitted.

### 3. Even if Equitable Tolling Is Permitted Under Section 2501, the Facts of this Case Do Not Warrant Application of the Doctrine

Even if open-ended equitable tolling is permissible for mutual mistake claims brought under the Tucker Act, Claimants have neither alleged nor proven facts to support its application here. In fact, Claimants never raised the prospect of equitable tolling before or during trial, conceding at trial that "the statute of limitations ran a long, long time ago." Tr. Tr. at 166:19-20. Claimants never alleged the possible application of equitable tolling until prompted by the Court after trial.

Even if Claimants had not waived a claim of equitable tolling, the principle would not apply here. Equitable tolling is "a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." Wallace v. Kato, _ U.S. _, 127 S.Ct. 1091, 1100 (2007); see also Irwin, 498 U.S. at 96 ("the principles of equitable tolling . . . do not extend to what is at best a garden variety claim of excusable neglect"). "Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152 (1984). Accordingly, "[f]ederal courts have typically extended equitable relief only sparingly." Irwin, 498 U.S. at 96; Martinez, 333 F.3d at 1318 ("equitable tolling against the federal government is a narrow doctrine").

Generally, "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary

circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005) (concluding, in the context of a claim brought under the Antiterrorism and Effective Death Penalty Act, that "[e]ven if we were to accept petitioner's theory [of extraordinary circumstances], he would not be entitled to relief because he has not established the requisite diligence"); Irwin, 498 U.S. at 96 (equitable tolling applies only when there is some compelling reason to justify its application, such as "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass"); Santana-Venegas v. Principi, 314 F.3d 1293, 1296 (Fed. Cir. 2002) ("Equitable tolling is generally available in two types of situations: (1) "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period," or (2) "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.").

Following these principles, the Federal Circuit has concluded that even if equitable tolling were available under Section 2501, the doctrine would not apply if the plaintiff was "fully aware of the injury he had suffered," and failed to present "sufficient basis to establish equitable tolling." Martinez, 333 F.3d at 1319; see also DuMarce, 446 F.3d at 1305 (declining to apply equitable tolling due to a lack of evidence that the litigant was "induced or tricked" by government misconduct); accord Warren v. United States, 74 Fed. Cl. 723, 726 (2006) (finding that plaintiff "has not demonstrated a sufficient factual basis for invoking [the] doctrine [of equitable tolling]").

As discussed below, equitable tolling cannot apply in this case.

### i. Claimants Did Not Diligently Pursue Their Legal Rights

For equitable tolling to apply, a plaintiff must "advance[] his claims within a reasonable time of their availability." Pace, 544 U.S. at 419. In other words, a plaintiff must have "actively pursued his judicial remedies by filing a defective pleading during the statutory period." Irwin, 498 U.S. at 96; Martinez, 333 F.3d at 1319.

Claimants did not file a defective pleading during the statutory period or otherwise attempt to diligently pursue their rights. Claimants filed a Tucker Act claim in 2005 – 38 years after 1967, the latest date upon which Claimants' claims would have accrued. Even assuming Claimants had alleged a Tucker Act claim in 1994, in their initial complaint, that claim would have been filed no less than 26 years after it accrued. Consequently, Claimants did not diligently pursue their legal rights, and equitable tolling cannot apply.

The Interim Report tentatively found that Claimants had diligently pursued their legal rights because "[s]ometime in 1968, after the United States Supreme Court denied certiorari in the Higginson case, a group of former landowners and/or their heirs formed the Breckinridge Land Committee ["BLC"] and turned to Congress to seek redress." Land Grantors I, 64 Fed. Cl. at 685; Land Grantors v. United States, 71 Fed. Cl. 614, 618 (2006) ("Land Grantors III") (same); Land Grantors IV, 74 Fed. Cl. at 521 (same). Claimants repeat a similar allegation in their Second Amended Complaint. See Second Am. Compl. ¶ 29 (alleging that "Claimants, acting independently and through the [BLC], attempted and exhausted all other means of redress, short of Congressional Reference with respect to the matter"). Neither Claimants' allegation nor the Court's finding supports application of equitable tolling for several reasons. First, Claimants clearly did not "exhaust[] all other means of redress" as they allege in paragraph 29 of the

Second Amended Complaint. They could have filed a lawsuit, but decided not to do so. Claimants have never offered any explanation for this failure, which is fatal to their argument. Indeed, Claimants' failure does not even rise to the level of a "garden variety claim of excusable neglect," which itself would be insufficient to support application of equitable tolling. Irwin, 498 U.S. at 96.

Second, writing letters to Congress does not evidence diligent pursuit of one's claims. See Kanehl v. United States, 38 Fed. Cl. 89, 105 (1997) (Cong. Ref.) (finding congressional reference claims barred by laches because "Plaintiff's contention that he contacted persons in Congress during the years 1983 to 1993 in an attempt to bring a congressional reference action does not by itself demonstrate diligent pursuit of plaintiff's claim"), adopted by Kanehl v. United States, 40 Fed. Cl. 762, 771 (1998) ("The panel fully agrees with and adopts the hearing officer's findings and conclusion in this regard."); Drew v. Dep't of Corrections, 297 F.3d 1278, 1289 (11th Cir. 2002) (pro se habeas petitioner's act of writing letters was not adequate to constitute diligent pursuit for purposes of equitable tolling), cert. denied, 537 U.S. 1237 (2003); Campbell v. Potter, 2004 WL 2861871, at *3 (E.D. Pa. Dec. 9, 2004) ("Plaintiff has failed to cite a single case in which the measure he resorted to [writing letters to political officials and bringing an action before a collective bargaining unit] have been found to justify equitable tolling."). The act of writing letters does not interfere with or hinder any individual's ability to file a Tucker Act claim in this Court, and certainly does not evidence that any Claimant filed "a defective pleading during the statutory period." Irwin, 498 U.S. at 96. Further, even if such letters could show diligent pursuit, only those individuals who actually wrote such letters could make this argument. Certainly those who never wrote to Congress, or their heirs, could not show that they

diligently pursued their rights by this means.

Third, the creation of the BLC (upon which the Court's finding is based) is irrelevant to whether any individual Claimant diligently pursued his or her rights. The BLC is not a Claimant in this matter and there is no basis to attribute creation of that organization (or any actions taken by that organization) to the efforts of any individual claimant to diligently pursue his or her rights.

Fourth, the Court's chronology is incorrect: the BLC was formed in late 1978, not 1968. See CX-34 at BLC 1370 ("In the late spring of 1978 several individuals with family ties to the land taken by the Federal Government for Camp Breckinridge, Kentucky, formed the Breckinridge Land Committee."); CX-11 at BLC 1240 (same). The record shows that one individual – Ms. Ruby Higginson Au – wrote letters to various organizations and individuals before 1978, but none of those letters mention anything about the BLC or any similar organization.[9] Ms. Higginson Au is a descendent of Cyrus Higginson (who pursued an unsuccessful claim against the Federal Government in the 1960s) and is therefore precluded from participation in this matter. See Land Grantors III, 71 Fed. Cl. at 627. Claimants offered no evidence to support any other individual's pre-1978 efforts to pursue his or her rights.

In support of its finding that the BLC was formed in 1968, the Court provided the following citation: "Compare Higginson Dep. at 285, 304, 328; CX 267 (Murphy Dep.) at 13-14,

---

[9] The Court's statement that "The first specific request for a Senate inquiry of this matter appears to have been directed to the GSA by Senator Walter D. Huddleston on or about June 6, 1973," cites a letter from Senator Huddleston to Ms. Au. Land Grantors I, 64 Fed. Cl. at 685 (citing CX-22). That letter shows only that Senator Huddleston requested information from GSA pursuant to Ms. Au's request. See id. GSA responded to Senator Huddleston on June 20, 1973 (CX-39), and Senator Huddleston provided the information to Ms. Au on July 2, 1973 (CX-40).

18, with CX 53." Land Grantors I, 64 Fed. Cl. at 685.[10] The citations do not support the Court's finding. Page 285, for example, says that Ms. Higginson Au started as chairperson of the BLC in 1978. See Higginson Au Depo. at 285:11-13 ("Q: When had you started as chairperson of the BLC? A: From '78."). Page 328 does not include any dates and includes no discussion of the formation of the BLC. See id. at 328. Page 304 says nothing about when the BLC was formed. Similarly, pages 13 and 14 of Mr. Murphy's deposition transcript say nothing about the date the BLC was formed. See CX-267 at 13-14. Mr. Murphy explained that he was not involved in any activities related to the Breckinridge properties until sometime in 1978. See id. at 11:10-14.[11] The Court's final citation – CX-53 – is a letter from GSA to Senator Marlow W. Cook, dated March 18, 1974. The letter responds to a letter written by Ms. Higginson Au, and says nothing about the formation of the BLC or any similar organization. See CX-53.[12]

Accordingly, even if the creation of the BLC was relevant to any individual's efforts to diligently pursue a legal remedy (which it is not), the date of that event (1978) was more than six years after a claim accrued. Creation of the BLC, therefore, could not have tolled the running of

---

[10] Pages 285 and 328 of Ms. Higginson Au's deposition are not part of the trial record.

[11] Mr. Murphy testified that his activities were very limited, consisting of a review of documents in 1978, which he concluded showed nothing "upon which to build a misrepresentation argument." CX-267 at Ex. 7; CX-267 at 18:15.

[12] In a footnote following the 1968 date, the Court added the following additional citation: "See, e.g., JX 58-59 (referencing letters from Mrs. Ruby Higginson Au in 1976, 1978, and 1979 to Congressman Carroll Hubbard); Court Ex. 3A (referencing Congressman Gene Snyder forwarding letter of Mrs. Ruby Higginson Au to Paul E. Goulding, Deputy Administrator, GSA)." Land Grantors I, 64 Fed. Cl. at 685 n.28. JX-58 and JX-59 do not mention the BLC or any similar organization and say nothing about when the BLC was formed. The letter identified as Court Exhibit 3A merely references a letter written by Ms. Higginson Au on October 2, 1978. These documents, too, do not support a 1968 date.

the statute of limitations: "If the statute has already run before the alleged tolling action commences, however, there is nothing left to toll. In other words, tolling cannot be applied retroactively to extend a limitations period that has already expired before the tolling event occurs." MacLean v. United States, 454 F.3d 1334, 1337 (Fed. Cir. 2006).

In summary, apart from a handful of letters written by a single individual – a person who is excluded from participating in this lawsuit – Claimants did nothing at all for a minimum of 11 years after a claim of mutual mistake accrued (from 1967 to 1978). In 1978, some individuals (the evidence does not show how many there were, who they were, or whether they are Claimants) allegedly gathered informally as the BLC. The former landowners did not file a complaint in this (or any) Court until 1994, and no one alleged a Tucker Act claim until 2005. Claimants have neither alleged nor shown that anything prevented them from filing a Tucker Act claim for the 27-year period of 1968 through 1994 (or the 37-year period of 1968 through 2005) or otherwise pursuing a judicial remedy. Given these facts, there is no basis on which to hold that any Claimant "actively pursued his judicial remedies," Irwin, 498 U.S. at 96, and equitable tolling, therefore, cannot apply.

**ii. No Extraordinary Circumstance Stood in the Way of Any Claimant Asserting His or Her Legal Right**

Equitable tolling can not apply here because there are no extraordinary circumstances that "stood in [the] way" of any individual in asserting his or her rights. Pace, 544 U.S. at 418. Claimants have never alleged, and there is no evidence to support, that the United States induced or tricked any Claimant into allowing the six-year limitations period to pass. Claimants do not contend, and have not shown, that any Claimant was incapable of pursuing these claims before the limitations period lapsed. Claimants' Second Amended Complaint offers no allegations that

would satisfy this necessary element. There are, in short, no extraordinary circumstances here, and equitable tolling cannot apply.

In Land Grantors I, the Court preliminarily concluded that the "unique and *sui generis* circumstances of this case [warrant application of] the doctrine of equitable tolling." Land Grantors I, 64 Fed. Cl. at 713. The United States submits that this conclusion is not supported by the record. In support of its preliminary holding, the Court relies upon the following findings:

1. "The record evidences that numerous requests/petitions were made by the former landowners to repurchase their land after World War II ended." Id. at 713; id. at 713 n.52 (citing eight documents).

2. "The record also evidences that there was considerable confusion about what federal office was responsible for decisions about disposal of Camp Breckinridge that was caused by the Government." Id. at 713; id. at 713 n.53 (citing six documents).

3. "The record evidences no public notice or local news article about the 1957 lease to Felmont Oil or 1959 lease to Kingwood Oil at the time they were entered." Id. at 714.

4. "Landowners living in the Henderson, Union, and Webster County areas may have assumed, albeit erroneously, that sufficient efforts were made to preserve their legal rights to benefit from the doctrine of equitable tolling by the filing of the Higginson complaint." Id. at 715.

5. "Plaintiffs did not have the ability to compel the Government to obtain and release information about the 1957 and 1959 leases and 1965 sales" because the

"Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, ("FOIA") was not enacted until 1966." Id.

As discussed below, none of these events hindered, delayed or prevented Claimants from filing a timely claim against the United States. These events, therefore, are not "extraordinary events" that might support the application of equitable tolling. In addition, the Court's findings are not supported by the record.

**a. "The record evidences that numerous requests/petitions were made by the former landowners to repurchase their land after World War II ended." Land Grantors I, 64 Fed. Cl. at 713.**

A finding that several former landowners inquired about repurchasing their land after World War II ended would not support a finding of "extraordinary circumstances" or application of equitable tolling. The act of making such inquires would not hinder any individual from filing a claim in this Court, or otherwise pursuing a legal remedy. Further, even if writing letters did evidence "extraordinary circumstances," an implausible conclusion, these letters would not justify application of equitable tolling for anyone other than the specific author.

The Court's finding is also not supported by the record. One would certainly expect "numerous requests/petitions" from former landowners to repurchase their land after World War II ended if government agents had made verbal repurchase promises, as some Claimants have alleged. There were several hundred former landowners, and if even a fraction of those former landowners had actually been promised the right to repurchase their properties at the end of the war, one would expect numerous requests or petitions to repurchase these properties in the record. That evidence, however, does not exist. See also Def.'s Post-Trial Mem. at 35-64 (discussing the historical evidence in detail); see also Tr. Tr. at 172:8-15 (THE COURT: "Do we

have any evidence in the record of letters from people to the government saying remember me, you told me the following, and now I'm back and I want to buy my land?" CLAIMANTS' COUNSEL: "Well, in the record right now, no, we don't have any letters. We do have people who obviously took that position in the sixties, but it has been taken down through the years.").

In support of its conclusion, the Court cited eight documents. Land Grantors I, 64 Fed. Cl. at 713 n.52 (citing DX-95, DX-96, DX-87, DX-92, DX-94, DX-97, DX-102, and DX-107). Only two of those documents are written to (or by) former owners or their heirs (DX-92 and DX-94). The other letters are not written to (or by) former landowners and, therefore, could certainly not support application of the doctrine of equitable tolling with respect to any individual Claimant's claim.

The only two documents that were written to (or by) former landowners in the Court's list are DX-92 and DX-94. Both letters appear to relate to tracts that the federal government acquired by condemnation, not voluntary sale (DX-92 appears to relate to E-110, a condemned tract; it is unclear what property is the focus of DX-94, but the surname "Denton" does not appear on the list of voluntary sellers). Any claims relating to these tracts were dismissed pursuant to the Court's November 1998 Order.

In addition, the letters are not attempts to repurchase these properties "after World War II ended." Land Grantors I, 64 Fed. Cl. at 713. Rather, the letters were written during the war, and merely serve to show that two former landowners asked about acquiring these Breckinridge properties after they were no longer needed by the federal government. See DX-92 (December 11, 1944 letter); DX-94 (July 12, 1945 letter). The letters were not a demand by former landowners to repurchase their land – they were simply requests for information.

**b. "The record also evidences that there was considerable confusion about what federal office was responsible for decisions about disposal of Camp Breckinridge that was caused by the Government." Land Grantors I, 64 Fed. Cl. at 713.**

Claimants have never alleged any confusion on this issue, and they presented no evidence in support of such an allegation. In addition, the finding has no bearing on whether a extraordinary circumstance hindered any Claimant from pursuing his or her legal claim in this Court. Even if a former landowner was confused about what federal office was responsible for disposal of the Breckinridge properties, he did not need to wait 26 years before filing a complaint in this Court.

The Court's preliminary finding is also not supported by the record. The Court cites six letters to support this finding. See Land Grantors I, 64 Fed. Cl. at 713 n.53 (citing DX-87, DX-92, DX-97, DX-102, DX-107, and DX-150). Only two of these letters appear to be written to (or on behalf of) a former landowner or heir. See DX-92 (December 11, 1944 letter to E.R. McBride); DX-150 (July 5, 1951 letter to Fred I. King). The other letters appear to be written to people who were simply interested in acquiring a Breckinridge property when the properties were no longer needed by the federal government. Those letters could certainly not support equitable tolling with respect to any individual's claim.

The two letters that were written to former landowners do not show any confusion about which federal agency would handle the disposal of Camp Breckinridge or otherwise support the Court's finding. DX-92, for example, informs Mr. McBride about the temporary priority system established by the 1944 Act, but informs him that the properties had not then been surplused. See DX-92. Nothing in the letter indicates any confusion about what federal offices would be

responsible for disposal decisions.

The Court's truncated quotation of DX-150 is offered as proof that the government informed Mr. King that he should contact the Corps of Engineers' District Office to discuss his clients' interest in purchasing certain properties. Land Grantors I, 64 Fed. Cl. at 713 n.53. In fact, DX-150 informed Mr. King that none of the property had been declared surplus, but that the GSA would have authority over disposition once the properties were declared excess.[13/]

In five of the six letters (all except DX-150), the recipient was not informed that GSA would have responsibility for the disposition of the properties. To the extent the omission of that information is intended as proof that there was "considerable confusion about what federal office was responsible for decisions about disposal of Camp Breckinridge that was caused by the Government," Land Grantors I, 64 Fed. Cl. at 713, the United States respectfully disagrees. The five letters that do not mention GSA were written between 1944 and 1946 – approximately two decades before the Breckinridge properties were sold – and several years before GSA was established (in 1949). See 40 U.S.C. § 751. The reason the recipients were not informed that GSA would have responsibility for the disposition, then, was not because of "confusion," but because that agency did not then exist. After GSA was established, individuals interested in acquiring Breckinridge properties were informed that they should contact that organization. See DX-150.

---

[13/] In addition, the letter informs Mr. King that the

> Federal Property and Administrative Services Act of 1949 provides for the continuation of all priorities and preferences contained in the Surplus Property Act of 1944, as amended, only until 12 o'clock noon of December 31, 1949. Accordingly, the rights accorded former owners to reacquire their former holdings expired at that time.

DX-150 at DOJ1509.

**c. "The record evidences no public notice or local news article[s] about the 1957 lease to Felmont Oil or [the] 1959 lease to Kingwood Oil at the time they were entered." Land Grantors I, 64 Fed. Cl. at 714.**

The Court is correct that the parties did not submit evidence of "public notice or local news articles" about these leases. That absence of evidence, however, is because that fact was not at issue at trial. Claimants never alleged that public notice was not given, they never alleged any wrongdoing with respect to the notice given of the public auction in the 1960s, and the issue was not part of Claimants' case or the government's defense. The Court's apparent conclusion that a lack of evidence on an undisputed point evidences government impropriety (or somehow supports the application of equitable tolling) cannot be sustained.

Even if there was evidence that public notice was not given, the finding is irrelevant to the possible application of equitable tolling because the former landowners of the tracts covered by these leases had actual notice of the proposed lease before either lease was signed. The former landowners filed formal protests of the two leases prior to the signing of those leases. See, e.g., Land Grantors IV, 74 Fed. Cl. at 519 (noting that the two former landowners protested the lease on March 15, 1957); Land Grantors III, 71 Fed. Cl. 614, 617 (2006) (same); Land Grantors I, 64 Fed. Cl. at 664 (same). The Department of the Interior dismissed the former landowners' protest after review, and the former landowners did not file an appeal.[14/] The former landowners, therefore, had prior notice of the proposed leasing arrangement, and the Court's

---

[14/] The United States disagrees with the Court's assessment that DOI dismissed the protest "without even minimum due process." Land Grantors I, 64 Fed. Cl. at 714. The record evidences that DOI considered and rejected the protest in accordance with its rules and regulations and there is no evidence of any impropriety. See DX-40 at DOJ0310. The United States is not responsible for the protestors' decision to not challenge the dismissal of their protest in district court.

finding cannot support equitable tolling.

There is no evidence to support the Court's conclusion that "Dr. W.H. Puryear and Judge A.G. Pritchett only became aware of the Government's plans to lease gas and oil underlying land they previously owned because Judge Pritchett had a lease on the land for agricultural and grazing purposes." Land Grantors I, 64 Fed. Cl. at 714.[15] The Court's speculation is not supported by any evidence and cannot be sustained, even if it was relevant to the possible application of equitable tolling.

**d. "Landowners living in the Henderson, Union, and Webster County areas may have assumed, albeit erroneously, that sufficient efforts were made to preserve their legal rights to benefit from the doctrine of equitable tolling by the filing of the Higginson complaint." Land Grantors I, 64 Fed. Cl. at 715.**

Claimants never alleged that any individual had such a belief about the Higginson lawsuit, and they presented no evidence in support of such an allegation. Even if Claimants had offered some evidence that some individual had such an erroneous belief for 26 years (they did not), that evidence is not equivalent to the "filing [of] a defective pleading during the statutory period," as the Court suggested in Land Grantors I. Land Grantors I, 64 Fed. Cl. at 714 (citing Irwin, 498 U.S. at 96). The filing (in 1965) of a complaint in Higginson (and the ensuing three years of litigation in that case), was not a "defective pleading." The Higginson case was not dismissed because it was filed in the wrong court or in the wrong case, and Claimants did not

[15] The Court's citation for this finding is DX-183 at Exhibit 73 at DOJ3442. See Land Grantors I, 64 Fed. Cl. at 714. That document shows only that Ashley G. Pritchett and Willard Greenwell had an agricultural lease, and provides no support for a conclusion about how Mr. Pritchett learned about the oil leases.

refile that case here once they noticed a pleading defect. The district court (and the Sixth Circuit and the Supreme Court) dismissed Higginson case because the claims raised could not succeed.[16] Therefore, the filing of the Higginson lawsuit, or any confusion about that case among former landowners, cannot support equitable tolling here. Even if such confusion could be shown, certainly such confusion would have ended when that case concluded in 1968 without Claimants obtaining any relief.

The finding also conflicts with the Court's conclusion that the Higginson lawsuit does not have any *res judicata* effect:

> There is no evidence in the record that other landowners urged Mr. Higginson to file his suit, participated in the selection of his counsel, reviewed the 1965 complaint, contributed to paying Mr. Higginson's counsel or costs, or relied on Mr. Higginson to represent and protect their legal interests.

Land Grantors I, 64 Fed. Cl. at 709-10. If the outcome of the Higginson lawsuit cannot be attributed to the Land Grantors Claimants for purposes of *res judicata*, then it must follow that the filing of the Higginson lawsuit also cannot be attributed to the Land Grantors Claimants for purposes of equitable tolling.

---

[16] The United States disagrees with the Court's statement that Higginson was a "jurisdictional ruling, because the suit was improperly filed pursuant to the Surplus Property Act of 1944, 58 Stat. 765, a law that was repealed by the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471, et seq., well before the suit was filed." Land Grantors IV, 74 Fed. Cl. at 520. The Higginson plaintiffs also raised a Fifth Amendment claim pursuant to 28 U.S.C. Section 1346, which was dismissed on the merits. See DX-64 at DOJ1251 (district court concluding that "The Declarations of Taking referred to above show unequivocally that the United States acquired the full fee simple title to this property. There is no ambiguity whatsoever in the estate taken by the Secretary of War.").

**e. "Plaintiffs did not have the ability to compel the Government to obtain and release information about the 1957 and 1959 leases and 1965 sales" because the "Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, ("FOIA") was not enacted until 1966." Land Grantors I, 64 Fed. Cl. at 715.**

While it is not clear whether the Court intended to offer the passage of FOIA in 1966 as an additional ground to toll Section 2501, Land Grantors I included the above-quoted language in its discussion of equitable tolling as "[o]ne additional important point [that] needs to be made." Land Grantors I, 64 Fed. Cl. at 715. Passage of FOIA in 1966 (or the absence of FOIA prior to that date) is not an "extraordinary circumstance" that might be relevant for evaluation of an equitable tolling allegation. Passage of the act could hardly qualify as an "extraordinary" event, since the Court's finding could be made with respect to any claim that accrued before 1966. Even if the federal government did not enact FOIA prior to 1966, Claimants certainly did not have to wait until that date to file a lawsuit or otherwise seek to preserve their legal claims.

Moreover, passage of FOIA could not toll Section 2501 subsequent to 1966. Since Claimants did not invoke the Tucker Act until 2005, the claims would still be barred by the statute of limitations by several decades.

Finally, the supposedly-missing evidence that could have been gained by a FOIA request – "information about the 1957 and 1959 leases and 1965 sales" events – is irrelevant to a claim of mutual mistake. In order for the doctrine of mutual mistake to apply, the mistake must have been made at the time the Contracts were signed. See discussion, supra, § III(E). Information about the leasing and sale of these properties decades after the Contracts were signed have no bearing on the mutual mistake inquiry.

**iii. The United States is Significantly Prejudiced by Application of the Doctrine of Equitable Tolling**

Equitable tolling is not available here for the additional reason that the United States would be significantly prejudiced by its application. "Although absence of prejudice is a factor to be considered in determining whether the doctrine of equitable tolling should apply once a factor that might justify such tolling is identified, it is not an independent basis for invoking the doctrine and sanctioning deviations from established procedures." Baldwin County Welcome Center, 466 U.S. at 152. In other words, the existence of prejudice to the United States is available only as a shield, not a sword: although the absence of prejudice to the government cannot justify application of equitable tolling, the presence of prejudice can prevent its application.

As discussed at length in the Defendant's Post-Trial Brief (and several other pleadings made in this case), all of the historical evidence supports the government's position. The uncontroverted record demonstrates that rumors of alleged wrongdoing arose decades after the acquisition of these properties. The idea that verbal repurchase promises were made at the time of acquisition, for example, was first articulated in the mid-1960s, and has spread by word of mouth, passed down from family to family and generation to generation, without any historical factual support.

If Claimants had sued within the 6-year statute of limitations, this case would have been litigated (and dismissed) decades ago, before the rumors of impropriety had been planted, taken root, and grown into its current form. As a direct result of Claimants' decision to delay decades before filing a lawsuit, the Government is now forced to defend against hearsay rumors that find no support – and are directly contradicted by – thousands of pages of historical documents. The

United States has no ability to directly cross examine those non-testifying witnesses upon which the Court's findings of impropriety are based. See Corman's Limitation of Actions § 3.3.2 at 186-87 (stating that prejudice is shown in the context of the doctrine of laches by "loss of the evidence that would support the defendant's position [which can occur] by reason of the death of a witness or through loss of memory or records"). In addition, because of their extraordinary delay in bringing this lawsuit, Claimants have very limited knowledge of even the most basic allegations in this case other than rumors of impropriety that they may have heard second or third hand. E.g., Eurell v. United States, 566 F.2d 1146, 1150 (Ct. Cl. 1977) (laches invoked where government's ability to defend itself was prejudiced by faded memories of key witnesses seven years after event giving rise to the claim). The government is seriously prejudiced by Claimants' delay in bringing suit, and the application of equitable tolling, therefore, cannot apply. See also Def.'s Post-Trial Mem. at 120-28 (discussing why the doctrine of laches bars relief of the Congressional Reference claims).

**4. Conclusion**

The Court has repeatedly stated that the "unique and *sui generis* circumstances of this case" justifies application of equitable tolling. See Land Grantors I, 64 Fed. Cl. at 713; Land Grantors II, 69 Fed. Cl. at 436; Land Grantors III, 71 Fed. Cl. at 620. The most "unique" aspect of this case is the extraordinary length of time between accrual and the filing of this lawsuit. Claimants did not file a Tucker Act claim within six years, as required by Section 2501. For the reasons discussed above, their claims are time barred and must be dismissed for lack of jurisdiction.

**D. Count I Is Barred by the Doctrine of Laches**

"Because of the equitable origins of relief in cases of relief for mistakes in the amount of land, the equitable doctrine of laches may be invoked to deny relief." 7 Corbin on Contracts § 28.33 at 171. For the same reasons discussed above, Count I is barred by the doctrine of laches. See also Def.'s Post-Trial Mem. at 119-28 (discussing why the doctrine of laches bars relief of the Congressional Reference claims).

**E. Count I Must be Dismissed for Failure to State a Claim Upon Which Relief Can Be Granted**

"The purpose of reforming a contract on the basis of mutual mistake is to make a defective writing conform to the agreement of the parties upon which there was a meeting of the minds." Emerald Maint., Inc. v. United States, 925 F.2d 1425, 1429 (Fed. Cir. 1991). Reformation of a written agreement on the ground of mutual mistake is an extraordinary remedy, and is available only upon presentation of satisfactory proof of four elements:

(1) the parties to the contract were mistaken in their belief regarding a fact;
(2) that mistaken belief constituted a basic assumption underlying the contract;
(3) the mistake had a material effect on the bargain; and
(4) the contract did not put the risk of the mistake on the party seeking reformation.

Nat'l Austl. Bank, 452 F.3d at 1329 (quoting Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990)); see also Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994); RESTATEMENT (SECOND) OF CONTRACTS ("RESTATEMENT") § 152 (1981). In considering the doctrine, courts must assess the "facts in existence at the time of the sale." Colorado Coal & Iron Co. v. United States, 123 U.S. 307, 328 (1887). The burden of proof is born by the party attacking the validity of the contract, and he must present "clear and

convincing evidence" of each element before mutual mistake can be found. See Nat'l Austl. Bank, 452 F.3d at 1329; Philippine Sugar Estates Dev. Co. v. Government of Philippine Islands, 247 U.S. 358, 391 (1918) (reformation will not be granted "unless the proof of mutual mistake be of the clearest and most satisfactory character); RESTATEMENT § 155 cmt. c (1981) (noting that the law of contract typically "requires the trier of the facts to be satisfied by 'clear and convincing evidence' before reformation is granted").

**1. Claimants' Right to Avoid the Contracts Are Barred for Failure to Act Within a Reasonable Time**

In Grymes v. Sanders, 93 U.S. 55 (1876), the Supreme Court held that "[w]here a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. . . . Delay and vacillation are fatal to the right which had before subsisted." Id. at 62 (emphasis added). Regardless of the merits of their allegations, Claimants may not invoke the doctrine of mutual mistake due to their failure to act within a reasonable time after they became aware of the relevant facts.

As discussed above, the Court determined that a claim of mutual mistake accrued in the mid- to late-1960s. See discussion, infra § III(C)(1). However, only one individual (Mr. Cyrus Higginson) filed a lawsuit or lodged a formal protest or complaint with a government agency within a reasonable time period. That lawsuit ended in 1968. Claimants did not file a complaint in this Court until 1994, approximately 26 years after the alleged discovery of the "mutual mistake." Even if Claimants had raised a mutual mistake claim in 1994 (which the United States disputes), their 26 year delay cannot qualify as an "at once" announcement. Grymes, 93 U.S. at 62. Accordingly, regardless of the merits of this claim, Claimants' right to avoid the contacts is barred for failure to act within a reasonable period of time.

### 2. **Subsequent Discovery of Commercially Valuable Mineral Deposits Cannot Retroactively Create a Mistake of Fact**

In support of its conclusion that the Contracts are void under the doctrine of mutual mistake, the Court preliminarily determined that the parties mistakenly believed that "no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operations at the time of sale." Land Grantors I, 64 Fed. Cl. at 703. Claimants repeat this preliminary finding as an allegation in their Second Amended Complaint. See Second Am. Compl. ¶ 34. As discussed below, the evidence does not support this finding. See discussion, supra § III(E). Even if the record supported the Court's finding, a mistake about the existence of commercially-valuable minerals cannot support application of the doctrine of mutual mistake. Accordingly, the Court should dismiss this claim for failure to state a claim upon which relief can be granted. See RCFC 12(b)(6).

The quantity of minerals underlying a particular property is often speculative. For this reason, the "subsequent discovery of commercially valuable [mineral] deposits, or new discoveries making formerly noncommercial deposits profitable to mine, would not retroactively create a mistake of fact." Haag v. State Bd. of Univ. & School Lands, 219 N.W.2d 121, 127 (N.D. 1974); accord RESTATEMENT § 154, comment (a). As authority for its conclusion, the Haag court relied upon Colorado Coal & Iron Co. v. United States, 123 U.S. 307 (1887), where title to land was challenged on the ground that the land was shown by subsequent discoveries to be rich in minerals. The Court rejected the challenge, stating:

> A change in the conditions occurring subsequently to the sale, whereby new discoveries are made, or by means whereof it may become profitable to work the veins as mines, cannot affect the title as it passed at the time of sale. The question must be determined according to the facts in existence at the time of the sale.

Id. at 328 (emphasis added).

These principles are based on the well-settled view that "[a] party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact.]" Dairyland, 16 F.3d at 1203 (concluding that "[t]he availability of commercial reprocessing in the future cannot constitute an existing fact at the time of the 1973 sale contract"); see also Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20 (2000) ("A mutual mistake in prophecy or opinion may not be taken as a ground for rescission where such mistake becomes evident through the passage of time."). As the Federal Circuit stated in Dairyland, "there is uniformity among the circuit courts of appeals and the commentators that mutual mistake of fact cannot lie against a future event." 16 F.3d at 1203 (emphasis added).

The Court's decision conflicts with these principles. See, e.g., Land Grantors I, 64 Fed. Cl. at 709 ("the facts on which a claim of mutual mistake [are based] did not occur until many years later"). Although phrased in terms of whether the parties were aware of the existence of commercially-valuable minerals, the only real "mistake" the parties made was in failing to predict that the sales prices in the 1960s would exceed the sales prices in the 1940s. That kind of "mistake" – a failure to accurately predict the future – is not cognizable under the doctrine of mutual mistake for the reasons stated above. The 1960s sales prices were unknowable in the early 1940s because no one could have predicted how oil and gas consumption in the United States would increase during World War II, and then soar in the postwar years as the U.S. economy boomed. See Daniel Yergin, The Prize: The Epic Quest for Oil, Money & Power (Simon & Schuster 1991) at 382, 409 ("At the peaks, the American Forces in Europe used one

hundred times more gasoline than in World War I." "In 1945, 26 million cars were in service; by 1950, 40 million. Virtually no one in the oil industry was prepared for the explosion of demand for all oil products."). In addition, the parties could not have predicted in 1942 that a bidding war would drive up prices in the 1960s. See Allied Chem. Corp. v. Union County Bd. of Supervisors, 511 S.W.2d 196, 197 (Ct. App. Ky. 1974) (one mineral purchaser alleging that "quantities of oil were less than anticipated by the purchasers; [and] the bids [in the 1960s] were highly speculative; and the sale price was excessive."). Claimants have never disagreed with this assessment, stating in their Pre-Trial Memorandum that "[t]he major source of the capital appreciation [from 1942 to 1966] was the much greater value of mineral rights in 1966 than in 1942, reflecting increased demand not only for oil and gas but also for coal." Pls.' Pre-Trial Memo. at 12 (emphasis added).[17]

Post-transaction discovery of commercially-valuable minerals (even if supported by the record) cannot retroactively create a mutual mistake of fact to void the Contracts. The Court should dismiss Count I for failure to state a claim upon which relief can be granted.

---

[17] The only expert testimony in the record on the concept of fair market value is from John D. Dorchester, MAI. As he testified,

> Market value is created by buyers and sellers as of a given date. It is the property-specific issue of the rights appraised for a given parcel of real estate and the time-specific issue of a particular date that establish the foundation for market value.

DX-651 at 16. Moreover, events or discoveries occurring subsequent to a real estate sale

> do not mean that the earlier valuation was incorrect at the time, even if the later event or circumstances were believed to be possible at the earlier date of value. What is considered possible in the future is factored by the market into its present market value. What is unknown is a form of speculation and cannot be used at a future date to retrospectively change an earlier market value opinion.

Id. at 34.

**3. The Alleged Mistake of Fact Did Not Have a Material Effect on the Parties' Bargain**

The Court preliminarily determined that the parties' mistake about the existence of commercially-valuable minerals had a material effect on the agreed exchange of performance because "the financial benefit that the Government received from the coal, gas, oil, and other mineral interests far exceeded what was bargained for, *i.e.*, the use of the land for Camp Breckinridge, which was the sole basis of the Declarations of Taking." Land Grantors I, 64 Fed. Cl. at 707. The United States respectfully disagrees. The former landowners sold, and the government bought, the full fee simple estate for each of the Breckinridge properties, not just use of the surface interest for a limited purpose. See Higginson, 384 F.2d at 507 ("In the instant case the declarations provided that 'The estate taken for said public uses is in full fee simple title, subject however to existing easements for public utilities, for public railroads, and for pipelines.' Thus, if valid title passed to the United States, it received full fee title except for the specified easements."); see also Tr. Tr. at 198:12-13 (CLAIMANTS' COUNSEL: "We've now found from discovery that the minerals were paid for."). The "agreed exchange of performance," then, was the fee simple conveyance of a particular property. The fact that the minerals were sold for more money 25 years after they were acquired by the United States does not have any effect on the parties' bargain (much less a "material effect") because the parties had already completed the full performance of their bargain 25 years earlier. The Claimants' subsequent frustration with these events neither retroactively creates a mutual mistake nor changes the terms of the unambiguous contracts.

**4. The Former Landowners Bore the Risk of Mistake**

The doctrine of mutual mistake also cannot apply because the former landowners bore

the risk of the subsequent discovery of commercially-valuable mineral deposits. As a general matter, the doctrine of mutual mistake does not protect the seller of land if he sells the property for less than it is worth. See 7 Corbin on Contracts § 28.35 at 180 (stating that a mistaken estimate of market value is "[p]ractically never" the type of mistake that would justify avoidance of a contract); Frona M. Powell, Mistake of Fact in the Sale of Real Property, 40 DRAKE L. REV. 91, 110 (1990/1991) (stating that the law "generally does not protect the seller from loss if he sells the property for less than it is worth"). This is because a seller's ownership of property presumably creates knowledge about the property, placing the seller in a better position than the purchaser to know the relevant facts, and the burden should rest on the party most likely to know those facts. See id. (citing Palumbo v. Ewing, 540 F. Supp. 388, 393 (D. Del. 1982)); see also RESTATEMENT § 154, comment c (mistaken party who is aware when he made the contract that his knowledge was limited with respect to the facts to which the mistake relates bears the risk of the mistake).

For this reason, the RESTATEMENT specifically allocates the risk of mistake to the seller of farm land that is later discovered to contain valuable mineral deposits:

> [I]t is commonly understood that the seller of farm land generally cannot avoid the contract of sale upon later discovery by both parties that the land contains valuable mineral deposits, even though the price was negotiated on the basic assumption that the land was suitable only for farming and the effect on the agreed exchange of performances is material. In such a case a court will ordinarily allocate the risk of the mistake to the seller, so that he is under a duty to perform regardless of the mistake.

RESTATEMENT § 154, comment a; see also 2 E. Allan Farnsworth, FARNSWORTH ON CONTRACTS § 9.3 at 608 (3d ed. 2004) ("Suppose an owner of farm land discovers, after making a contract for its sale, that the land contains mineral deposits that make it much more valuable than either

party has supposed. As a general rule, the owner cannot avoid the contract on the ground that both parties were mistaken in assuming, when they fixed the price, that the land was suitable only for farming.”).

In several instances, the former landowners owned the farm land for many years prior to the government’s acquisition. See, e.g., JX-554 at CHI-016-E040-0020 (stating that the landowner for Tract No. E-40 had owned that property for 24 years prior to the United States’ acquisition). More than half of the properties were subject to outstanding mineral leases in third parties, and several former owners had conveyed their entire mineral interests well before the government’s acquisition. The former owners were aware that minerals might exist underneath these properties and also knew that little was known about the quantities of those minerals. These former landowners could have conducted exploration of their land to gain a better understanding of the quantity of minerals, something that the United States lacked the ability to do. These landowners also had the option to proceed to a jury trial to fully evaluate the value of their property, but they chose not to do so. In such a situation, the former owners plainly bore the risk of the mistake.

The Court preliminarily found that “[u]nder the unique and *sui generis* circumstances of this case, the landowners should not bear the risk of the parties’ mutual mistake. . . .” Land Grantors I, 64 Fed. Cl. at 707. The Court supports this finding in two ways. The Court first concluded that the government should bear the risk of mistake because the Contracts did not expressly require the former landowners to assume such a risk. See id. at 707 (citing Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 312 F.2d 408 (1963)). The United States disagrees. As discussed above, the acquisition documents show that the former landowners did

contemplate the possible existence of subsurface minerals at the time of sale. In addition, the former landowners explicitly promised to "sell and convey to [the United States] its successors and assigns forever," and expressly noted that the United States would hold the Breckinridge properties "forever, with a covenant of 'General Warranty.'" JX-554 at CHI-016-E040-0006 to 0007 (emphasis added). When the former landowners signed the receipt for their payment from the United States, they acknowledged that the sum was received "in full satisfaction and discharge of the interest of the undersigned in the premises conveyed." JX-554 at CHI-016-E040-0010. The former landowners, therefore, expressly gave up all of their rights to these properties and consequently assumed the risk of the later discovery of commercially-valuable minerals.

Flippin Materials, which the Court cites in support of its conclusion, supports the United States' position. In that case, the Court of Claims rejected a contractor's mutual mistake claim related to a contract to excavate rock from a government-owned mountain. When the contractor found more clay-contaminated rock than it expected, the contractor sought to avoid the contract based, in part, on a claim of mutual mistake. See 312 F.2d at 411. Because the contract lacked the "usual changed conditions clause," the contractor bore the risk of the mistake, and could not avoid the contract. See id. at 415-16. Similarly, these Contracts do not include a "changed conditions clause," but instead explicitly show that the United States acquired the full fee simple. Accordingly, Claimants bore the risk of mistake, and mutual mistake cannot apply.

Next, the Court concluded that the United States bore the risk of mistake because the "Government required the landowners to vacate the premises under very short notice," meaning that landowners were unable to "seek a neutral professional assessment of the potential for coal,

gas, oil, and other minerals on the property. . . ." Land Grantors I, 64 Fed. Cl. at 707. The Court's finding cannot be supported. The majority of former landowners declined the government's initial appraisal, declined to voluntarily sell their property, and opted instead to proceed to condemnation. Those former landowners were allowed to file Exceptions to the values estimated in the Commissioners' Reports, submit their own appraisal report, and proceed through a jury trial if they so desired. If the former landowners disagreed with the jury's assessed award, they could have appealed the jury's decision. Nothing prevented these Claimants from proceeding through condemnation and engaging in exactly the type of assessment the Court contemplates.

For the reasons stated above, the former landowners bore the risk of mistake, and the doctrine of mutual mistake cannot apply.

**F. In the Alternative, Count I Cannot Be Supported Under the Trial Record Generated in Land Grantors v. United States, No. 94-643X (Fed. Cl.)**

**1. The Parties Were Not Mistaken About Any Fact**

Although Count I fails on the pleadings, the evidence also does not support application of the doctrine of mutual mistake. At most, the evidence shows that although former landowners were aware of the existence of subsurface minerals, some former landowners had not fully explored or actively mined the minerals underlying their properties prior to the government's acquisition. There is no basis, however, to equate a finding that the former landowners had not developed their subsurface minerals with a conclusion that the parties shared a mutual mistake about those subsurface minerals.

An examination of the evidence upon which the Court relies to support its conclusion that the parties shared a mistake demonstrates the point. To support a finding that the parties were

mistaken about the existence of commercially-valuable minerals, the Court relied upon the following evidence:

1. **Government's Pre-Trial Memorandum.** See Land Grantors I, 64 Fed. Cl. at 703 (citing the Government's Pre-Trial Memo. at 41). In our pre-trial memorandum, we argued that there "is no evidence (and Claimants do not even contend that there is) that the government knew something about the minerals that the landowners did not or that the government refused to pay the former owners for minerals." The government's argument (which is not evidence, but is certainly correct) does not support any finding about the parties' awareness of subsurface minerals at the time the Contracts were signed.

2. **Dr. Brigham's Expert Report (DX-183)**. See id. at 703-04. Dr. Brigham offered no evidence to support a conclusion that the parties shared a mistake about subsurface minerals. Rather, Dr. Brigham's testimony contradicts such a conclusion by explaining that:

   > Coal mining began in the Morganfield area before the Civil War. In 1940, the Maginnis Coal Company operated a mine that produced coal for the domestic market. Mine owners were primarily dependent on the railroads for shipping coal to market, so most mines were located near the Illinois Central Railroad or the Louisville and Nashville Railroad.

   DX-183 at DOJ2767. Dr. Brigham's report also cited historical data relating to producing nearby coal mines in 1941, see id. at DOJ2768, and cited a report about oil prospecting in the area in the early 1940s, see id. at DOJ2768-69. In discussing the government's surplusing of the Breckinridge properties, Dr. Brigham stated that "The nationwide demand for oil increased dramatically during and after World War II. The increased demand spurred oil exploration and

production in western Kentucky. Oil production in the area had been rising since the war." Id. at DOJ2787.[18]

3. **Heady Deposition (CX-271)**. See Land Grantors I, 64 Fed. Cl. at 704 n.41. The Court relies on Mr. Heady's statement that, at the time of acquisition, the former owners had not actively developed their subsurface minerals. See id. at 704 n.41 (citing CX-271 at 60). Mr. Heady offered no opinion about the possibility that any former landowner or government agent was mistaken about any fact.

4. **The Acquisition Documents**. In Land Grantors I, the Court stated that "[t]he purchase options issued by the Government further evidence this 'basic assumption' since they specifically excluded 'all oil and gas leases of record that are still in force, also except all coal and mineral rights heretofore conveyed if any.'" 64 Fed. Cl. at 704. The quoted language reflects the fact that the option agreement did not include (1) any mineral leases and (2) any mineral rights that the former landowners had already conveyed to third parties. These leases and previously-conveyed mineral rights were, of course, also acquired by the federal government. See Def.'s Pre-Trial Mem. at 40-50; Tr. Tr. at 199:15-17 (Claimants' counsel stating "[w]hat we agreed to is the government bought the entire package, minerals and [surface]"). The quoted language does not support a finding that the parties were mistaken about the possible existence of subsurface minerals. To the contrary, the language shows that the parties considered subsurface minerals at the time of the government's acquisition.

[18] The Court also cited Dr. Johnson's report that an oil well was drilled in May 1943 on a farm 2.5 miles west of Morganfield. See Land Grantors I, 64 Fed. Cl. at 704 n.41 (citing DX-182 at DOJ1853-54) The report does not support the Court's finding.

In further support of its conclusion, the Court cited a Certificate of Inspection and Possession and Affidavit of Vendor for Tract A-15. See Land Grantors I, 64 Fed. Cl. at 704 (citing DX-541 at CHI-002-A015-0015 and DX-541 at CHI-002-A015-0036). These documents, which were included in the acquisition documents for the condemned properties, show that certain former owners whose property was condemned had not actively explored for subsurface minerals prior to the government's acquisition. That finding does not support a conclusion that the parties had a mutual mistake about the existence of subsurface minerals. As with the purchase agreements, these documents instead show that the parties did consider subsurface minerals at the time of the government's acquisition.

5. **Affidavits signed by heirs in 1979**: The Court also cites 39 affidavits in support of a conclusion that the parties shared a mistake about minerals. See id. at 704 n.44. Each of these documents is dated 1979, decades after the relevant events. Although it is the government's position that these documents are inadmissible hearsay, if they are admitted, they contradict a conclusion that the parties were mistaken about the existence of commercially-valuable minerals. Thirteen of the affiants, for example, stated their belief that the mineral rights related to their ancestor's tract had been leased to third parties and that pumping oil wells were located near their farms prior to the government's acquisition.[19] An additional fourteen affiants stated their belief that the mineral rights

---

[19] CX-133 (claims that oil rights were leased and pumping oil wells were located near the farm in 1942); CX-149 (same); CX-157 (same); CX-167 (same); CX-168 (same); CX-169 (same); CX-197 (same); CX-212 (same); CX-221 (same); CX-228 (same); CX-198 (also states that oil rights were leased and that a test oil well had been drilled shortly before the government's (continued...)

had been leased before the government's acquisition,[20] or that pumping oil wells were located near the farm before the government's acquisition.[21] These affiants could not reasonably argue that the former landowners were mistaken about the possible existence of commercially-valuable mineral rights. Four affidavits make the bald assertion, directly contradicted by Claimants' counsel at trial, that former landowners were not paid for their mineral rights.[22] See Tr. Tr. at 198:12-13 (Claimants' Counsel: "We've now found from discovery that the minerals were paid for."). The remaining eight affidavits merely state a belief that the oil rights were not leased in 1942 and that there were no pumping oil wells on the property in 1942.[23] Even if the affidavits were correct, the statements do not support a conclusion about what any former landowner or any government agent believed about the existence of commercially-valuable minerals in the 1940s.

6. **Interrogatory Responses.** The Court cites four answers to interrogatories for the

---

[19](...continued)
acquisition); CX-211 (also states that government agent refused to allow former landowner to reserve mineral rights); CX-126 (also states "Mr. Jeff Tapp had a producing oil well at this time" and had received income from the well).

[20] CX-151 (claims that mineral rights had been leased prior to acquisition); CX-153 (same); CX-170 (same); CX-178 (same); CX-180 (same); CX-185 (same); CX-206 (same); CX-219 (same); CX-230 (same).

[21] CX-155 (claims pumping oil wells were located near the farm in 1942); CX-173 (same); CX-182 (same); CX-190 (same); CX-223 (same).

[22] CX-147 (claims that no consideration was given for mineral rights); CX-210 (same); CX-213 (same); CX-267 (same).

[23] CX-163; CX-172; CX-183; CX-196; CX-216; CX-218; CX-226; CX-227.

proposition that former landowners had not actively mined the minerals prior to the government's acquisition. See Land Grantors I, 64 Fed. Cl. at 705 n.44. Even if true, the statements do not support a conclusion about a shared mistake.

7. **Deposition Transcripts.** The Court also cites five deposition transcripts. See id. at 705 n.44. The transcripts suggest that the former landowners were aware of minerals and the potential for mineral development in the area. See CX-270 at 30-35 (deponent states that the former landowners' attorney, who represented the former landowners during the acquisition, communicated with the U.S. Attorney about minerals and the handling of mineral leases); CX-273 at 17 (deponent states that the former landowners were aware of nearby oil wells pumping at the time of acquisition); CX-276 at 32 (deponent states the minerals were leased to third parties and that the oil company had drilled test hole before she vacated the property); Eulah P. Tilley Depo. at 31-32 (deponent states that landowners were aware of minerals at the time of acquisition).[24/] These transcripts do not support a finding of mutual mistake.

8. **Lease Acquisitions.** The Court concluded its discussion of mutual mistake with the following sentence:

> Where the Government was aware of even the potential for coal, gas, oil, or mineral deposits because of the existence of a lease, whether being exercised or not, the lessees were paid for the leases or negotiated an agreement whereby the lessees could resume activities after the war. See DX-627; DX-630; DX-633.

Land Grantors I, 64 Fed. Cl. at 706. The Court's limitation to circumstances where the

[24/] The fifth deponent, Ms. Dixon, testified about her belief that she had the right to retain the mineral rights and had been promised the right to repurchase the property after the war for 1/10 of its value. See CX-275 at 14. Ms. Dixon's belief is not supported by any admissible evidence.

"Government was aware" of the existence of mineral deposits is not supported by the record; the government condemned all mineral leases. The government's acquisition of mineral leases from third parties does not support the Court's finding that the parties shared a mistake about subsurface minerals.

**2. There Was No Subsequent Discovery of Any Mistake of Fact**

Because the parties were not mistaken in their belief regarding any fact, the record does not support the Court's conclusion that the parties subsequently learned of the mistake or that the parties subsequently discovered substantial minerals underlying the Breckinridge properties. The Court concluded that the United States "discovered" significant oil and gas reserves under the Breckinridge properties in either 1951, 1954 or 1956.[25/] In addition, the Court appears to have concluded that the Claimants discovered the mistake at a later date – perhaps April 1964, as a result of newspaper articles about the leasing of some mineral interests, or August 1967, as a result of the sale of certain mineral interests. See id. at 711, 714.

The Court's findings are not supported by the evidence. For example, in support of its

---

[25/] See id. at 664 (stating that by "June 19, 1951, the Department of Defense ("DOD") became aware that substantial gas and oil reserves may be located under the condemned properties"); id. at 664 (stating that "[i]n August 1956, DOI's Geological Survey Office confirmed the existence of substantial oil and gas reserves under the condemned properties that were being drained by producing wells adjacent to Camp Breckinridge"); id. at 673 (stating that DOI's Office of Geological Survey confirmed that "potentially significant oil and gas deposits were present under the Camp Breckinridge lands" in May 1954).

The Interim Report also states that a May 4, 1943 document, which describes the planned acquisition of a 9.4-acre parcel for a water line as "[a]gricultural land without improvements but active mineral rights" is the "first indication that the Government was aware of the potential value of mineral rights on the condemned properties." See id. at 671-72 (citing JX-22 at DOJ1349). The United States acquired an easement over the referenced 9.4-acre parcel, and that tract is not part of this case. In addition, the phrase "active mineral rights" is a description of the particular 9.4-acre parcel, and the Court's attachment of some significance to the words cannot be supported.

statement that the Department of Defense "became aware that substantial gas and oil reserves may be located under the condemned properties" by June 1951, the Court cites only to the government's June 9, 2004 discovery response to Claimants' Request for Admission Number 27. See Land Grantors I, 64 Fed. Cl. at 664 n.2; see also Land Grantors IV, 74 Fed. Cl. at 519 n.3 (same). That request for admission, however, merely asked the United States to admit "that on or about June 19, 1951, the United States Department of the Army transferred all oil and gas rights on the Property to the Department of the Interior." The request for admission says nothing about the discovery of "substantial gas and oil reserves" and does not support the Court's finding.

In support of its statement that DOI's Geological Survey Office "confirmed the existence of substantial oil and gas reserves" in 1954 or 1956, the Court relies only upon DX-40 at DOJ0311. See Land Grantors I, 64 Fed. Cl. at 673 (using a May 1954 date, and citing only DX-40); but see id. at 664 (using an August 1956 date, with no citation); Land Grantors IV, 74 Fed. Cl. at 519 (same). DX-40 is a copy of DOI's 1957 dismissal of a protest against the issuance of an oil and gas lease for a 190-acre tract, which had been filed by two former owners. Page DOJ0311 of that document references a 1954 investigation undertaken by the Geological Survey, stating the following:

> Investigation of the drainage situation by the Geological Survey of this Department in May 1954 disclosed that the threat of drainage from oil wells in the South Morganfield oil field had been diminished to a considerable extent, if not entirely eliminated. Consequently, further action on this matter was then suspended pending completion of a study by the Army of its need for the land for military purposes.

DX-40 at DOJ0311. The document then describes that the situation changed in August 1956, when the Geological Survey reported that 14 off-base wells had been completed and were then in

operation. See id. Without stating anything about a discovery of oil or gas reserves underneath the Breckinridge properties, the report states that "[i]n order to protect the United States against loss by reason of the drainage of the oil and gas deposits occurring from the Camp Breckinridge lands, the tract of 190 acres on the east boundary of the camp was offered for leasing on March 20, 1957." Id. These documents do not evidence a "discovery" of oil and gas in 1954 (or 1956) – rather, DX-40 shows only that DOI became concerned in 1956 that off-base oil prospecting might result in drainage. Because DOI had "the legal obligation to take such measures as may be necessary to protect the interests of the United Sates from loss," id. at DOJ0311, it leased out the mineral interests underlying the 190 acres.

The Court's conclusion that Claimants learned of the mistake in the mid-1960s when the United States sold these properties, see Land Grantors I, 64 Fed. Cl. at 711, 714, is also not supported by any evidence. Most of the former landowners had already leased out their mineral rights to third-party mineral companies before the United States acquired the Breckinridge properties in the 1940s. See DX-204 (showing 66% of condemned tracts had third-party mineral leases at the time of acquisition); DX-537 (showing 30% of purchased tracts had third-party mineral leases at the time of acquisition). The United States separately condemned those mineral leases in the 1940s. Certainly some heirs of former landowners are now frustrated that the minerals sold for more in 1960s than they did in the 1940s, but that frustration does not support a finding that the parties shared a mutual mistake in the 1940s.

**3. Summary**

For the reasons set forth above, the doctrine of mutual mistake cannot apply as a matter of law and Count I should be dismissed pursuant to Rule 12(b)(6). In addition, the trial evidence

does not support application of mutual mistake, and the Court should, therefore, enter judgment in favor of the United States pursuant to Rule 58 of the Rules of the Court of Federal Claims. The record shows that the government intended to acquire, and the former landowners intended to sell, the full fee simple absolute, including mineral rights. The parties agree that the United States paid the former landowners for their mineral rights, and there is no evidence to support a conclusion that any former landowner or any government agent was mutually mistaken with respect to any fact.

Claimants do not, and have never, argued otherwise. In Claimants' First Amended Complaint, for example, Claimants alleged that "[a]t and prior to the time of the appraisal and condemnation of the real properties, the aforementioned sub-surface minerals, including gas, oil and/or coal, were being extracted from some of the real properties as well as surrounding properties." First Amended Complaint ¶ 69; Second Amended Complaint ¶ 92 (same). In their Post-Trial Memorandum, Claimants argued that coal had been mined in the immediate area since before the Civil War, and that oil and gas drilling was well underway before these properties were sold to the United States. See Claimants' Post-Trial Mem. at 2. The evidence shows that the United States paid the former landowners full and reasonable value for a fee simple interest in their properties. Claimants' frustration that the government sold the Breckinridge properties for more money 25 years after they were acquired cannot support a mutual mistake claim.

**G. Claimants Failed to Prove Damages Caused by the Alleged Mutual Mistake**

In general, "[w]here there has been a mutual mistake of fact causing the terms of the written contract to depart from the parties' actual understanding, this court, like other courts, will normally grant reformation." Southwest Welding & Mfg. Co. v. United States, 179 Ct. Cl. 39,

373 F.2d 982, 989 (Ct. Cl. 1967). Because the Contracts were fully performed more than 60 years ago and Claimants failed to diligently pursue their claims for decades after their claim accrued, reformation is now an impracticable remedy.

The Court stated its belief that "the 1942-1944 contracts are void, because they were based on a mutual mistake." Land Grantors I, 64 Fed. Cl. at 707. This remedy is also impracticable. A declaration that the Contracts are voidable is problematic because these Contracts were fully performed decades ago. There is no way to avoid the consequences of the Contracts by declaring them voidable because those consequences were settled long ago. Moreover, a finding that the parties were mistaken about the possible existence of minerals cannot justify a declaration that a contract is void *ab initio*. See Godley v. United States, 5 F.3d 1473, 1476 (Fed. Cir. 1993) (requiring some illegal action to invoke the void *ab initio* rule). A declaration that the Contracts are void *ab initio* would also create significant complications involving multiple third parties who are not currently represented in this lawsuit. The United States, therefore, submits that any remedy would not involve the voiding of these Contracts.

Regarding a monetary award, the Court tentatively concluded that Claimants are entitled to restitution. See Land Grantors I, 64 Fed. Cl. at 708 ("The Remedy For Mutual Mistake is Restitution.").[26] If restitution is available at all, the "award of restitution should seek to return

---

[26] The United States does not concede that restitution is an appropriate remedy in this context. In discussing restitution, for example, the Court cited only two cases, both of which are easily distinguished from the instant matter. Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604 (2000), involved the alleged repudiation of two government contracts, not a claim of mutual mistake. The principle for which the case is cited – that past performance did not constitute waiver of the contractors' rights to restitution – has no bearing on how the Court should fashion a remedy for this mutual mistake claim. Landmark Land Co. v. FDIC, 256 F.3d 1365 (Fed. Cir. 2001), a Winstar-related case, does not involve a mutual mistake (continued...)

the non-breaching party to as good of a position as it would have been in if the contract had never been entered into, 'the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach.'" Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004) (quoting Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003)). If restitution is an appropriate measure of damages, then the Court should fashion an award that would take into account the amount the former landowners would have received if they had not signed the Contracts.

If the former landowners had not signed the Contracts, the government would have condemned their properties. See Tr. Tr. at 171:19-23 (Claimants' Counsel: "Had [the voluntary sellers] not signed the option agreements and agreed to the appraised value, they would have still had their property taken, and they still would have had to have gone, to some extent, through the condemnation proceedings."). For this reason, the Court indicated at trial that any monetary award would take into account the values that the former landowners might have received if they had never entered into the Contracts and instead proceeded through condemnation proceedings:

> [T]he best evidence of [underpayment] is what you did earlier, which is where you compared the prices of the condemned properties. The properties went through condemnation versus the properties that, you know, were sold voluntarily. You take a look to see, you know, if hopefully if they were like-kind properties and which ones had mineral interests and which ones didn't. That's the best evidence of that.

Tr. Tr. at 679:17-25. The Court's favored analysis, though flawed for the reasons set forth in the government's Post-Trial Memorandum, is at least somewhat consistent with the realities of the

---

[26/](...continued)
claim. Therefore, its discussion of restitution (which relies on Mobil Oil Exploration), has no bearing on the claim raised here.

acquisition processes in the 1940s.

The analysis is also consistent with the parties' arguments regarding damages in the context of the Congressional Reference matter. See Def.'s Post-Trial Br. at 130-159; Claimants' Post-Trial Br. at 76-85. At trial, the parties disagreed about how to compare the two data sets (i.e., the values paid for the condemned properties and the values paid for the purchased properties). Claimants suggested a blind comparison – calculating the difference between the average values paid for the two data sets without first evaluating whether the two data sets were comparable (or, in the Court's words, whether the two data sets included "like-kind properties"). The government's experts demonstrated the flaws in Claimants' overly-simplistic calculation, and argued that Claimants would have to show, at a minimum, (1) that the difference between the two data sets is statistically significant (that is, the difference was not due to chance) and (2) that difference was the result of some government action (in this context, Claimants would have to show that the difference was the result of the alleged mutual mistake identified by the Court after trial). See Def.'s Post-Trial Br. at 130-159. Claimants failed to make such a showing.

As the government's experts testified, the mathematical difference between the two data sets is not statistically significant. See id. at 130-159. In addition, Claimants failed to show that the difference between the two data sets was the result of any government action or any mutual mistake. As discussed in more detail in the government's Post-Trial Memorandum, "even if the Court believes that this comparison makes sense and that the difference is statistically significant, there is no basis for the Court to conclude that the price differential evidences improper government actions rather than some innocuous explanation." Id. at 133.

The United States disagrees with the Court's discussion of "unjust enrichment" and the

tentative conclusion that the government might be required to disgorge the proceeds it received when it sold the Breckinridge properties in the 1960s. See Land Grantors I, 64 Fed. Cl. at 709. As a preliminary matter, a claim based on unjust enrichment is equitable in nature and falls outside the Court's Tucker Act jurisdiction. See Aetna Casualty & Surety v. United States, 228 Ct. Cl. 146, 164 (1981) ("The claim based on unjust enrichment . . . proceed[]s from a perception that a party *ought* to be bound rather than . . . agreed to be bound. [An] unjust enrichment . . . theory of recovery is therefore based upon a contract implied in law, over which this court has not been given jurisdiction."); Anderson v. United States, 73 Fed. Cl. 199, 206 (2006) (same).

Even if the Court had jurisdiction to fashion a remedy on the grounds of unjust enrichment, such a remedy would be inappropriate here. The Court's theory appears based on a conclusion that to allow the government to retain the sales proceeds would result in unjust enrichment based on a perception that the government gained more value from the Breckinridge properties than it gave the former landowners. In its discussion of such situations, however, the Restatement of Restitution notes that when defendant "was no more at fault than the claimant, he is not required to pay for losses in excess of the benefit received by him and he is permitted to retain gains which result from his dealing with the property." RESTATEMENT OF RESTITUTION at 595-96; Developers Three v. Nationwide Ins. Co., 582 N.E.2d 1130, 1136 (Ohio App. 1990) (citing the Restatement provision and concluding that the correct measure of damages even when the defendant was more at fault than claimant "is the plaintiff's loss (including lost profits) that arises out of the tortious interference, not the defendant's gain"); see also Burger King Corp. v. Mason, 710 F.2d 1480, 1494 (11th Cir. 1983) ("[D]isgorgement of profits earned is not the remedy for breach of contract."). The United States is no more responsible for the alleged

mutual mistake than the former landowners. The 1960-era sale proceeds, therefore, did not "unjustly" enrich the United States and are not relevant to an award of restitution.

Accordingly, if the Court determines that Claimants proved the elements of a claim of mutual mistake, the Court should reject the claim for failing to prove damages.

## IV. CONCLUSION

For the reasons stated above and in the government's previous memoranda, the United States requests that the Court dismiss Count I and enter a recommendation in the United States' favor in the Congressional Reference matter.

Respectfully submitted this 1st day of October, 2007,

RONALD J. TENPAS
Acting Assistant Attorney General

_/s/ William J. Shapiro________
WILLIAM SHAPIRO
United States Department of Justice
Environment and Natural Resources Division
501 I Street
Suite 9-700
Sacramento, CA 95814
(916) 930-2207 (phone)
(916) 930-2210 (fax)

TOM C. CLARK II
Principal Deputy Section Chief
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
601 D Street, NW
Room 3152
Washington, DC 20530
(202) 514-3553 (phone)
(202) 305-0506 (fax)
Attorneys for the United States

Of Counsel:
Dale Holmes
Stephen J. Allison
U.S. Army Corps of Engineers
600 Dr. Martin Luther King Place
Louisville, KY 40202

Martin Cohen
U.S. Army Corps of Engineers
20 Massachusetts Ave., N.W.
Washington, DC 20314-1000