IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAND GRANTORS IN HENDERSON, UNION, and WEBSTER COUNTIES, KENTUCKY and THEIR HEIRS, | ) | |
| Plaintiffs, | ) | No. 93-648 |
| v. | ) | Hon. Susan G. Braden |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, MOTION FOR JUDGMENT ON THE RECORD**

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW
1350 Connecticut Avenue, N.W.
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)

December 14, 2007

Counsel for Plaintiffs

## TABLE OF CONTENTS


TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

I. Factual Background .......... 3

II. Procedural Background .......... 6

A. *Higginson v. United States* .......... 6

B. Congressional Reference/CFC Litigation .......... 7

ARGUMENT .......... 12

Standard of Review .......... 12

I. Rule 12 Motions Are Pre-Trial, Not Post-Trial Motions .......... 13

II. The Filing of an Amended Complaint Under Rule 15(b) Does Not Support the Filing of a Motion to Dismiss Under Rules 12(b)(1) & (6) or (c) .......... 16

III. Rules of Finality (Law of the Case) Also Bar Defendant from Relitigating Issues that Have Already Been Ruled On by this Court .......... 19

IV. This Court Has Jurisdiction to Enter Judgment Under the Tucker Act .......... 28

A. Congress Has Never Withdrawn Tucker Act Jurisdiction for Congressional Referrals .......... 28

B. Congress Expressed No Intent to Withdraw Tucker Act Jurisdiction Over Any Claims in S. 794 or S. Res. 98. .......... 32

V. Plaintiffs Have Standing to Bring These Claims Under the Tucker Act .......... 33

VI. The Statute of Limitations Is Equitably Tolled in this Case. .......... 39

A. Equitable Tolling Applies to the Tucker Act .......... 39

B. Defendant's Argument that Equitable Tolling Does Not Apply to Mutual Mistake Claims Should Be Rejected ....................................41

C. The Evidence Fully Supports Equitable Tolling. ..............................43

VII. As This Court Has Already Ruled, Defendant Is Not Prejudiced by Plaintiffs' Claim of Mutual Mistake ..............................................................46

VIII. As this Court Has Already Determined, the Facts Adduced at Trial Fully Support the Court's Finding of Mutual Mistake ..........................................47

IX. The Facts Adduced at Trial Also Support the Court's Proposed Damages Award.......................................................................................49

X. Plaintiffs Are Entitled to Receive Full Restitution of the Benefit Defendant Acquired by its Wrongful Acquisition of Plaintiffs' Oil and Mineral Rights ........................................................................................52

CONCLUSION ........................................................................................................56

# TABLE OF AUTHORITIES

## CASES

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
960 F.2d 1020 (Fed. Cir. 1992) ....................46

*Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*,
988 F.2d 1157 (Fed. Cir. 1993) ....................14

*American Pipe & Const. Co. v. Utah*,
414 U.S. 538 (1974)....................35, 45

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006)....................14

*Bald Eagle Ridge Protection Ass'n, Inc. v. Mallory*,
119 F.Supp.2d 473 (M.D. Pa. 2000).................... 12-13

*Bannum, Inc. v. United States*,
59 Fed. Cl. 241 (2003) ....................28

*Bishop v. United States*,
26 Cl. Ct. 281 (1992)....................28

*Blanchette v. United States*,
419 U.S. 102 (1974)....................33

*Bradley v. Chiron Corp.*,
136 F.3d 1317 (Fed. Cir. 1998) ....................17

*Breyer v. Meissner*,
214 F.3d 416 (3d Cir. 2000) ....................37

*Burnette v. Carothers*,
192 F.3d 52 (2d Cir. 1999) ....................12

*Cada v. Baxter Healthcare Corp.*,
920 F.2d 446 (7th Cir. 1990) ....................42

*Cedars-Sinai Medical Center v. Watkins*,
11 F.3d 1573 (Fed. Cir. 1993) ....................13

*Chung v. Dep't of Justice*,
333 F.3d 273 (D.C. Cir. 2003)....................40

*Circle K Corp. v. United States*,
23 Cl. Ct. 659 (1991)....................28

*Craigs, Inc. v. General Elec. Capital Corp.*,
12 F.3d 686 (7th Cir. 1993)....................12

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
432 F.3d 286 (3d Cir. 2005)....................36

*Dep't of Army v. Kirkendall*,
128 S.Ct. 375 (2007)....................10, 23, 39

*Dole v. Arco Chemical Co.*,
921 F.2d 484 (3d Cir. 1990)....................17

*Drew v. Dep't of Corrections*,
297 F.3d 1278 (11th Cir. 2002)....................45

*Drew v. Dep't of Corrections*,
537 U.S. 1237 (2003)....................45

*Dworkin v. Hustler Magazine, Inc.*,
867 F.2d 1188 (9th Cir. 1989)....................12

*Feres v. United States*,
340 U.S. 135 (1950)....................14

*First Hartford Corp. Pension Plan & Trust v. United States*,
194 F.3d 1279 (Fed. Cir. 1999)....................35

*Firestone & Parson Inc. v. Union League of Philadelphia*,
672 F. Supp. 819 (E.D. Pa. 1987)....................43

*Foster v. United States*,
733 F.2d 88 (Fed. Cir. 1984)....................46-47

*Glidden Co. v. Zdanok*,
370 U.S. 530 (1962)....................29, 30

*Henderson City Drainage Dist. No. 3 v. United States*,
55 Fed. Cl. 334 (2003) ....................28

*Higginson v. United States*,
384 F.2d 504 (6th Cir. 1967) ....................6, 7

*Higginson v. United States*,
390 U.S. 947 (1968)....................7

*Hulsey v. United States*,
6 Cl. Ct. 593 (1984)....................32

*In re Kenneth Allen Knight Trust*,
303 F.3d 671 (6th Cir. 2002) ....................21

*I.N.S. v. Chadha*,
462 U.S. 919 (1983)....................31, 33

*Inslaw, Inc. v. United States*,
35 Fed. Cl. 63 (1996) ....................32

*Irwin v. Department of Veteran Affairs*,
498 U.S. 89 (1990)....................39, 40

*J.B. McCrary v. United States*,
84 F. Supp. 368 (Ct. Cl. 1949) ....................32

*Kirkendall v. Dep't of the Army*,
412 F.3d 1273 (Fed. Cir. 2005) ....................10, 39

*Kirkendall v. Dep't of Army*,
479 F.3d 830 (Fed. Cir. 2007) ....................23

*Krahmer v. Christies, Inc.*,
903 A.2d 773 (Del. Ch. 2006) ....................43

*Land Grantors v. United States*,
64 Fed. Cl. 661 (2005) .................... *passim*

*Land Grantors v. United States*,
69 Fed. Cl. 435 (2005) ....................9, 10, 25

*Land Grantors v. United States*,
71 Fed. Cl. 614 (2006) ........................................................... 10, 25, 45-46

*Land Grantors v. United States*,
74 Fed. Cl. 518 (2006) ........................................................................ *passim*

*Land Grantors v. United States*,
77 Fed. Cl. 686 (2007) ........................................................................ *passim*

*Landmark Land Co. v. United States*,
46 Fed. Cl. 261 (2000) ..............................................................................52

*Landmark Land Co. v. Federal Deposit Insurance Corp.*,
256 F.3d 1365 (Fed. Cir. 2001) ...............................................................53

*Martinez v. United States*,
333 F.3d 1295 (Fed. Cir. 2003) ...............................................................41

*Media Technologies Licensing, LLC. v. The Upper Deck Co.*,
334 F.3d 1366 (Fed. Cir. 2003) ...............................................................38

*Mendenhall v. Barber-Greene Co.*,
26 F.3d 1573 (Fed. Cir. 1994) ...........................................................20, 21

*Mendenhall v. Astec Industries, Inc.*,
513 U.S. 1018 (1994).................................................................................20

*Menendez v. Perishable Distributors, Inc.*,
763 F.2d 1374 (11th Cir. 1985) ...............................................................18

*Miller v. Albright*,
523 U.S. 420 (1998)...................................................................................38

*North American Philips Co. v. United States*,
358 F.2d 980 (Ct. Cl. 1966) .......................................................................32

*Paine Webber Real Estate Sec., Inc. v. D.G. Meyer & Co.*,
835 F. Supp. 116 (S.D.N.Y. 1993) ............................................................42

*Powers v. Ohio*,
499 U.S. 400 (1991)...................................................................................37

*Sommers Oil Co. v. United States*,
241 F.3d 1375 (Fed. Cir. 2001) ....................................................................12

*Soriano v. United States*,
352 U.S. 270 (1957)....................................................................................39

*Sosna v. Iowa*,
419 U.S. 393 (1975)................................................................................ 34-35

*Suel v. Secretary of Health and Human Services*,
192 F.3d 981 (Fed. Cir. 1999) ......................................................................20

*Texas State Bank v. United States*,
No. 04-5126, 2005 WL 2293078 (Fed. Cir. Sept. 21, 2005)...............................54

*Tommaseo v. United States*,
75 Fed. Cl. 799 (2007) ..................................................................................14

*United States v. $277,000 U.S. Currency*,
69 F.3d 1491 (9th Cir. 1995) .................................................................53, 54

*United States v. $515,060.42*,
152 F.3d 491 (6th Cir. 1998) .........................................................................53

*United States v. Beggerly*,
524 U.S. 38 (1998).........................................................................................41

*United States v. Brockcamp*,
519 U.S. 347 (1997).......................................................................................40

*United States v. Students Challenging Regulatory Agency Procedures*,
412 U.S. 669 (1973).......................................................................................36

*Webb v. City of Dallas, Tex.*,
314 F. 3d 787 (5th Cir. 2002) .........................................................................36

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*,
842 F.2d 1275 (Fed. Cir. 1988) ......................................................................21

**STATUTES & LAWS**

28 U.S.C. § 1492 (West 2007) .......................................................................................31

28 U.S.C. § 2501 (West 2007) ........................................................................39, 40, 41

40 U.S.C. § 258(a) (West 2007) .......................................................................................3

40 U.S.C. § 101 (West 2007) ....................................................................................... 6-7

Act of Oct. 15, 1966, Pub. L. 89-691 § 1, 80 Stat. 958 ................................................28

Federal Courts Improvement Act of 1982, Pub. L. 97-164, tit. I, § 133(b), 96 Stat. 40 (codified as amended at 28 U.S.C. § 1491 (West 2007)) ........................ *passim*

Ky. Rev. Stat. Ann. § 413.170 (West 2007) .................................................................41

Ky. Rev. Stat. Ann. § 413.190 (West 2007) .................................................................41

S. Res. 98, 103d Cong. (1993) .................................................................................. 32-33

Surplus Property Act of 194458 Stat. 765 (repealed 1949)..........................................6

War Purposes Act, 40 Stat. 241 (codified as amended at 50 U.S.C. § 171) ................3

**RULES**

RCFC 12(b)(1) ..................................................................................................1, 11, 13

RCFC 12(b)(6) ..................................................................................................1, 11, 13

RCFC 12(c).......................................................................................................1, 11, 14

RCFC 15(b) .................................................................................................9, 11, 16, 17

RCFC 58 .......................................................................................................................11

RCFC 59(a)(1)............................................................................................... 9, 15-16

**MISCELLANEOUS**

4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* §§ 2.5- 2.8 (4th ed. 2002)....................35

5C Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ. 3d* § 1367 (2002)....................15

6A Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ. 2d* § 1494 (2002)....................17

18B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4478 (2002)....................21

61A Am. Jur. 2d *Pleading* § 770....................18

**PLAINTIFFS' OPPOSITION TO UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, MOTION FOR JUDGMENT ON THE RECORD**

Plaintiffs oppose Defendant's motion to dismiss (under Rules of the United States Court of Federal Claims ("RCFC") 12(b)(1) & (6), and (c)) their claim for relief under the Tucker Act, specifically Count I of the Second Amended Complaint, Mutual Mistake Claims for Restitution, on the grounds that Defendant's motion is untimely, barred by law of the case, and is without merit. In 2005, following an evidentiary hearing, this Court issued its first Interim Report stating that the trial testimony and evidence supported a conclusion that Plaintiffs were entitled to restitution for the Defendant's unjust enrichment based on the parties' mutual mistake regarding the existence of significant minerals under the land it acquired to build Camp Breckinridge during World War II. In this Interim Report, the court ordered the parties to show cause why it should not enter final judgment under the Tucker Act, 28 U.S.C. Section 1491(a)(1), and stay issuance of a final report under the Congressional Reference statute, 28 U.S.C. Section 2509. In response, the parties fully briefed this jurisdictional issue.

Nevertheless, and at every step in this litigation, Defendant continues to object and generate more briefing on what is at bottom the same issue, without regard either to the court's or the parties' resources. For example, when the court granted Plaintiffs' motion to file a second amended complaint to conform to the evidence adduced at trial, Defendant filed an opposition to the Tucker Act claims on the ground that the court should not enter judgment under the Tucker Act.

When Plaintiffs filed a motion to reconsider Judge Merow's denial of class certification, Defendant opposed that motion arguing that this is a Congressional Reference case, not a case under the Tucker Act claim. And, when the court severed the claims prior to the mediation, assigning the Congressional Reference claims one number (Case No. 93-648-X) and the Tucker Act claims another number (Case No. 93-648-1L), Defendant again objected, asking for yet more briefing on whether the court should enter judgment under the Tucker Act.

In short, although there has been an evidentiary hearing, a mediation, and multiple briefs by the parties over the last several years on the same issue, Defendant has filed this motion to dismiss arguing that this Court erred in concluding that the evidence presented at trial supported the finding of mutual mistake regarding the presence of mineral rights on the subject property such that final judgment for restitution should be entered in the Plaintiffs' favor under the Tucker Act.

Defendant's present motion to dismiss Count I in the Second Amended Complaint is especially inappropriate because it attempts to misuse the Rule 15(b) housekeeping device as yet another opportunity to re-open every issue and previous ruling in the case related to the Tucker Act claim. Plaintiffs urge this Court to deny Defendant's motion for the reasons set forth herein and to enter final judgment in favor of Plaintiffs under the Tucker Act.

## I. Factual Background

Immediately after the attack on Pearl Harbor in December 1941, the federal government recognized that it needed to quickly acquire land and establish Army training facilities. To accomplish this objective, it invoked the War Purposes Act, 40 Stat. 241 (codified as amended at 50 U.S.C. § 171), which authorized the government to utilize "quick take" condemnation proceedings, whereby the government could take immediate possession of land and negotiate or litigate a purchase price with the landowner after the property was acquired. *Land Grantors v. United States*, 64 Fed. Cl. 661, 666–667 (2005) ("*Land Grantors I*"); *see also* 40 U.S.C. § 258(a) (West 2007) (stating that title to land obtained by condemnation vests upon the filing of the declaration of taking).

Utilizing its quick-take procedures, between February 1942 and May 1944, the government acted to acquire 35,849.28 acres of farmland in Union, Henderson, and Webster Counties in Kentucky for military training purposes and the establishment of Camp Breckinridge. *Land Grantors I*, 64 Fed. Cl. at 668–73. Pursuant to the War Purposes Act, the local U.S. Attorney filed petitions of condemnation in the local federal district court; the district court then authorized the transfer of title to the land from the owner to the United States, and issued orders to the landowners to vacate their land within days of receiving the order. *Id.* Agents for the government who acted on behalf of the government in acquiring the land told the landowners that after the war was over, they would get their farms back. *Land Grantors I*, 64 Fed. Cl. at 701–02 ("The court . . . has

absolutely no doubt that many of the landowners entered into Contracts with the Government in 1942-1944 with the apparent understanding that they could repurchase their properties after World War II was concluded and, in some cases, at the same price that the Government paid for it or at a discount."); *see also id*. at 670 n.11 (noting that a former negotiator stated that "government negotiators were instructed by their superiors that if the property owners questioned whether or not they would be able to repurchase the property they were to be told that they would have the first option to repurchase the property after the war").

Under enormous (at times even abusive) pressure to immediately vacate their homes and farms, the majority of the Plaintiffs simply accepted the sale price "offered" to them by the federal agents; the remainder requested a jury trial to determine "just compensation." *Id.* at 664. Notably, one government agent was rated "unsatisfactory" in his dealings with the landowners because "as negotiator he used duress and threatening tactics." *Land Grantors I*, 64 Fed. Cl. at 670 n.11. Likewise, the government's Chief Negotiator for these land acquisitions received an "unsatisfactory" rating because his conduct "showed partiality in government dealings with public, used threatening & abusive methods of doing business, respectful to those of wealth and education, exceedingly abusive of ignorant & poverty stricken." *Id*. (citing DX 261 at PER0322-23).

At the time, neither Defendant nor the landowners realized that valuable minerals were present in the land in quantities sufficient to "support exploration or operations." *Land Grantors I*, 64 Fed. Cl. at 703. Thus, the government failed

properly to appraise and to pay any of the landowners in this case for the value of the minerals (*e.g.*, oil, gas, coal) underlying the subject property, regardless of whether the price was negotiated, the initial option price was agreed to after the initial option phase but before trial, or compensation was litigated through trial. Altogether, "[t]he government paid the landowners approximately $3,107,341 for fee simple in all of the condemned properties, whether the price was negotiated or determined by jury." *Id.*

Had Defendant fulfilled its promise to offer the land back to Plaintiffs for repurchase after the war, the parties' mutual mistake in failing to value the mineral rights would have been harmless. *Id.* at 673–77. Unfortunately, Defendant did not fulfill its promise to resell the land back to the owners. Later, though, when the government discovered oil, gas, and other minerals on the land, Defendant leased the mineral rights, and then sold the land, keeping for itself all the proceeds from the leasing and the sales. *Id.* at 677–80. Defendant's failure to value the minerals underlying the subject property unjustly enriched the government by at least $32,879,240. *Id.* at 709. Since the court's First Interim Report was issued, Defendant has identified an additional $157,442 in oil royalties, $441,477 in coal royalties, and Plaintiffs have identified an additional $825,295 in mathematical errors in documents cited by the trial court in its interim opinion. Accordingly, the court's original restitution amount of $32,879,240 should be adjusted upward to $34,303,481. In addition, Plaintiffs have determined that Defendant received $1,398,850 in royalties from mineral tracts 7A and 7B, and

$35,017,116 in coal royalties from a coal lease and coal easement with Peabody Coal Company. In total, Defendant has been unjustly enriched by $70,719,447.[1] *See* Pls.' Mot. for Leave to Respond to Court's Dec. 15, 2005 Order 11-12 (Docket No. 200).

## II. Procedural Background

### A. *Higginson v. United States*

In response to the government's decision in the 1960s to sell off all the subject property, one of the landowners, Cyrus Higginson, filed a lawsuit in the U.S. District Court for the Western District of Kentucky challenging the validity and constitutionality of the sale of his father's property, and asserting the right to re-purchase it as promised at the time of the condemnation. *See Higginson v. United States*, 384 F.2d 504 (6th Cir. 1967). The Plaintiff asked the court to certify a class of "all former landowners, or heirs, successors, and assigns thereof, of 36,000 acres, namely Camp Breckinridge, in Union, Webster, and Webster Counties, Kentucky." *Land Grantors I*, 64 Fed. Cl. at 680. The lawsuit, however, was dismissed on jurisdictional grounds; the district court held that the suit had been improperly filed pursuant to the Surplus Property Act of 1944, 58 Stat. 765, a law that was repealed by the Federal Property and Administrative Services Act of

[1] This figure only includes the proceeds from mineral sales and leases that the government has acknowledged; it does not include the total compensation that would fully disgorge the government of the unjust enrichment it has received in the form of avoided interest for not being required to borrow the amount at issue for over 40 years. *See* Pls.' Mem. on Order to Show Cause (Docket 182) Oct. 3, 2005.

1949, 40 U.S.C. § 101 (West 2007), before Higginson's suit was filed. *Higginson v. United States*, No. 2074 (W.D. Ky. Sep. 7, 1965) (unpublished), 384 F.2d 504 (6th Cir. 1967), *cert. denied*, 390 U.S. 947 (1968). The *Higginson* Court never ruled on the class certification issue, and the putative class was never given notice of dismissal as required by the Due Process Clause.

**B. Congressional Reference/CFC Litigation**

Following dismissal of the *Higginson* lawsuit, the landowners, loosely organized as the Tri-County Land Committee — later renamed the Breckinridge Land Committee — pursued relief in Congress for twenty-five years. *Land Grantors I*, 64 Fed. Cl. at 685. In 1993, the United States Senate finally referred the claims in this case to the U.S. Court of Federal Claims for resolution pursuant to 28 U.S.C. Section 2509, and a complaint was filed in 1994. *Land Grantors I*, 64 Fed. Cl. at 685–86. On November 24, 1998, Judge Merow, the original hearing officer in this case, granted in part Defendant's motion to dismiss certain plaintiffs. Order 9 (Nov. 24, 1998). Judge Merow also denied the Plaintiffs' motion to certify a class, explaining that class actions are disfavored in the Court of Federal Claims. Order 2 (Dec. 23, 1997).

Settlement discussions ensued off and on over the next five years. On August 15, 2003, this case was reassigned to the presiding judge. *Land Grantors I*, 64 Fed. Cl. at 688. On September 8–10, 2004 and November 23, 2004, the court held an evidentiary hearing. As this Court later summarized its findings and conclusions:

> [D]espite the unavailability of first-hand witnesses due to death or ill-health and the Government's claim that it no longer possessed a substantial number of relevant documents, the court held that the documents that were introduced at trial or in the public domain, as well as the testimony of the Government's experts, established by a preponderance of the evidence that the 1942-1944 contracts were based on a mutual mistake that no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operation.

*Land Grantors v. United States*, 74 Fed. Cl. 518, 521 (2006) ("*Land Grantors IV*"), citing *Land Grantors I*, 64 Fed. Cl. at 703-708.

After the evidentiary hearing, the court's call for more information from Defendant, and the court's painstaking review of the voluminous document comprising the record, on April 1, 2005, the court issued an Interim Report, finding that the transactions entered into between Defendant and landowners between 1942 and 1944 for land condemned for use as Camp Breckinridge were void because they were based on the mutual mistake that no significant economically recoverable coal, gas, oil, and other mineral deposits existed under the condemned property. Having further concluded that the facts supported a conclusion that the statute of limitations had been equitably tolled, the trial court held that Plaintiffs were entitled to restitution of the value of the mineral rights from Defendant. *Land Grantors I*, 64 Fed. Cl. at 712–13. Before issuing its Final Report, the court ordered the "parties to show cause why the court should not exercise jurisdiction, pursuant to 28 U.S.C. § 1491(a)(1), to enter a final judgment and stay issuance of a report on S. 794, pursuant to 28 U.S.C. § 2509." *Id.* at 717.

On October 3, 2005, in accordance with the court's direction in the April 1, 2005 Interim Report and Memorandum Opinion, Plaintiffs filed the Second Amended Complaint in which a count for restitution based on mutual mistake and an additional basis for jurisdiction were added to conform the complaint to evidence adduced at trial. *See Land Grantors I*, 64 Fed. Cl. at 708 ("Accordingly, Plaintiffs will be afforded 60 days within which to file a concise Second Amended Complaint to conform to the evidence and issues tried in this case, as specifically discussed herein."); *see also* RCFC 15(b). In response, Defendant filed an objection styled "Defendant's Opposition to Filing of Plaintiffs' Proposed Second Amended Complaint." Although not formally filed as a motion for reconsideration, Defendant's Opposition sought reconsideration of the court's order that an amended complaint be filed. *See* RCFC 59(a)(1).

On December 29, 2005, the court ordered the parties to submit briefs addressing "whether certification is appropriate in light of the 2002 revision of RCFC 23, the evidence adduced at trial and thereafter, and the court's ruling that the April 15, 1965 filing of the Higginson suit as a class action . . . was sufficient to allow equitable tolling of the statute of limitations." *Land Grantors v. United States*, 69 Fed. Cl. 435, 436-37 (2005) ("*Land Grantors II*"). The court additionally requested "a statement of the requirements for class membership and a proposed course of action for meeting the notice requirement." *Id.* at 437. Accordingly, on January 31, 2006, the parties filed briefs responsive to the court's Order. Defendant, however, moved to strike Plaintiffs' responsive filing. Defendant's

motion to strike centered on the objection at issue here — Defendant's continuing objection to allowing Plaintiffs' to assert claims under the Tucker Act. Plaintiffs responded to Defendant's motion to strike, arguing among other things that "that the parties have already fully briefed the jurisdictional issues." Pls.' Opp. 7, Mar. 2, 2006. *Land Grantors II*, 69 Fed. Cl. at 436. On June 22, 2006, the court granted Plaintiffs' motion for class certification over Defendant's objection. *Land Grantors v. United States*, 71 Fed. Cl. 614, 626–27 (2006) ("*Land Grantors III*").

On December 14, 2006, the court issued its Second Interim Report identifying two unresolved issues in the case: the date Plaintiffs' mutual mistake accrued and whether the doctrine of equitable tolling applies under the Tucker Act. *Land Grantors IV,* 74 Fed. Cl. at 523-24. The court deferred issuing a final ruling in this case until the Federal Circuit's *en banc* decision in *Kirkendall v. Dep't of the Army*, 412 F.3d 1273, 1275-78 (Fed. Cir. 2005) (*en banc*) (applying the *Irwin* presumption of equitable tolling under the Veteran's Employment Opportunity Act), *cert. denied*, *Dep't of Army v. Kirkendall*, 128 S.Ct. 375 (2007), was issued and final. The court also asked the parties if they would consent to the appointment of a mediator to attempt resolution of the claims in this case, which they did. Thereafter, the court issued an order severing the claims into two cases, the Congressional Reference claims one number (Case No. 93-648-X) and the Tucker Act claims another number (Case No. 93-648-1L). Defendant objected, asking that the parties again engage in briefing on the issue of whether the claims can be filed under the Tucker Act, which the court denied. Order (Feb. 28, 2007).

Subsequently, the parties entered into mediation, with the Honorable Justice Sandra Day O'Connor serving as the mediator. Unfortunately, Plaintiffs, consistent with the court's Order of February 8, 2007, had no choice but to apprise the court that a settlement could not be achieved. Pl.'s Notice of Withdrawal, May 18, 2007.

Accordingly, the court issued an order granting the parties' request that the court stay the Congressional Reference claims, and resolve the Tucker Act claims first. *Land Grantors v. United States*, 77 Fed. Cl. 686, 687 (2007) ("*Land Grantors V*"). The court also granted, over Defendant's objection, Plaintiffs' motion to amend the complaint pursuant to RCFC 15(b), a pleading that the court had directed Plaintiffs to file. *Id.* at 687. The court explained:

> In this case, the Government introduced at trial the primary evidence on which Plaintiffs based the Amended Complaint's mutual mistake claim. Accordingly, the Government cannot "satisfy the court that the admission of such evidence would prejudice the [Government] in maintaining . . . [the] defense upon the merits." *Id.* (alterations in original).

In addition to granting Plaintiffs' motion to amend, the court also gave Defendant leave to file "a Motion to Dismiss in Case No. 93-648L (Tucker Act claims) and any other dispositive motions on the merits . . . . " *Id.*

On October 1, 2007, Defendant filed its motion to dismiss, under RCFC 12(b)(1) & (6), and (c)), or alternatively that the court enter judgment in its favor under RCFC 58 (Entry of Judgment).

## ARGUMENT

**Standard of Review**

"When reviewing a dismissal for failure to state a claim upon which relief can be granted under . . . Rule 12(b)(6) of the Federal Rules of Civil Procedure, we must accept as true all the factual allegations in the complaint[.]" *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). "A trial court should not dismiss a complaint for failure to state a claim unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* (internal quotation marks omitted).

Rule 12(c) motions are analyzed under the same standard as Rule 12(b)(6) motions, with the main difference between the two motions being timing. *See, e.g.*, *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999) ("In deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party."); *Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993) ("A motion under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12."); *Dworkin v. Hustler Magazine, Inc.,* 867 F.2d 1188, 1192 (9th Cir. 1989) ("The principal difference between motions filed pursuant to Rule 12(b) and Rule 12(c) is the time of filing. Because the motions are functionally identical, the same standard of review applicable to a Rule 12(b) motion applies to its Rule 12(c) analog."); *Bald Eagle Ridge Protection Ass'n, Inc. v. Mallory*, 119 F.Supp.2d 473, 476 (M.D. Pa. 2000) ("The

primary difference is that a Rule 12(c) motion is filed after an answer while a Rule 12(b)(6) motion is filed before an answer.").

## I. Rule 12 Motions Are Pre-Trial, Not Post-Trial Motions

In its motion to dismiss, the Defendant repeatedly asserts that Plaintiffs' claims "must be dismissed for failure to state a claim upon which relief can be granted." (Def. Mem. at 7, 45, 60.) The plain language of Rule 12 indicates that such motions are intended as pre-trial, not post-trial motions. RCFC 12(b)(1) & (6) provide:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter . . . (6) failure to state a claim upon which relief can be granted. . . . *A motion making any of these defenses shall be made before pleading if a further pleading is permitted.*

RCFC 12(b) (emphasis supplied).

Rule 12(b) motions, thus, typically must be filed before a responsive pleading because, by their nature, the relief sought by such motions is a pre-answer dismissal of the claim. *See* RCFC 12(b) (motions "must be made before pleading if a responsive pleading is allowed"); *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1577 n.6 (Fed. Cir. 1993) (stating that the court "correctly refused to entertain" Rule 12(b)(6) motion that was made after opponent had already filed an answer to a complaint). At most, a Rule 12(b)(6) objection

"endures up to, but not beyond, trial on the merits . . . ." *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) (citations omitted).

The policy against entertaining a Rule 12(b)(6) motion at such a late stage in litigation is that such motions "challenge[] the legal theory of the complaint, not the sufficiency of any evidence that might be adduced. The purpose of the rule is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and trial activity." *Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993).

In the unusual instances where courts have allowed motions to dismiss after a trial, those motions have been tailored to pre-trial identified issues of law. *See Tommaseo v. United States*, 75 Fed. Cl. 799 (2007) (denying without prejudice Government's pretrial challenge to jurisdiction, but leaving it open to reassertion after discovery either on a motion for summary judgment or after trial); *Feres v. United States*, 340 U.S. 135 (1950) (affirming judgment where a district court reexamined issue of law that was brought up in pretrial motion and denied without prejudice).

RCFC 12(c) – Motion for Judgment on the Pleadings—provides:

> *After the pleadings are closed, but within such time as not to delay the trial,* any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by RCFC 56.

As noted in 5C Wright & Miller, *Fed. Prac. & Proc. Civ. 3d* § 1367, a motion under Rule 12(c) is unavailing where it raises issues that have been ruled on:

> It should be stated again, however, that Rule 12(c) cannot be used to assert Rule 12(b) defenses that have not been raised previously in the pleadings or by preliminary motion or are not expressly preserved by Rule 12(h). They quite appropriately will be deemed to have been waived by nonassertion in timely fashion.

5C Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ. 3d* § 1367 (2002) (footnotes omitted).

Here, Defendant's motion to dismiss does not fall within any of the narrow exceptions which would allow for post-trial Rule 12 motion, either in the broad scope of its argument or in its renewed challenges of the court's evidentiary findings and prior rulings. Indeed, far from leaving open pretrial issues for subsequent, post-trial briefing or decision, the court has rejected Defendant's argument at trial and after the trial, without reservation. *See, e.g., Land Grantors I*, 64 Fed. Cl. at 707-08. To the extent that Defendant raised Rule 12(b) arguments at prior stages of this litigation, the court has rejected them, with prejudice. *See Land Grantors I*, 64 Fed. Cl. at 709 (addressing application of Government's asserted defense based on statute of limitations); *Land Grantors V*, 77 Fed. Cl. at 687 (denying Government's Objection, which contained similar arguments to Government's present Motion). Finally, Rule 12(c) is not the appropriate vehicle for challenging this court's prior rulings and Defendant has no authority supporting its use in the posture of this case. *Cf.* RCFC 59(a)(1)

("[R]econsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States.").

Accordingly, Defendant's motion to dismiss Count I of Plaintiffs' Second Amended Complaint should be denied as untimely, contrary to law of the case, and outside the scope of permissible Rule 12 motions.

## II. The Filing of an Amended Complaint Under Rule 15(b) Does Not Support the Filing of a Motion to Dismiss Under Rules 12(b)(1) & (6) or (c)

Under this Court's rules, following an evidentiary hearing, the court may allow a party to amend its pleadings in order to conform the pleading to the evidence presented at trial:

> Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; *but failure so to amend does not affect the result of the trial of these issues.* If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

RCFC 15(b) (emphasis supplied).

While Rule 15(b) encourages courts to grant leave to amend a complaint where doing so will facilitate the resolution of cases "on the merits rather than on technicalities," *Dole v. Arco Chemical Co.,* 921 F.2d 484, 487 (3d Cir. 1990) (amendment to conform a pleading to evidence presented at trial not required), RCFC 15(b) states: "[s]uch amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, *even after judgment*; but failure so to amend does not affect the result of the trial of these issues" (emphasis supplied); *see also Bradley v. Chiron Corp.*, 136 F.3d 1317, 1327 (Fed. Cir. 1998) ("The liberal pleading requirements of the Federal Rules encourage the grant of leave to amend."). As the Rule itself states, the amendment, or the failure to amend, does not the affect the result of the trial on issues.

As explained in 6A Wright & Miller, *Fed. Prac. & Proc. Civ. 2d* § 1494, an amendment of a pleading pursuant to Rule 15(b) leaves the result of a trial undisturbed:

> Since the rule also provides that a failure to amend will not affect the actual result of the trial as it relates to the adjudication of the unpleaded issues, as long as they are tried with the consent of the parties, the timing of the motion to conform is of little moment. Nor is the timing of a motion to amend under Rule 15(b) affected by the fact that the modification would change the theory of the case or the nature of one or more of the originally pleaded defenses.

6A Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ. 2d* § 1494 (2002) (footnotes omitted).

When objecting to Rule 15(b) amendments, therefore, defendants should not raise pre-trial objections that might be proper under Rule 12, but instead must establish unfair prejudice resulting from a RCFC 15(b) amendment, such as might occur when an objecting party is surprised by evidence and has no reasonable opportunity to prepare for it. *See Menendez v. Perishable Distributors, Inc.*, 763 F.2d 1374, 1379 (11th Cir. 1985) ("[T]he district court abused its discretion by permitting the appellees to amend their answer at trial and assert the affirmative defense of release without giving [appellant] a fair opportunity to gather and present rebuttal evidence which, under the applicable state law, he was entitled to introduce."); 61A Am. Jur. 2d *Pleading* § 770 ("In some jurisdictions, it is within the trial court's discretion to allow the amendment of pleadings until and even after judgment, as long as the amendment does not unfairly deprive the adverse party of the opportunity to contest the issues that it raises.").

In this case, on April 1, 2005, the court issued an Order allowing Plaintiffs to file a Second Amended Complaint pursuant to RCFC 15(b), the purpose of which was expressly to allow the complaint to be amended to conform to the evidence presented at trial and thereafter. *Land Grantors I*, 64 Fed. Cl. at 708. On October 3, 2005, Plaintiffs filed their Second Amended Complaint, adding in Count I for mutual mistake based directly on the evidence supporting the claim introduced at trial. *See* Second Am. Compl. (Count I quoted in footnote 3). The amendment was limited to issues tried by express or implied consent of the parties.

Thus, not only has Defendant had the opportunity to litigate the very issues it complains of in this motion, it has also already had the opportunity to oppose the filing of the Second Amended Complaint. In ruling against Defendant's objections to the amendment prior to its filing, the court specifically rejected Defendant's argument, which it raises again here, that it will be prejudiced by Count I in the Second Amended Complaint:

> In this case, the Government introduced at trial the primary evidence on which Plaintiffs based the Amended Complaint's mutual mistake claim. Accordingly, the Government cannot 'satisfy the court that the admission of such evidence would prejudice the [Government] in maintaining . . . [the] defense upon the merits.

*Land Grantors V*, 77 Fed. Cl. at 687. Thus, Defendant can show no unfair prejudice based on the amendment, and cites to no authority supporting its effort to reopen issues resolved at trial. Accordingly, the court should deny Defendant's motion to dismiss Count I of the Second Amended Complaint as raising issues already ruled on and failing utterly to show prejudice to Defendant in its defense of this lawsuit or the claims therein.

**III. Rules of Finality (Law of the Case) Also Bar Defendant from Relitigating Issues that Have Already Been Ruled On by this Court**

Law of the case is a judicially created doctrine designed to promote judicial efficiency and to prevent endless litigation over issues that already have been decided within a case. Under this doctrine, a court generally will refuse to reopen or reconsider what it has already decided, both expressly and by implication, at an earlier stage of litigation. As the Federal Circuit has stated:

> Law of the case is a judicially created doctrine, the purpose of which is to prevent relitigation of issues that have been decided. The doctrine operates to protect the settled expectations of the parties and promote orderly development of the case. It ensures judicial efficiency and prevents endless litigation. Its elementary logic is matched by elementary fairness - a litigant given one good bite at the apple should not have a second. Under law of the case, then, a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation.

*Suel v. Secretary of Health and Human Services*, 192 F.3d 981, 984-85 (Fed. Cir. 1999) (citations and internal quotation marks omitted).

Although not binding, courts generally adhere to law of the case unless exceptional circumstances are present:

> The law of the case does not involve preclusion after final judgment, but rather it regulates judicial affairs before final judgment. 18 Charles A. Wright, *et al., Federal Practice and Procedure* § 4478 (1981). It is a doctrine resting on the need for judicial economy. A court will not generally revisit an issue once decided in the litigation." Although courts are often eager to avoid reconsideration of questions once decided in the same proceeding, it is clear that all federal courts retain power to reconsider if they wish."

*Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1582 (Fed. Cir.) (quoting Charles A. Wright & Arthur R. Miller, 18 *Federal Practice and Procedure* § 4478 (1981)), *cert. denied*, *Mendenhall v. Astec Industries, Inc.*, 513 U.S. 1018 (1994).

The Federal Circuit has held that intervening changes in applicable authority can serve as a basis for reconsideration of a previous decision. *Mendenhall*, 26 F.3d at 1582. Other courts have reconsidered their law of the case to avoid clear error or to prevent a manifest injustice:

> In *Central Soya, Inc. v. George A. Hormel & Co.*, 723 F.2d 1573 (Fed. Cir. 1983), this court was asked to reconsider a decision of the Court of Appeals for the Tenth Circuit upholding a district court's judgment of liability, rendered on interlocutory appeal. In accordance with other circuits, we held the law of the case doctrine is a policy not a command even respecting a prior appellate decision in the case, and should be applied as a matter of sound judicial practice, under which a court generally adheres to a decision in a prior appeal in the case unless one of three "exceptional circumstances" exists: the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.

*Id.* (citations omitted or abbreviated).

In *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1278 (Fed. Cir. 1988), the Federal Circuit affirmed that the trial court's application of the law of the case doctrine extended to issues decided by necessary implication: "[t]he law of the case doctrine was judicially created to ensure judicial efficiency and to prevent the possibility of endless litigation. The doctrine applies not only to issues discussed and decided but also those decided by necessary implication." (citations omitted); *see also* 18B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4478 (2002) ("The decision of an issue need not be express to establish the law of the case. Implicit decision suffices . . . ." (quoted in *In re Kenneth Allen Knight Trust*, 303 F.3d 671, 676 (6th Cir. 2002))).

Here, Defendant has shown no exceptional circumstances to overcome application of the law of the case doctrine. Rather, Defendant explicitly challenges numerous issues in its motion to dismiss, most of which have been litigated and decided at an earlier stage of litigation. Thus, although the court granted

Defendant's request to "file a Motion to Dismiss . . . and any other dispositive motion on the merits," *Land Grantors V*, 77 Fed. Cl. at 687, it is unreasonable to assume that the court thereby authorized Defendant to challenge the court's entire body of prior factual and substantive rulings in the case. To the contrary, the policy embodied in the law of the case doctrine necessarily limits the scope of any dispositive motions at this stage to issues that have not been litigated and decided at an earlier stage.

In *Land Grantors I*, the court ordered the parties to show cause why it should not exercise jurisdiction pursuant to 28 U.S.C. Section 1491(a)(1), enter a final judgment, and stay issuance of a Report on S. 794 — the Congressional Reference that originally brought this matter before the court. 64 Fed. Cl. at 717-18. The show-cause order invited briefing on a jurisdictional question to be resolved "prior to entry of a Report or Memorandum Opinion and Final Judgment." This inquiry was bound up with the court's "concerns for the proper treatment of the former landowners." *Id.* at 718. Following briefing, the court forecast two outcomes: forwarding its report to the Review Panel, or issuing a final judgment under the Tucker Act — that Defendant could appeal. *Id.* ("In the event the court is reversed on appeal, the court would . . . finalize this Interim Report, and forward it to the [Senate] Review Panel.").

The court, however, cast no doubt about the substance of the rulings themselves. Indeed, irrespective of the ultimate resolution of the jurisdictional question, the court's three key conclusions remained intact: (1) contracts entered

into between Defendant and landowners were void because they were based on mutual mistake, *id*. at 703; (2) restitution was the appropriate remedy for the mutual mistake, *id*. at 708; and (3) the evidence compelled of equitable tolling the statute of limitations on claims of former landowners and their heirs, *id*. at 711.

In light of its prior factual determinations and legal rulings regarding equitable estoppel, mutual mistake, and the Plaintiffs' entitlement to restitution for Defendant's unjust enrichment, in *Land Grantors IV*, the court posed two other limited jurisdictional questions:

> Assuming that the court exercises jurisdiction under 28 U.S.C. § 1491 and stays the congressional reference, the court must address two other threshold jurisdictional issues. First when did Plaintiffs' mutual mistake accrue. And, second, whether the doctrine of equitable tolling stays the Tucker Act's six year statute of limitations . . . [and if so] whether the doctrine of equitable estoppel bars the application of the statute of limitations.

74 Fed. Cl. at 523-24 (citation and footnote omitted). The court determined that

> the interests of justice require deferral of a final disposition in this case until the en banc decision in *Kirkendall* is issued and final," at which time the parties were requested to "provide their views as to whether the presumption of equitable tolling . . . applies to the Tucker Act; and whether the court's disposition thereof should be certified for interlocutory appeal.

*Id*.

The Federal Circuit subsequently held in *Kirkendall v. Dep't of Army*, 479 F.3d 830 (Fed. Cir.) (*en banc*), *cert. denied*, *Dep't of Army v. Kirkendall*, 128 S.Ct. 375 (2007), that "the presumption of equitable tolling was not rebutted in the Veterans Employment Act of 1998." Because the final ruling in that case is consistent with

the prior equitable estoppel rulings of this court in its Interim Report, *Kirkendall* does not qualify as an exceptional circumstance warranting disregard for the law of the case doctrine.

Given that Defendant has provided the court with no new reason or argument whatsoever to compel the court to reverse itself on its prior rulings, it would therefore be inappropriate to treat the court's allowance of a motion to dismiss as an open-ended invitation to re-litigate any and all issues decided in this case. Thus, Defendant's motion and arguments must be expected to conform to the law of the case and rejected where they do not.

Law of the case bars the following arguments:

**Part III(A).** Defendant argues against the court entering judgment under the Tucker Act, in part by repeating its prior challenges to the court's decision to allow Plaintiffs to file a Second Amended Complaint. It is self-evident; however, a motion for judgment on the pleadings is unpersuasive when it makes no reference to the pleadings actually filed. In any event, the court has spoken: "Accordingly, the court denies the Government's October 21, 2005 Objection to filing of Plaintiffs' Second Amended Complaint. Plaintiff's October 3, 2005 Second Amended Complaint, filed in response to the court's April 1, 2005 Order, comports with the standards of RCFC 15(b)." *Land Grantors V*, 77 Fed. Cl. at 687.

Law of the case precludes re-litigating this issue.[2]

**Part III(B).** The court also already has held that Plaintiffs have standing: "Plaintiffs have met both of these standing requirements in this case." *Land Grantors I*, 64 Fed. Cl. at 696. Law of the case demands that the court deny Part III(B) Defendant's motion.

**Part III(C)(3).** Defendant's argument seeks to re-litigate whether "the facts of this case" warrant application of equitable tolling. This argument is nothing more than a series of challenges either to the evidentiary basis for the court's previous findings and legal conclusions, or a challenge to the findings and conclusions themselves. *See*, *e.g.*, Def.'s Mem. 33 ("The Court's finding is also not supported by the record."); *id.* at 35 ("The Court's preliminary finding is also not supported by the record."); *id.* at 37 ("The Court's apparent conclusion . . . cannot be sustained."); *id.* at 40 ("[T]he supposedly-missing evidence is irrelevant . . . .").

The court ruled in its Interim Report that the doctrine of equitable tolling applies to Claims under Tucker Act *Land Grantors I*, 64 Fed. Cl. at 712-13. In addition, the court has emphasized: that the "unique and sui generis circumstances of this case" justifies application of equitable tolling. *Land Grantors I*, 64 Fed. Cl. at 713; *Land Grantors II*, 69 Fed. Cl. at 436; *Land Grantors III*, 71 Fed. Cl. at 620.

---

[2] The first, fourth, fifth, and sixth (including subparagraphs numbered 1-3) paragraphs of Part III(A) should be rejected because they raise issues that have already been litigated and decided.

Subsequent to its findings and rulings on equitable estoppel, the court indicated that it might revisit the legal issue, depending on the outcome of *Kirkendall*. *Land Grantors IV*, 74 Fed. Cl. at 525. *Kirkendall* is now final and is consistent with the Interim Report. Law of the case precludes revisiting these issues yet again.

Defendant also seeks to re-litigate whether Defendant is prejudiced by the application of equitable tolling. The court already has "determined that the Government is not prejudiced by application of the doctrine of equitable tolling." *Land Grantors I*, 64 Fed. Cl. at 716. Defendant's complaint that equitable tolling was not raised until after trial is specious. The facts giving rise to equitable estoppel are the same facts relevant to and admitted at trial on the laches question, which always has been an issue. Nevertheless, the court has addressed and rejected Defendants' complaints.

**Part III(D).** Defendant argues that Count I of the Second Amended Complaint is barred by the doctrine of laches. The court could not have ruled more clearly on this issue in *Land Grantors I* — laches is "inapplicable" and "not relevant" here, and "in any event the Government cannot bear the burden to establish that delay in bringing a complaint in this court was unreasonable and caused the Government any prejudice." 64 Fed. Cl. at 716-717. It is inexplicable how an argument in a motion for judgment on the *pleadings* could include assertions so contrary to a court's conclusions following trial. Accordingly, this argument should be denied by law of the case.

**Part III(E).** Defendant argues that Count I must be dismissed for "failure to state a claim upon which relief can be granted," structuring its argument around the elements necessary for reformation of a written agreement on the ground of a mutual mistake. These issues have already been litigated and decided in Plaintiffs' favor. Indeed, in *Land Grantors I*, the court addressed at length the identical elements listed by Defendant in its Motion and held that the 1942-44 contracts were "based on a mutual mistake." 64 Fed. Cl. at 707. These are further established by the necessary implication of the court's opinion in *Land Grantors IV*, leaving open only the question of "when did Plaintiffs' mutual mistake claim accrue." 74 Fed. Cl. at 524. But since Defendant acknowledges that Plaintiffs' mutual mistake claim accrued "no later than September 1967," Def.'s Mem. 17, 44, accrual is not at issue.

The remaining portions of Defendant's arguments in Part III(E) also contravene the law of the case doctrine. At several points, Defendant disagrees with what it characterizes as the court's preliminary determination, finding, or application of legal authority. Def.'s Mem. 45 ("the evidence does not support this [Court's] finding"); *id.* at 46 ("The Court's decision conflicts with these principles."); *id.* at 48 ("The United States respectfully disagrees [with what the Court 'preliminarily determined']."); *id.* at 50 ("The United States disagrees [with the Court's finding]."). Defendant's arguments plainly are aimed at what the court already has ruled, determined, or found, not at Plaintiffs' "failure to state a claim upon which relief can be granted." Such arguments are suited for an appeal

or motion for reconsideration, not a motion for judgment on the pleadings.[3] Certainly, they should be rejected under the law of the case.

## IV. This Court Has Jurisdiction to Enter Judgment Under the Tucker Act

Defendant's motion also fails on the merits.

### A. Congress Has Never Withdrawn Tucker Act Jurisdiction for Congressional Referrals.

Nothing in the congressional resolution referring this case to the Court of Federal Claims purports to withdraw the court's Tucker Act jurisdiction over these claims; nor could it, since a single-house resolution is not a statute. Congress' 1966 elimination of the Court of Claims' jurisdiction to enter judgment in a congressional reference case certainly eliminated that alternative statutory authority, Act of Oct. 15, 1966, Pub. L. 89-691 § 1, 80 Stat. 958, but it did not

3 The proper standard for reviewing Defendant's opposition is that for reconsideration under RCFC 59, which the court has interpreted narrowly. Reconsideration may only be granted when the movant shows "either that: (a) an intervening change in the controlling law has occurred, (b) evidence not previously available has become available, or (c) that the motion is necessary to prevent manifest injustice." *Bannum, Inc. v. United States*, 59 Fed. Cl. 241, 243 (2003); *accord Henderson City Drainage Dist. No. 3 v. United States*, 55 Fed. Cl. 334, 337 (2003); *Bishop v. United States*, 26 Cl. Ct. 281, 286 (1992). Moreover, reconsideration is "not intended to give an unhappy litigant an additional chance to sway the court." *Circle K Corp. v. United States*, 23 Cl. Ct. 659, 665 (1991).

Defendant here has failed to satisfy the narrow standard for reconsideration; rather, Defendant merely attempts to reargue points already addressed and ruled upon in the Interim Report and Opinion. Defendant has not demonstrated how the court's rulings have been affected by an intervening change in the law, new evidence, or why the court's ruling needs to be reconsidered to prevent a manifest injustice.

purport to affect in any way this Court's separate and independent Tucker Act jurisdiction.

In *Glidden Co. v. Zdanok*, 370 U.S. 530, 556 (1962), the Supreme Court, in holding that Court of Claims judges were authorized to wield judicial power under Article III of the Constitution, observed that the original Tucker Act, passed in 1887, for the first time conferred true judicial power upon the Court of Claims, evidencing the "increasing confidence placed in that tribunal by Congress. The Tucker Act, Section 1, 24 Stat. 505 (1887), now 28 U.S.C. Section 1491, greatly expanded the jurisdiction of the court by authorizing it to adjudicate":

> All claims founded upon the Constitution of the United States or any law of Congress, except for pensions, or upon any regulation of an Executive Department, or upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable . . . .

*Glidden Co. v. Zdanok*, 370 U.S. 530, 556 (1962).

The Court continued:

> Indeed there is reason to believe that the Court of Claims has been constituted as it is precisely to the end that there may be a tribunal specially qualified to hold the Government to strict legal accounting. From the beginning it has been given jurisdiction only to award damages, not specific relief. . . . No question can be raised of Congress' freedom, consistently with Article III, to impose such limitation upon the remedial powers of a federal court. . . . But far from serving as a restriction, this limitation has allowed the Court of Claims a greater freedom than is enjoyed by other federal courts to inquire into the legality of governmental action.
>
> * * *

> But because of the barrier of sovereign immunity, the laws controlling governmental rights and obligations could not for years obtain a fully definitive exposition. The creation of the Court of Claims can be viewed as a fulfillment of the design of Article III.
>
> * * *
>
> While the United States as a government may not be sued without its consent, yet with its consent it may be sued, and the judicial power of the United States extends to such a controversy. Indeed, the whole jurisdiction of the Court of Claims rests upon this proposition.
>
> * * *
>
> It is unquestioned that the Tucker Act cases assigned to the Court of Claims, 28 U.S.C. s 1491, 28 U.S.C.A. s 1491, advance to judgment according to the regular course of legal procedure. Under this grant of jurisdiction the court hears tax cases, cases calling into question the statutory authority for a regulation, controversies over the existence or extent of a contractual obligation, and the like.

*Glidden Co.,* 370 U.S. at 556-573 (citations omitted).

The *Glidden* Court observed, however, that congressional reference cases (unlike Tucker Act cases) might call for advisory opinions over which the Court of Claims judges lacked jurisdiction under Article III of the Constitution.[4] To resolve this constitutional infirmity, in 1966 Congress separated the Article III function of Court of Claims judges from the Article I (non-judicial) function of making

---

[4] 28 U.S.C. 1492, 2509, 28 U.S.C.A. §§ 1492, 2509, appear to subject the decisions called for from those courts to an extrajudicial revisory authority incompatible with the limitations upon judicial power this Court has drawn from Article III. . . . Whether they actually do so is not, however, entirely free from difficulty, and cannot in our view appropriately be decided in a vacuum, apart from the setting of particular cases in which we may gauge the operation of the statutes. For disposition of the present cases, we think it is sufficient simply to note the doubt attending the validity of the jurisdiction, and to proceed on the assumption that it cannot be entertained by an Article III court.

*Glidden Co.*, 370 U.S. at 582 (citations omitted).

recommendations to Congress under references by directing that Commissioners of the court, rather than the judges, decide such cases. The judges would perform the judicial function of reviewing the Commissioners' recommendations, thus preserving the dichotomy between the Article III judges and the Article I Commissioners.[5] When, in 1982, the Court of Claims was split into the Court of Appeals for the Federal Circuit and what became the Court of Federal Claims, congressional reference jurisdiction remained with the Article I judges of this Court. Federal Courts Improvement Act of 1982, Pub. L. 97-164, tit. I, § 133(b), 96 Stat. 40 (codified as amended at 28 U.S.C. § 1491 (West 2007)).

Tucker Act jurisdiction also remained with this Court because nothing in the 1982 Federal Courts Improvement Act removed its Tucker Act jurisdiction. Therefore, there is nothing that purports to diminish the Tucker Act jurisdiction under 28 U.S.C. Section 1491 when a congressional reference is made under 28 U.S.C. Section 1492. Indeed, such a withdrawal of statutory jurisdiction by resolution of a single house of Congress would pose substantial constitutional questions. *See I.N.S. v. Chadha,* 462 U.S. 919 (1983).

Likewise, there is no suggestion, much less a holding, that a Plaintiff must make an election between a Tucker Act remedy and a congressional reference. Rather, the entry of judgment under the Tucker Act has always stood independent

[5] "Any bill, except for a bill of pension, may be referred by either House of Congress to the chief commissioner of the Court of Claims for a report in conformity with section 2509 of this title." 28 U.S.C. § 1492 (West 2007).

of the congressional reference as a separate remedy that the Plaintiff may elect. *See North American Philips Co. v. United States*, 358 F.2d 980, 981 (Ct. Cl. 1966) ("This case is before the court on a Congressional reference. It is also one within the general jurisdiction of the court."); *see also J.B. McCrary v. United States*, 84 F. Supp. 368, 369 (Ct. Cl. 1949) ("This section authorizes us to render judgment if we have general jurisdiction to do so, and it is clear that we do have jurisdiction of plaintiff's claim because it is one founded upon [a] contract with the United States, and is not barred by the statute of limitations.").

### B. Congress Expressed No Intent to Withdraw Tucker Act Jurisdiction Over Any Claims in S. 794 or S. Res. 98.

The Senate Resolution by which this case was referred to this Court (S. Res. 98, 103d Cong. (1993) (enacted)) contains no language purporting to withdraw Tucker Act jurisdiction over the case:[6]

> Resolved, That the bill (S. 794) entitled 'A bill for the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs', now pending in the Senate, together with all accompanying papers, is referred to the Chief Judge of the United States Court of Claims. The Chief Judge shall proceed with the same in accordance with the provisions of section 1491 and 2509 of title 28,

---

[6] The Claims Court's decision in *Hulsey v. United States*, 6 Cl. Ct. 593 (1984) is inapposite to the issue of whether this Court has Tucker Act jurisdiction to enter judgment for claims that are the subject of a congressional reference. In *Hulsey*, the court held that it lacks jurisdiction over claims "not within the scope of the reference . . . ." *Id.* at 596; *see also Inslaw, Inc. v. United States*, 35 Fed. Cl. 63, 67 (1996) (holding that the court had broad jurisdiction over congressional reference claims where the reference used language supporting the exercise of broad jurisdiction).

> United States Code, and report back to the Senate, at the earliest practicable date, giving such findings of fact and conclusions that are sufficient to inform Congress of the amount, if any, legally or equitably due from the United States to the claimants individually.

S. Res. 98, 103d Cong. (1993) (enacted).

Moreover, since it is not a statute (*i.e.*, not passed by both houses of Congress and signed by the President), it could not withdraw statutorily conferred Tucker Act jurisdiction. *See I.N.S. v. Chadha*, 462 U.S. 919, 955 (1983) ("[W]hen the Framers intended to authorize either House of Congress to act alone and outside of its prescribed bicameral legislative role, they narrowly and precisely defined the procedure for such action.").

Consequently, this Court retains jurisdiction to enter judgment for Plaintiffs in this case, regardless of whether Congress also made a reference requesting this Court's view on the matter. To hold to the contrary is to violate the fundamental canon that withdrawal of Tucker Act jurisdiction must be affirmatively and expressly stated. *Blanchette v. United States*, 419 U.S. 102, 126 (1974). Since Congress has not withdrawn Tucker Act jurisdiction over this case, the court still has that jurisdiction and should enter judgment accordingly.

**V. Plaintiffs Have Standing to Bring These Claims Under the Tucker Act**

Defendant argues that Plaintiffs lack standing to pursue their Tucker Act claims. This Court, however, already has ruled on the standing question in its Interim Report:

> To establish injury in fact, plaintiff must have suffered: "an invasion of a legally protected interest which is (a) concrete and particularized

> *and* (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (emphasis added) (internal citations omitted). In this case, Plaintiffs have "legally protected interests" in their former land, including coal, gas, oil, and other mineral rights and the 1942-1944 contracts with the Government, which allegedly were "invaded" or adversely affected. *See, e.g., Tenn. Elec. Power Co.* v. *Tenn. Valley Auth.*, 306 U.S. 118, 138 (1939) (holding that a claim based on the invasion of a legal right includes "one of property [and] one arising out of contract"); *U.S. Trust Co. of N.Y.* v. *New Jersey*, 431 U.S. 19, n.16(1977) ("[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); *Cienega Gardens* v. *United States*, 331 F.3d 1319, 1328-31 (Fed. Cir. 2003) (same); *see also Kelo* v. *City of New London*, 843 A.2d 500 (Conn. 2004) (*cert. granted*, 73 USLW 3204 (U.S. Sept. 28, 2004) (No. 04-108) (to determine the limits of the "public use" requirement of the Fifth Amendment to the United States Constitution when the Government takes land).
>
> The burden on Plaintiffs is to evidence "specific facts," establishing that a recovery is "concrete" and "particularized." *See Defenders of Wildlife*, 504 U.S. at 560-61. As discussed herein, Plaintiffs have met both of these standing requirements in this case.

*Land Grantors I*, 64 Fed. Cl. at 696.[7] Defendant does not challenge the extensive factual findings upon which the court grounded its ruling nor does it offer any other reason for or new evidence upon which the court could change its mind on the standing issue.

Because it is a mere repetition of previous filings, Defendant's standing argument fails even to address the impact of the court's June 2006 Order certifying a class for the Tucker Act claims in this case. As a class action, whether class representatives may represent the interests of absent class members is not a standing issue but depends on meeting the requirements of Rule 23. *Sosna v. Iowa*,

[7] The court reiterated its decision on standing in its Order granting class certification. *Land Grantors III*, 71 Fed. Cl. 614 (2006).

419 U.S. 393, 402-03 (1975) (once standing of a class representative is established, the focus shifts to the requirements of Rule 23). So long as the prerequisites of RCFC 23 have been met, then, absent class members need not make an individual showing of standing.[8] After extensive briefing, the court has ruled that this case meets the requirements of RCFC 23 and has certified a class. That ruling is not the subject of Defendant's current motion.

Defendant does not even address the standing of individual class representatives. Rather, Defendant makes the blanket rhetorical argument that descendants of original owners do not have standing.[9] The United States cites no cases, however, that would stand for such a blanket proposition. Those descendants who are the class representatives in this case have suffered an injury in their own right. But for the mutual mistake regarding the extent of the minerals underlying the land taken by the United States, the original owners would have received substantially more money for their lands. That money would have

---

[8] Requiring class members to satisfy standing requirements is antithetical to the purposes of the class action rules, which provide protection even for those individuals who know nothing about the lawsuit. *See American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 552 (1974) ("Rule 23 is not designed to afford class representation only to those who are active participants in or even aware of the proceedings. …"). *See generally* 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* §§ 2.5- 2.8 (4th ed. 2002).

[9] Defendant's argument, based on privity, overstates the law in the Federal Circuit, where the court has granted standing under implied contract and derivative theories. *See Maher v. United States*, 314 F.3d 600, 603 n.1 (Fed. Circ. 2002); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1293 (Fed. Cir. 1999) (approving shareholder derivative standing).

inured to the benefit of the owners' heirs. This court has found that Defendant must provide monetary restitution to remedy this mutual mistake, to be shared by the owners and descendants of Camp Breckinridge lands. "Monetary harm is a classic form of injury-in-fact (citation omitted). Indeed, it is often assumed without discussion." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 292 (3d Cir. 2005); *see also Webb v. City of Dallas, Tex.*, 314 F. 3d 787, 791 (5th Cir. 2002) (standing present even though plaintiffs were not direct descendants of named beneficiaries). This actual injury gives the class representatives standing in their own right, compelling rejection of the Defendants' rhetoric.

Defendant argues that this monetary injury is speculative, but its argument goes to the ultimate proof in the case, not to standing. *See Webb*, 314 F.3d at 791 (the [plaintiffs] may ultimately fail to prove ownership or any property interest, but they have suffered injury-in-fact). Certainly, Defendant cites no cases where a court has denied *standing* under similar circumstances. Any "identifiable trifle" is enough to establish standing. *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973) ("As Professor Davis has put it: 'The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.'"). As this Court has found, much more than a trifle of an injury is present here.

In addition, the injury-in-fact suffered by the class representatives gives them a "sufficiently concrete interest" in the outcome of this case to represent the

interests of their ancestors who owned the land. *See Powers v. Ohio*, 499 U.S. 400, 410-411 (1991). In *Powers*, the Supreme Court "recognized the right of litigants to bring actions on behalf of third parties." The Court found three criteria for third party standing from its prior decisions:

> The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Id.*

Defendant recognizes that third-party standing could apply, but argues that the requirements are not met here. The "close relation" criteria, however, certainly is met by these class representatives, who (as individual litigants rather than class representatives) are representing the interests of their own ancestors who owned the land taken by the United States. *See Breyer v. Meissner*, 214 F.3d 416, 423 (3d Cir. 2000) (for third party standing, the closeness of a mother/son relationship is obvious). And, as the Defendant points out, virtually all original owners are deceased, a clear hindrance for them in prosecuting their own claims. *See id.* at 416 (the mother's death "most definitely constitutes a hindrance to her assertion of her own rights").

Defendant argues that the original owners could have brought claims while they were still living, but this argument inexplicably mixes its standing argument with its limitations arguments and ignores the requirement that standing be

assessed at the time of the complaint." Article III standing, like other bases of jurisdiction, must be present at the inception of the lawsuit." *Media Technologies Licensing, LLC v. The Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 570 n.5 (1992) (plurality opinion) ("[S]tanding is to be determined as of the commencement of suit.")).[10]

The Defendant also posits that the fact that some owners leased their mineral rights to others precludes standing, making the nonsensical assertion that: "Plaintiffs lack standing to raise any complaint about the amounts the United States paid the third parties for their mineral interests. The court should, therefore, dismiss any Plaintiff whose claim relates to a tract where the former landowner had entered into a mineral lease prior to the government's acquisition." Def.'s Mem. 16. The argument that Plaintiffs lack injury-in-fact because there were leases on some properties is demonstrably false. Plaintiffs are not complaining about the amounts the United States paid to lessees for their leasehold interests, as Defendant asserts. Plaintiffs' claims rest on the fact that Defendant unjustly benefited by the mutual mistake of the parties regarding the extent of the minerals underlying their lands.

---

[10] Defendant cites *Miller v. Albright*, 523 U.S. 420 (1998) as stating a presumption against third party standing. In that case, however, the Court recognized the standing of a daughter to litigate the rights of her father, thereby supporting Plaintiffs', not Defendant's, argument. *Id.* at 433 (finding it proper to evaluate the discrimination against the father as well as the daughter even though the father was no longer a party).

As this Court found, one way in which Defendant was unjustly enriched by the parties' mutual mistake was in the royalties it has received on property where it leased the mineral interests to third parties. The injury to the Plaintiffs, as lessees, is the mirror image of the unjust royalty benefits captured by the United States after it condemned their lands. *See Land Grantors*, 64 Fed. Cl. at 707 (identifying, in part, the financial benefits to the government from its oil leases on Camp Breckinridge lands).

**VI. The Statute of Limitations Is Equitably Tolled in this Case.**

**A. Equitable Tolling Applies to the Tucker Act .**

The en banc decision in *Kirkendall v. Dep't of the Army*, 412 F.3d 1273 (Fed. Cir. 2005) (*en banc*), *cert. denied*, *Dep't of Army v. Kirkendall*, 128 S.Ct. 375 (2007), provides every reason for this Court to finalize its findings and conclusions on equitable estoppel. Indeed, Plaintiffs believe that the United States Supreme Court has resolved whether the doctrine of equitable tolling applies to claims brought under 28 U.S.C. Section 2501. In *Irwin v. Department of Veteran Affairs,* 498 U.S. 89 (1990), the seminal equitable tolling case, deals with a limitations statute that is most closely analogous to the limitations statute applicable to Tucker Act claims. *Irwin* disposes of the legal question whether equitable estoppel applies to Tucker Act claims.

First, the *Irwin* opinion appears to have "directly overruled" *Soriano v. United States*, 352 U.S. 270, 275–76 (1957), a case in which the Supreme Court held equitable tolling inapplicable to Tucker Act claims. The *Irwin* Court concluded

that the language in the Tucker Act was not so different from the language in Title VII as to "manifest a different congressional intent with respect to the availability of equitable tolling." *Irwin*, 498 U.S. at 95; *id*. at 98 (White, J. concurring in part and concurring in the judgment) (*Irwin* "directly overrules" *Soriano*). Thus, *Irwin* itself quite strongly indicates that equitable tolling is available under the Tucker Act. The *Irwin* Court observed, "[t]ime requirements in lawsuits between private litigants are ordinarily subject to equitable tolling . . . ." *Irwin*, 498 U.S. at 95.

"[W]e believe the Court meant simply that it is reasonable to presume the Congress, unless it said otherwise, expected Defendant to face equitable tolling in litigation because equitable tolling is a traditional feature of the procedural landscape." *Chung v. Dep't of Justice*, 333 F.3d 273, 276 (D.C. Cir. 2003). The *Chung* Court looked further at the Supreme Court's decision in *Brockamp*, in which the court assumed, "'for argument's sake, that a tax refund suit and a private suit for restitution are sufficiently similar to warrant' the presumption [of equitable tolling] in the first place." The *Chung* Court concluded, "[t]he 'similarity' inquiry of *Brockamp*, however, must be conduced at a fairly high level of generality, if we are not to undermine the Court's goal in *Irwin* of simplifying the equitable tolling issue . . . ." *Id*. at 277.

Second, 28 U.S.C. Section 2501, the general Tucker Act limitations statute, has more in common with the Title VII limitations statute than with the "unusually emphatic" language in the tax statute at issue in *United States v. Brockamp*, 519 U.S. 347 (1997), or the "unusually generous" limitations period

under the Quiet Title Act at issue in *United States v. Beggerly*, 524 U.S. 38 (1998). Section 2501 is neither unusually emphatic nor unusually generous. Further, claims under the Tucker Act are, by definition, claims for money judgments. While the Federal Circuit has not finally decided whether equitable tolling is available for Tucker Act claims, the Federal Circuit has opined that "[a]ctions under § 2501 are, by definition for money damages and thus have much in common with ordinary actions at law between private parties." *Martinez v. United States*, 333 F.3d 1295, 1318 (Fed. Cir. 2003).

Section 2501 does contain its own tolling provision, which, under *Irwin*, might counsel against a finding that equitable tolling should apply. But that customary provision, which tolls claims for persons "under a legal disability or beyond the seas at the time the claim accrues[,]" 28 U.S.C. § 2501 (West 2007), is similar to state statutes of limitation, *see*, *e.g.*, Ky. Rev. Stat. Ann. § 413.170 (West 2007), to which equitable tolling also applies, *see* Ky. Rev. Stat. Ann. § 413.190 (West 2007). *Irwin* counsels that equitable tolling applies to Tucker Act claims.

### B. Defendant's Argument that Equitable Tolling Does Not Apply to Mutual Mistake Claims Should Be Rejected

Defendant argues that equitable tolling does not apply to mutual mistake claims under the Tucker Act. The argument should be rejected for two reasons. First, no court has held that equitable tolling applies to some kinds of claims under a given statute but not to other kinds of claims under the same statute. The very idea runs directly counter to the Supreme Court's efforts to simplify and

generalize the application of equitable tolling in cases against the United States. Defendant's argument that equitable tolling is unavailable because the Plaintiffs' contract claim is actually one for mutual mistake simply makes no sense.

Second, the cases cited by Defendant do not support the assertion that equitable tolling is inapplicable to mutual mistake claims. Defendant cites *Paine Webber Real Estate Sec., Inc. v. D.G. Meyer & Co.*, 835 F. Supp. 116 (S.D.N.Y. 1993) as standing for the proposition that under federal law, a mutual mistake claim can only equitably tolled until "discovery." In actuality, the *Paine Webber* court was merely reciting the arguments of the plaintiff; the court made no ruling on the question. In any event, the statement in the case confuses settled federal equitable tolling law, which this Court recognized in its Interim Report:

> Equitable tolling is frequently confused both with fraudulent concealment on the one hand and with the discovery rule – governing, as we have seen, accrual – on the other hand. . . . [Equitable tolling] differs from [the discovery rule] in that the plaintiff is assumed to know that he has been injured, so that the statute of limitations has begun to run; but he cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant.

*Land Grantors I*, 64 Fed. Cl. at 711 (quoting *Cada v. Baxter Healthcare Corp*. 920 F.2d 446, 451 (7th Cir. 1990)). Defendant does not take issue with this clear statement of equitable tolling principles. Thus, the discovery accrual rule has no bearing on the application of equitable tolling in this case, except to the extent the discovery rule determines when the claims accrued. *See Cada v. Baxter Healthcare Corp*. 920 F.2d 446, 451 (7th Cir. 1990) (distinguishing between accrual rule and equitable tolling).

*Krahmer v. Christies, Inc.*, 903 A.2d 773, 778-79 (Del. Ch. 2006), upon which Defendant also relies, has nothing to do with a mutual mistake claim. Rather, the case applies Delaware state tolling principles to a negligent misrepresentation claim.

Likewise, Defendant's footnoted citations provide no support for its argument that equitable tolling should not apply to cases under the Tucker Act involving mutual mistake. Those cases deal with whether, given the jurisdiction, the discovery rule delays accrual of a cause of action. With one exception, the cases do not even mention equitable tolling and in the exception, *Firestone & Parson Inc. v. Union League of Philadelphia*, 672 F. Supp. 819 (E.D. Pa. 1987), the court assumed that equitable tolling was available but rejected the application of the doctrine on the facts presented. *Id*. at 821 ("The time limit for filing suit is not extended by reasons of the adversary's refusal to agree that the claim in valid").

**C. The Evidence Fully Supports Equitable Tolling.**

Defendant maintains that equitable tolling is to be applied sparingly, ignoring this Court's repeated conclusion that this case presents unique and extreme circumstances. The equities are overwhelming, so the Defendant's criticisms of the court's thorough analysis of the equitable tolling issue ring hollow. For example, Defendant disagrees with the court's factual finding that the Breckinridge Land Committee was formed about 1968, arguing that the evidence supports the conclusion that the group was not formed in 1978. To the contrary, Ruby Higginson testified that in the 1960s the group *changed its name* from the Tri-

County Land Committee to the Breckinridge Land Committee.[11] *See* Ruby Higginson Dep. 330 (excerpts filed Jan. 24, 2005). The testimony of Mildred Watson confirms this. *See* Mildred Watson Dep. 9-10 (excerpts filed Feb. 14, 2005).

Defendant also argues that the efforts of the Breckinridge Land Committee and some of its individual members to seek redress for the unjust enrichment enjoyed by the United States are insufficient to justify equitable tolling. Additionally, Defendant argues that the court must assess the application of equitable tolling to each Plaintiff individually. The first argument ignores the facts as this Court has found them. The second ignores the court's class certification ruling.

Defendant cites cases where courts have found on the facts presented, including letters to government officials, that equitable tolling did not save the plaintiff's claims. Those cases stand on their facts. In this case, the court thoughtfully examined the evidence and determined that "under the unique and *sui generis* facts of this case [equitable tolling] stays the statutes of limitations 'where the interest of justice require vindication of the plaintiff's rights.'" *Land Grantors*, 64 Fed. Cl. at 713 (quoting *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 428 (1965)).

The evidence fully supports the court's conclusions. As Defendant recognizes, Plaintiffs' claims did not accrue until 1967. Def.'s Mem. 27. Under

---

[11] Defendant asserts that Ruby Higginson is a "descendant of Cyrus Higginson." Def.'s Mem. 29. That assertion is unsupported by the record and is false.

*American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974), the statute of limitations was tolled until the Supreme Court denied *certiorari* in 1968. *Id.* at 558-59. From that point, the evidence at trial established that the Breckinridge Land Committee, acting largely through Ruby Higginson, turned to the other branches of the United States government to redress their grievances. Those efforts began as early as 1969, CX 10, 13, 14, 15, and continued up until the point that the Kentucky congressional delegation introduced the first bill for relief in the United States Senate, CX 11, 12, 7, 19, 20, 22, 23, 24, 25, 26, 27, 34, 40, 42, 43, 44, 50, 52, 53, 63. In this long line of correspondence, representatives of the executive, legislative, and judicial branches of the United States government either pointed fingers at other government branches or told the landowners that they simply had no recourse.

None of the cases cited by Defendant establish this unbroken chain of diligence.[12] This evidence, coupled with the evidence supporting the court's conclusion that "the Government at various times provided information that was dissembly, misleading or incomplete," *Land Grantors I*, 64 Fed. Cl. at 711, fully supports the court's application of equitable tolling to the facts established by the voluminous record, as set forth by the court in its Interim Report.

Defendant's argument that equitable tolling must be assessed individually is in essence an attack on the court's class certification Order. *Land Grantors III*, 71

[12] In *Drew v. Dep't of Corrections*, 297 F.3d 1278, 1287-88 (11th Cir. 2002), *cert. denied*, 537 U.S. 1237 (2003), for example, the court found that the plaintiff could not establish facts sufficient to apply equitable tolling in part because the plaintiff could not identify the timing or substance of the inquiries.

Fed. Cl. 614 (2006). In that Order, the court expressly found — after a thorough review of the substantial body of evidence — that application of equitable tolling is a common issue. The efforts of the Breckinridge Land Committee to pursue the claims of the landowners with all branches of the United States government was uncontroverted at trial. The court's decisions both on the merits of the Plaintiffs' claims and on the typicality of their claims were imminently correct.

## VII. As This Court Has Already Ruled, Defendant Is Not Prejudiced by Plaintiffs' Claim of Mutual Mistake

Defendant asks the court to reconsider or change its earlier ruling allowing Plaintiffs' the right to amend their complaint adding Count I, mutual mistake. As Defendant itself acknowledges, this is not a new argument: "As discussed at length in the Defendant's Post-Trial Brief (and several other pleadings made in this case), all of the historical evidence supports the government's position." Def.'s Mem. 41; *see also id.* at 42 (citing Def.'s Post-Trial Mem. at 120-28 (discussing why the doctrine of laches bars relief of the Congressional Reference claims)).

The doctrine of laches is an affirmative defense, equitable in nature, which denies relief to the plaintiff who has unreasonably or inexcusably delayed in asserting a claim. *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (*en banc*) ("neglect or delay in bringing suit to remedy an alleged wrong, which together with the lapse of time and other considerations, causes prejudice to the adverse party and operates as an equitable bar."); *Foster v.*

*United States,* 733 F.2d 88, 90 (Fed. Cir. 1984) (requiring plaintiffs to establish that the delay is unreasonable and that it caused prejudice to the defendant).

Here, following an evidentiary hearing, the court has held that evidence supports the conclusion that the doctrine of laches does not bar Plaintiffs' claims and that Defendant is not thereby prejudiced:

> For the same reason, relevant to the court's determination regarding the application of the equitable doctrine of tolling in this case, in any event the Government cannot bear the burden to establish that delay in bringing a complaint in this court was unreasonable and caused the Government any prejudice.

*Land Grantors I*, 64 Fed. Cl. at 717.

> The Government argues that laches bars any equitable claim . . . in this lawsuit. . . . Since the court has determined that Plaintiffs have a viable action in law, and are not dependent on pursuing an equitable action. As a matter of law, the doctrine of laches is not relevant.

*Id.* at 716 (citations and internal quotation marks omitted).

**VIII. As this Court Has Already Determined, the Facts Adduced at Trial Fully Support the Court's Finding of Mutual Mistake**

Defendant takes issue with the evidence cited by the court supporting the claim that there was a mutual mistake regarding the existence of minerals that would support exploration or operation. *See* Def.'s Mem. 43 ("Reformation of a written agreement on the grounds of mutual mistake is an extraordinary measure."). Cases cited by Defendant do not support the black and white proof proposition Defendant advances. Rather, the court quite properly inferred from the evidence – most of which was offered by Defendant — that neither Defendant

nor the landowners were aware at the time of the acquisition that there were minerals in sufficient quantities to support exploration and operations.

Such an inference certainly can be drawn from the fact that both the landowners and government agents *attested and swore* that there was no "exploration or operations" for the development of mineral interests. *Land Grantors I*, 64 Fed. Cl. at 74 (citing DX 541 at CHI-002-A015-0015; DX 541 at CHI-002-A015-0036).[13] Such an inference certainly can be drawn from the affidavits of the many Plaintiffs who testified that there were no wells or other mineral operations on their land when Defendant condemned it. *Land Grantors I*, 64 Fed. Cl. at 705 n.44. Additionally, the court's findings are supported by the contemporaneous new accounts reporting that "there had been little or no exploration of what was under the surface of the ground[,]" *Land Grantors I*, 64 Fed. Cl. at 704 (quoting DX 183, Ex 82), the materials collected and testimony given by historians employed by the United States to research the history of the

[13] The court determined that these documents, a vendor affidavit and a certificate of inspection and possession, evidenced the mutual mistake of the parties. *Land Grantors I*, 64 Fed Cl. at 704. The representations made in those documents carried forward and formed a basis upon which condemnation cases were settled and tried. The court defined, without limitation, the types of documents that may form a "contract" as including the option, certificate of inspection and possession, an affidavit of the vendor, a warranty deed, and a receipt. *Land Grantors I*, 64 Fed. Cl. at 703 n.38. Indeed, the body of contractual documents traverses a broad spectrum. For example, in every instance the government received a deed to Plaintiffs' properties, whether by early "voluntary" sale, transfer as the result of settlement agreements reached with the government, or after a jury decision as to the amount due to landowners. No matter the circumstance, every deed was based upon a mistaken belief as to the nature and extent of the minerals present on the lands.

area, *Land Grantors I*, 64 Fed. Cl. at 74 (citing CX 183 (direct testimony of Jay L. Brigham)), and from a local historian who has researched and studied the area for decades, *Land Grantors I*, 64 Fed. Cl. at 704 n. 41 (citing CX 271 (Peyton Heady Dep., local historian)).

Similarly, the evidence more than supports the conclusion that the landowners did not learn — had no idea — of the actual extent of the minerals under their former properties until Defendant advertised the fact — hawking "potential wealth" — at the time the parcels were sold. *Land Grantors I*, 64 Fed. Cl. at 677-78 (citing CX 244).

Defendant believes the inference should go the other way, but Defendant is not the fact-finder here. The evidence supports the court's conclusion that between 1942 and 1944, the landowners and the United States were operating under the material mistaken belief that there were not minerals beneath the acquired properties sufficient to support exploration and operations — a mistaken belief that led ultimately to the deed taken for each property. The court's findings should stand and the Defendant's motions should be denied.

## IX. The Facts Adduced at Trial Also Support the Court's Proposed Damages Award

In *Land Grantors I*, 64 Fed. Cl. 661, the court found that the Government's proceeds from its sales of minerals on the former Camp Breckinridge property constituted unjust enrichment to the Government and should be returned. The

court held that the amount of the government's unjust enrichment from these mineral sales was "at least $32,879,240." *Id.*

The government asserts that the record does not support this determination. To the extent the government is complaining about the amount, its contention is unfounded. As the court recognized, the government's own records demonstrate the amounts it received from the mineral sales. *See Land Grantors I*, 64 Fed. Cl. at 679. Indeed, the court identified numerous documents in the record that reflected the amounts the government yielded from the several sales of the minerals including the government's responses to Requests for Admissions. *Id.; see also id.* at 665, n. 4. Among the governments' records were: (1) the tabulation of the 1965 auction sale data in the October 20, 1965 GSA Form 1686 entitled "General Services Administration – Real Property Disposal Activities Central Continuation Sheet," Ex. A, Def.'s Resp. to Court's Order (Mar. 25, 2005); (2) the government's tabulation of the proceeds from the so-called Felmont and Kingwood oil and gas leases on mineral tracts 7A and 7B from their respective inceptions in 1957 and 1959 until April 30, 1964, JX 57 at DOJ 1568; (3) the government's Declaration of Linda Lautigar dated May 17, 2005, which provides the total government proceeds from the Felmont and Kingwood oil and gas leases on Mineral Tracts 7A and 7B from the period September 1983 through March 2005; and, (4) the government's Affidavit of Richard Mayhaugh dated May 17, 2005, which provides the total government proceeds from a coal lease to Peabody

Coal Company on a portion of Mineral Tract 7A for the period July 1, 1991 to June 25, 1993.

These government documents plainly support the court's determination that the amount of the government's unjust enrichment resulting from minerals sales was "at least $32,879,240." Indeed, the total amount the government reported in the four documents mentioned above is $34,303,481.59. *See* Pls.' Mot. for Leave to Respond to Court's Order (Dec. 15, 2005) & to Comprehensively Summarize Mineral Sale Proceeds. Simply stated, inasmuch as the court's determination of an amount of proceeds of mineral sales of "at least $32,879,240" is supported by the government's own records tabulating the amounts, the government has no basis to contend that the record does not support the court's determination. The government's assertions to the contrary should be rejected.

The government also states that it "does not concede that restitution is an appropriate remedy in this context." However, the government offers no legitimate reason for the court to depart from the conclusion it reached in its discussion entitled "The Remedy for Mutual Mistake in Restitution." *Land Grantors I*, 64 Fed. Cl. at 708. The court's analysis there of the remedy issue is not only fully supported by the law and facts, but also is just. The court held: "the record to date evidences that the government was unjustly enriched by at least $32,879,240 . . . ." *Id.* at 709. The government's argument now that somehow it was not "unjustly" enriched by the amount of the proceeds of the minerals sales should be rejected.

## X. Plaintiffs Are Entitled to Receive Full Restitution of the Benefit Defendant Acquired by its Wrongful Acquisition of Plaintiffs' Oil and Mineral Rights

In the Interim Report, the court ruled that Defendant must disgorge to Plaintiffs the amount it has been unjustly enriched, at least $32.8 million, representing the amount wrongfully received for sale of the mineral rights at Camp Breckinridge in the 1960's. *Land Grantors I*, 64 Fed. Cl. at 709. As previously indicated, since the Interim Report was issued, additional moneys have been discovered. *See supra*, pages 5-6.

Courts considering disgorgement claims against the United States have recognized that sovereign immunity is not a bar to such an enhancement to an award where a res is wrongfully obtained by the government, and the government has been additionally enriched by its continued possession of the res. Under such circumstances, courts have held that the "no interest rule" does not apply.

For example, in *Landmark Land Co. v. United States*, 46 Fed. Cl. 261, 266 (2000), cited approvingly by this Court on the restitution issue at 64 Fed. Cl. at 708, the government was required to pay restitution for over $20 million worth of real estate that it wrongfully required the plaintiff to contribute to a failing savings-and-loan. The plaintiff requested the court to award the value of its loss of use of this wrongfully obtained real estate. The court agreed that such an award would be appropriate: "We think it appropriate to reimburse Landmark for everything it

lost by actions of the breaching party, to the extent that those amounts can be justified according to applicable legal standards." *Id*. at 270.

On appeal, the Federal Circuit stated that there was no legal bar to a recovery of the disgorgement benefit in a restitution case: "The remedy of restitution may include compensation for lost use value where necessary to restore the plaintiff to its status quo ante by providing compensation for the use of the subject matter for the period during which [it] was deprived." *Landmark Land Co. v. Federal Deposit Insurance Corp*., 256 F.3d 1365, 1374 (Fed. Cir. 2001); *see also United States v. $515,060.42*, 152 F.3d 491, 504 (6th Cir. 1998) (concluding that when returning non interest bearing property to its owner "the seized funds should be treated as constructively earning interest at the government's alternative borrowing rate at all times until the rendering of judgment. Such amounts become part of the res, to be returned with the res to the claimants."*); United States v. $277,000 U.S. Currency*, 69 F.3d 1491, 1492 (9th Cir. 1995) (holding that the "no interest rule," does not apply when the government wrongfully obtains money, and is ordered to return it to its proper owner; the government should also be ordered to return the benefit it received from its use of the money).

These cases teach that disgorgement of the benefits of all wrongfully seized property is appropriate when (1) interest is actually earned when the money is segregated into an identifiable interest bearing account; or (2) there are saved costs of borrowing when the funds are simply deposited into the general fund of the Treasury thereby avoiding the government's usual cost of borrowing. When the

money is placed in an identified account earning interest, the cases indicate that any interest actually earned by the government must be disgorged as part of the res being returned to the owner. When the money is not placed in an identifiable account bearing identifiable interest, the courts recognize that the government nevertheless must disgorge the interest it has avoided paying on the money by not having to borrow at its usual cost to borrow.

Simply stated, courts recognize the common sense principle that money held by the government reduces the government's cost of borrowing in the amount of the interest it would have otherwise had to pay to borrow an equivalent amount in the credit markets.[14] Consequently, that benefit to the government must be returned to the owner along with the principal amount of money wrongfully obtained by the government. The Ninth Circuit explained why:

> All financial assets in the hands of the government are a means by which the government does not have to borrow equivalent funds . . . . Thus, the act of placing [the wrongfully obtained] money in any "Treasury account" represented an equivalent sum that the government was not required to borrow. This will always be the case, at least during any time there is government debt.

*United States v. $277,000*, at 1494-95.

[14] *But see Texas State Bank v. United States*, No. 04-5126, 2005 WL 2293078 (Fed. Cir. Sept. 21, 2005) (holding that the plaintiffs had no property interest cognizable under the Fifth Amendment in the interest the United States earned on mandatory reserves).

The Restatement (First) of Restitution also recognizes the growing trend toward including the value of the use of the subject matter in restitution awards:

> A person under a duty to another to make restitution of property received by him or of its value is under a duty to account for the direct product of the subject matter received while in his possession.

Restatement (First) of Restitution, § 157(1)(a). The comment to this section states: "In all cases the person entitled is fully restored to his original position only if compensation is made for the use of the subject matter for the period during which he was deprived." *Id.* at cmt. a.

In this case, Defendant has reaped great benefit for four decades from its continuous possession of the funds it wrongfully obtained from its sale of the mineral rights to the Camp Breckinridge properties in the 1960's. This Court's Interim Report properly requires disgorgement of the res from Defendant. But unless the benefit of four decades of use of those funds is also returned, Defendant will remain unjustly enriched.

Accordingly, Plaintiffs have urged and reiterate their request that this Court include an amount in its Final Judgment representing full disgorgement of the benefit to Defendant of having the res in its possession for the years involved. *See* Pls.' Mem. on Order to Show Cause (Oct. 3, 2005) (Docket No. 182) (calculations therein to be updated to the time of judgment). To do so is consistent with the basic principles of restitution and unjust enrichment, as recognized in *Landmark* and other cases.

## CONCLUSION

For all of these reasons, the court should deny Defendant's motion to dismiss, for judgment on the pleadings or on the record.

Respectfully submitted,

_s/ Nancie G. Marzulla__

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW
1350 Connecticut Avenue, N.W.
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)

Dated: December 14, 2007

Counsel for Plaintiffs

Of Counsel:

M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202-2898
(502) 589-5235
(502) 589-0309 (facsimile)